# EXHIBIT 8

Exhibit 8 Page 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

------------------------------------------------------

ARCTIC CIRCLE ENTERPRISES,  )
LLC.,                       )
      Plaintiff,            )
   vs.                      ) No. 3:-06-cv-170 (TMB)
ALASKA JUNEAU MINING        )
COMPANY LLC,                )
      Defendant.            )

------------------------------------------------------

Deposition Upon Oral Examination Of

DAVID LEE COATES

------------------------------------------------------

1201 Third Avenue, #4800, Seattle, Washington

DATE: February 5, 2007

REPORTED BY: Mindi L. Pettit, RPR, CCR #2519

SEATTLE DEPOSITION REPORTERS                    Exhibit 8 Page 2
www.seadep.com    (206)622-6661 * (800)657-1110   FAX: (206)622-6236
b9cbba1f-8de4-4deb-9f4e-f293dd0e9dfd

Page 6

1  year to come down here with my son to attend school
2  down here.
3      Q. Okay. And where is that?
4      A. In Kent.
5      Q. Okay. Are you employed, Mr. Coates?
6      A. I'm self-employed.
7      Q. And can you describe how you are
8  self-employed.
9      A. I'm a -- have ownership in approximately 15
10 different companies, retail and real estate
11 companies -- developing real estate and owning and
12 operating retail stores.
13     Q. Okay. What companies are those?
14     A. In the retail, Dockside Trading Company,
15 Ketchikan Outlet Store, Ketchikan Mining Company,
16 Inside Passage Tees, Alaska Juneau Mining Company,
17 Skagway Mining Company, Ketchikan Entertainment Center,
18 Godfather's Pizza, Omni Jewelry, Salmon Landing
19 Marketplace, Alaska Undersea Tours.
20         Probably more. I just can't think of -- if
21 you want me to sit down and write them all out, I can
22 do that.
23     Q. Well, if questions come up about some of the
24 others during the course of this and you remember
25 ownership in additional companies --

Page 7

1      A. You bet.
2      Q. -- please let me know.
3      A. Um-hum.
4         MR. McBRAYER: And I'm going to pause in my
5  questioning just for a second to put on the record that
6  I understand that the Court has not entered our
7  stipulated protective order yet, but the protective
8  order contains a provision that we agree to be bound by
9  its terms after filing but before the Court executes
10 it. So, for the purposes of today, I consider that
11 we're operating under the protective order that the
12 parties filed, stipulated to several weeks ago.
13        MR. KEYES: Sure, I agree.
14     Q. Mr. Coates, is it a fair summary that most of
15 your business interests are in the Alaska tourism
16 industry?
17     A. For a majority of them, I would say yes.
18     Q. What percentage of your personal business
19 involves specifically Alaskan souvenirs?
20     A. Say, maybe somewhere around 90 percent.
21     Q. How long has that been the case?
22     A. I'm not -- I'm not sure how long. In other
23 words, I've had other companies -- restaurants,
24 furniture business, clothing store -- things -- also,
25 so I can't tell you exactly what -- I'd have to -- it's

Page 8

1  kind of complicated. I buy one, sell one, buy one,
2  sell one, and it changes. So, you know -- you know,
3  maybe eight years or somewhere in there. Ten years,
4  eight years.
5      Q. Okay. Before your business -- were you
6  self-employed before you purchased your first business
7  associated with Alaska souvenirs?
8      A. I've been self-employed off and on most of my
9  working life. I have had a couple of instances where I
10 did work for someone else.
11     Q. When were you self-employed for the first time
12 either selling or manufacturing souvenirs for the
13 Alaskan market?
14     A. Approximately 20 years ago.
15     Q. Okay. And what company was that?
16     A. That was Schallerer's Photo.
17     Q. What -- what souvenir product did Schallerer's
18 Photo make or sell?
19     A. It didn't make any souvenirs. We sold -- we
20 sold Alaskan souvenir items -- shirts, T-shirts,
21 sweatshirts, souvenirs, coffee mugs, key chains --
22 those type of items.
23     Q. Where was Schallerer's Photo located?
24     A. In Ketchikan.
25     Q. What was your ownership interest in

Page 9

1  Schallerer's Photo?
2      A. Do you mean, what percentage?
3      Q. I -- you mentioned -- you mentioned
4  Schallerer's Photo in response to a question about
5  self-employment. I take it, you owned some
6  component --
7      A. Yeah, we owned that store. My wife and I
8  owned that store.
9      Q. Were you the sole owners of Schallerer's
10 Photo?
11     A. Yes.
12     Q. How long did Schallerer's Photo operate under
13 your ownership?
14     A. Under our ownership, you know, I'm not sure
15 about that, but I -- I don't know for sure -- maybe ten
16 years. We sold half of it to a -- a manager at one
17 point, and he operated it, where we still owned part of
18 it. But later we sold the -- the rest of it.
19     Q. Since you owned Schallerer's Photo, was -- has
20 there been a time in your working life when you haven't
21 owned an interest in a company that makes or sells
22 Alaska souvenirs?
23     A. No.
24     Q. It's accurate to say that you've been
25 self-employed as a business owner in the Alaska

Page 10

1  souvenirs market consecutively for the last 20 years?
2      A. Yes.
3      Q. What is your ownership interest, if any, in
4  Alaska Juneau Mining Company?
5      A. Own 25 percent.
6      Q. Please describe the remaining ownership
7  percentages for Alaska Juneau Mining Company.
8      A. 25 percent belongs to Neil and Toni Murphy, 25
9  percent belongs to Doug Trucano, and 25 percent belongs
10 to Gary and Mita Jethani, J-e-t-h-a-n-i.
11     Q. Do you have any responsibilities for the
12 operation of Alaska Juneau Mining Company?
13     A. I just help to oversee the -- the company.
14 Toni Murphy is the manager and runs the day to day, and
15 on occasions, we confer on things.
16     Q. Are you responsible for the day-to-day
17 operation of the store?
18     A. Am I?
19     Q. Correct.
20     A. No.
21     Q. Are you responsible for the financial
22 reporting or accounting operations of the company?
23     A. I'm not directly responsible, but I do have
24 contact with the person that does.
25     Q. Who is responsible for the financial and

Page 11

1  reporting and accounting operations of the company?
2      A. Yeah, we -- we have Lupi Thompson.
3      Q. Is Lupi Thompson a woman?
4      A. Yes.
5      Q. Is she an employee of Alaska Juneau Mining
6  Company?
7      A. Yes.
8      Q. What are her duties?
9      A. She basically pays bills, does payroll, does
10 the financials.
11     Q. Is Ms. Thompson an accountant?
12     A. I -- I don't know -- when you say "an
13 accountant." In other words, does she have a degree?
14 I don't know if she has a degree or not. She's worked
15 for us for, you know, I'm sure, ten years or -- or
16 longer doing these things. She does them for several
17 companies for us. I don't know if -- you say "an
18 accountant." You know, I would classify her as an
19 accountant, but I don't know if she has a degree in
20 accounting.
21     Q. Are you responsible for inventory tracking
22 operations at Alaska Juneau Mining Company?
23     A. I'm not responsible. Toni is responsible.
24 She is the manager.
25     Q. Do you order product for Alaska Juneau Mining

Page 12

1  Company?
2      A. On occasion.
3      Q. When have you ordered product for Alaska
4  Juneau Mining Company?
5      A. Well, every year I've ordered something, but I
6  don't order all the items. Just a few items here and
7  there. A few companies that I work with.
8      Q. How do you determine on what occasions you
9  will order product -- product for Alaska Juneau Mining
10 Company?
11     A. We have a couple of vendors that we -- by
12 ordering many stores together, we can get better
13 pricing. And those are some of our larger vendors, and
14 I oversee -- I try to oversee some of those.
15     Q. And what vendors are those?
16     A. Let's see, right -- right now, there is one
17 called JC Marketing, Dutch Harbor Gear, and Hayes
18 Specialties, and sometimes Greatland Classics.
19     Q. If Alaska Juneau Mining Company orders
20 products from a company other than the -- other than
21 the four you just listed, who is responsible for
22 ordering?
23     A. Toni Murphy.
24     Q. And for orders from JC Marketing, Dutch Harbor
25 Gear, Hayes Specialties, and Greatland, you are

Page 13

1  responsible for ordering?
2      A. Well, generally in those cases, Toni would
3  decide what she was going to buy and the quantities of
4  those items. And then she would give them to me, and I
5  would put them on a spreadsheet along with other stores
6  and incorporate them into a single order.
7      Q. For Alaska Juneau Mining Company, who
8  typically makes the decision to order any specific
9  product?
10     A. Toni Murphy.
11     Q. Have you ever suggested to Ms. Murphy that she
12 should order a specific product from JC Marketing,
13 Dutch Harbor Gear, Hayes Specialties, or Greatland?
14     A. I -- probably. Sure. But very seldom.
15     Q. Regarding Alaska Juneau Mining Company's sales
16 of the Alaska map photo album at issue in this case,
17 did you suggest to Ms. Murphy that she should order
18 that item from Hayes Specialties?
19     A. I don't know that I suggested that she order
20 it, but probably more let her know that that item was
21 available, similar to all the other items that were
22 available from Hayes Specialties, and then she had the
23 option to order that, if she wished to.
24     Q. When did Hayes Specialties, to your knowledge,
25 first offer the Alaska map photo album?

Page 14

1   A. I do believe it was for the 2006 season.
2   Q. And for -- if Hayes Specialties offered an
3   item for the 2006 season, what month would that product
4   have been -- month or months would that product have
5   been available?
6   A. I -- I don't know the exact month. I'm
7   guessing that in the fall of 2005, as we start to
8   prepare for the next year's season, that we had given
9   them our artwork for that item and asked them to make
10  us up a sample.
11  Q. Who gave Hayes Specialties artwork for the
12  Alaska Juneau Mining Company --
13  A. I did.
14  Q. -- photo album?
15      How did you provide that artwork?
16  A. It was in the form of a drawing that was done
17  by an artist -- I do believe that's it on the table
18  there, a black and white copy -- the artist James
19  Knutson -- or Jeff Knutson, excuse me, who did that
20  drawing for Gift Connections, I do believe, in the year
21  1999.
22  Q. When did you provide -- well, let me back up,
23  and I'll hand you what's been marked as Exhibit-30.
24      Do you recognize Exhibit-30, Mr. Coates?
25  A. Yes.

Page 15

1   Q. What is Exhibit-30?
2   A. Not in the black and white form, but in the
3   color form, I'm more familiar with it.
4   Q. Okay. What is Exhibit-30?
5   A. That's the black and white copy of the artwork
6   of the photo album, the Alaska map photo album.
7   Q. That you provided to Hayes Specialties?
8   A. Yes, that's correct.
9   Q. When did you provide that artwork to -- in
10  Exhibit-30 to Hayes Specialties?
11  A. I -- I don't know exactly, but as I said,
12  probably -- I mean, it was probably in the fall of
13  2005.
14  Q. How did you transmit that artwork to Hayes
15  Specialties?
16  A. I do believe I faxed him a color copy -- faxed
17  or e-mailed. I'm not sure if I scanned it and e-mailed
18  it to him or faxed it, but one way or the other.
19  Q. What did you say to Hayes Specialties when you
20  provided the artwork in Exhibit-30?
21  A. That that was artwork that we purchased from
22  Gift Connections when they went out of business and I
23  would like him to put that exact artwork on a photo
24  album for us.
25  Q. Did you communicate anything else to Hayes

Page 16

1   Specialties when you transmitted Exhibit-30 to them?
2   A. I could have, but I don't recall what it would
3   be.
4   Q. Before you transmitted Exhibit-30 to Hayes
5   Specialties, did you have any conversations with Hayes
6   Specialties about photo albums?
7   A. I -- again, I could have. I don't recall what
8   they would have been. I'm sure I asked him, you know,
9   if they manufactured photo albums. I could have asked
10  him that. And I don't know if I asked him or if I just
11  knew that they did by visiting one of their booths
12  in -- in Gatlinburg, Tennessee, where they -- where
13  their company exhibits their products.
14  Q. Did you suggest to Hayes Specialties when you
15  transmitted Exhibit-30 that you wanted a particular
16  price for the item?
17  A. No, I did not.
18  Q. Did Hayes Specialties give you a return
19  communication of any kind?
20  A. They ended up sending us a sample, and they --
21  they sent us a sample -- I guess maybe some art
22  drawings or -- and then eventually a sample.
23  Q. Before they sent a sample to you, did Hayes
24  communicate -- Hayes Specialties communicate with you
25  at all about the proposed photo album?

Page 17

1   A. I'm sure that they did. They've sent some
2   e-mails, you know, basically showing pictures of the
3   photo album and -- and probably talking about price at
4   that point.
5   Q. Other than an e-mail that contained or might
6   have contained photographs of the album, did Hayes
7   Specialties communicate with you at all about the
8   proposed photo album?
9   A. You mean, like on the telephone?
10  Q. Yeah. Did they -- did they call you?
11  A. I -- I talked to the person that we worked
12  with at Hayes Specialties, you know, probably, you
13  know, once or twice a month. You know, he calls me to
14  see how I'm doing. And we do other items with them as
15  well, so --
16  Q. Who is that?
17  A. His name is Jim Hayes, Jr.
18  Q. Do you recall any phone conversations with Jim
19  Hayes, Jr., about the proposed Alaska map photo album?
20  A. No particular phone conversations. Again,
21  we -- we talked -- you know, we talked fairly often.
22  He made a sales trip to Alaska. We fished with him and
23  got to be on a casual conversation. We talked just to
24  talk sometimes, but -- but nothing that stands out.
25  There was no special -- again, just one of many items

Page 18

1   that they were doing for us and didn't dwell on that
2   item.
3       Q. Do you remember any phone conversations with
4   Mr. Hayes about the Alaska map photo album?
5       A. I don't recall any specific conversations.
6   The conversation regarding to that would generally be,
7   "We've got a sample coming," or "We've got the
8   artwork," you know, "coming back," or the order will be
9   shipped on this type of a date. Those would be the
10  only types of conversations, but I don't recall any of
11  those specific dates or exact conversations.
12          They weren't just about that one item. In
13  other words, we talked about lots of items. So I
14  wouldn't dwell -- I -- I wouldn't have been dwelling on
15  that conversation -- on any of those at that time.
16      Q. You mentioned -- or you testified a little bit
17  ago that you had purchased this artwork from Gift
18  Connections, and I wanted to discuss that in a little
19  bit more detail. Did any companies or -- that you have
20  an ownership interest in or you personally purchase an
21  interest in artwork from Gift Connections, Inc.?
22      A. Yes, I did personally.
23      Q. Can you describe that purchase for me.
24      A. Steve Hogberg, who now works for Dutch Harbor
25  Gear, called me on the telephone when I was in

Page 19

1   Ketchikan, and he worked for this company, Gift
2   Connections, at that time. He was their sales rep.
3   And he informed me that Mitchell Godfred from Arctic
4   Circle had been trying to buy the remaining inventory
5   from this company and their rights to their artwork.
6          He let me know that the negotiations had
7   stopped; that they didn't -- weren't making progress,
8   but Mitchell offered $10,000 to purchase the artwork,
9   the trademarks and copyrights of the company, and the
10  owner of the company would have preferred that Mitchell
11  Godfred didn't get those -- that artwork. And they
12  asked me if I would be interested in purchasing it for
13  the same price. And I said sure, but I really wasn't
14  in the manufacturing business.
15         I asked Steve if he would be interested in
16  buying it with me, and he said yes. And so we paid
17  $10,000. He paid 5,000 -- I don't know in what form
18  that he paid -- in other words, if he wrote them a
19  check or if it was deducted off of commissions they
20  owed him. I'm not sure. And then my 5,000 was $2,500
21  from me personally and $2,500 from Kathy Fleenor, who
22  is my partner at Dockside. We -- excuse me -- split
23  the cost of the $5,000 of the purchase of the artwork.
24      Q. When was the purchase conducted?
25      A. Oh, I -- I can't tell you. I'm -- I -- I can

Page 20

1   look, if you -- you should have copies of the -- of the
2   purchase agreement, but I don't know. 2002? I'm
3   guessing. And those letters were all submitted, and
4   I'm sure that you have them or Mike has them.
5       Q. Other than letters that may have been
6   transmitted that are of, say, a paragraph each --
7       A. Um-hum.
8       Q. -- is there any sales agreement associated
9   with the purchase of that artwork?
10      A. The -- what I perceived as the purchase
11  agreement was the -- whatever it was, a paragraph or
12  whatever from -- I think the fellow's name was Chris
13  White who owned -- his family owned the company at that
14  time. They wrote us a letter giving them -- giving us
15  the rights to this -- to this artwork since they were
16  getting out of that business and no longer had any need
17  for that artwork.
18      Q. Since the purchase, have you transferred your
19  interest to any person or entity?
20      A. I licensed, at a point, Sandy Roth to be able
21  to use that artwork to -- to do -- to -- to manufacture
22  some of those items for us.
23      Q. Have you assigned or licensed any rights you
24  purchased in that Gift Connections portfolio other than
25  licensing Ms. Roth?

Page 21

1       A. No.
2       Q. To your knowledge, has Ms. Fleenor licensed or
3   assigned any rights from the Gift Connections portfolio
4   since their purchase?
5       A. Not that I know of.
6       Q. Since Mr. Hogberg purchased the Gift
7   Connections rights, to your knowledge, has he assigned
8   or licensed them to any person or entity?
9       A. I do not know that.
10      Q. Do you own -- let me back up. I want to
11  explore the nature of your ownership of these rights.
12          Do you own the rights personally?
13      A. Yes.
14      Q. You don't hold them in an IP ownership,
15  L.L.C., or corporation --
16      A. No.
17      Q. -- or entity of any kind?
18      A. No.
19      Q. Is your interest at 25 percent undivided
20  interest?
21      A. I -- I don't know the -- I don't know. I
22  don't know how that works. I -- I know that Kathy and
23  I are partners and we purchased 50 percent of -- we
24  paid 50 percent of the price. We paid 50 percent of
25  the price to be able to use any of the artwork that we

### Page 26

1  Liu mentions a revised photo album design.
2     A. Um-hum.
3     Q. Did Hayes Specialties revise the design you
4  provided to them in Exhibit-30?
5     A. What I -- what I do believe is we sent them a
6  sample and were -- and there is a sample sitting on the
7  desk, but I do believe the -- the letters or the word
8  "Alaska" was not as dark as we wanted them, and we
9  asked them to darken that word. And that is the
10 revision that they're referring to.
11    Q. When did you send Hayes Specialties a sample
12 of the Alaska map album?
13    A. I -- I do not know. I -- as I told you, I --
14 I do believe it was in the fall of 2005.
15    Q. Okay. Earlier you testified sending Hayes
16 Specialties, via fax or e-mail, the artwork. Did you
17 also send them at that time a sample of the photo
18 album?
19    A. I -- I don't recall at this time what I --
20 I -- I'm sure I sent them a -- the actual artwork. You
21 know, I'm positive now that I didn't send them a sample
22 because I didn't have a sample. They were all gone.
23 And that's why I looked for the artwork from Jim
24 Knutson -- Jeff Knutson, so I could have that artwork
25 for them to use, because I did not have any of those

### Page 27

1  samples in my possession. All of our previous stock
2  had already been sold. And I'm -- I'm very sure of
3  that, but I can't absolutely swear to that, but that's
4  the best of my recollection.
5     Q. When you say that your previous stock of that
6  item had been sold, did Alaska Juneau Mining Company
7  have previous stock of a photo album based on the Gift
8  Connections artwork?
9     A. There was the Gift Connections products that
10 were sold to us from Gift Connections. We -- we had
11 purchased those, not through Alaska Juneau Mining
12 Company, because that store has only been in existence
13 for, I do believe, three years. But we purchased that
14 photo album from Gift Connections back into, say, the
15 year 2000. She would not have had any of those samples
16 from Gift Connections, because that was such a long
17 time ago. I do believe they would have been -- all
18 been gone.
19       Any samples that we could have had might have
20 been ones that Sandy Roth had done for us through her
21 company, Tandem. And, again, I don't recall if we had
22 any of that item left. I -- I don't believe that we
23 had any samples. It was a good seller, and I think
24 that we had sold through them. But, again, I don't
25 know that for a fact, but I think that's the case.

### Page 28

1     Q. Did you send a Tandem Imports manufactured
2  Alaska map album to Hayes Specialties?
3     A. You know, I don't know if I -- if I did or
4  not. You know, I could have, and I may not have. I
5  just don't recall. And, again, to the best of my
6  recollection, I did not have a current sample; that we
7  may have been sold out. And I may have -- that --
8  that's why I was looking for the artwork. But, again,
9  I just -- I just don't recall.
10    Q. In the Gift Connections artwork depicted in
11 Exhibit-30, the word "Alaska" is in black. Is that
12 correct?
13    A. I -- I -- I can't tell you. On this page, it
14 looks black because it's black and white, but I can't
15 tell you -- I just cannot tell you. You guys should
16 have that original sample -- or the original copy, I
17 would assume, because I did get that to -- you know, to
18 the attorneys, but I don't -- I can't tell you.
19    Q. This -- the -- the darkening -- turning again
20 to Exhibit-37 -- that Ms. Liu refers to?
21    A. Right.
22    Q. Did you instruct the letters to be darkened?
23    A. I don't know that I did. It says here, "When
24 I sent Cheri the sample" -- Cheri works for us. It
25 says, She did approve the color of the album, however,

### Page 29

1  she did want to darken the Alaska letters on the front
2  and back. Attached is what they came up with.
3        So, obviously, it sounds like that Cheri,
4  Kathy Fleenor's daughter, instructed them to darken the
5  letters so it would stand out better.
6     Q. Before -- well, let me -- in the e-mail that
7  starts on the bottom of page 1 of Exhibit-37, that was
8  sent on January 5th, 2006, to you from -- I take it
9  that's Jim Hayes.
10    A. Yes.
11    Q. To your knowledge, had Mr. Hayes produced,
12 sometime before January 5th, 2006, a sample of the
13 album you wanted and sent it to Cheri Fleenor?
14    A. I -- I do not know. I do not know if they
15 produced a sample and sent it to her or sent her an
16 e-mail with the -- with the color pictures. I -- I
17 can't tell you what she actually -- what they did. I
18 don't know that.
19    Q. At the top of page 2 of Exhibit-37, Mr. Hayes
20 describes sending Cheri the sample. Do you see that?
21    A. I'm trying to . . . Yes. So apparently they
22 did then, according to this.
23    Q. Mr. -- in your dealings with Mr. Hayes, he
24 would not have described sending a, quote, sample,
25 unquote, if he had just sent a picture of some sort.

Page 46

1  definitely before then?
2      A. No, I'm sure it was before then.
3      Q. Okay. So it was either the 2001 or 2002
4  season?
5      A. Yeah, I'm thinking maybe 2001, because Sandy
6  Roth -- well, let's see. When we bought that
7  artwork -- there should be something on that letterhead
8  of the date that we purchased the artwork. And that
9  would be right around the very end of their -- their
10 existence. I mean, it could have been --
11     Q. Your purchase of the Gift Connections
12 inventory was in the same year -- about the same time
13 as you purchased the artwork?
14     A. Pretty sure. More or less.
15     Q. Okay.
16     A. I mean, it was right about the end. Plus they
17 had a lot of inventory in China that was manufactured
18 that they couldn't pay for, they were going out of
19 business, and I bought that also.
20     Q. When you say you bought that, did you
21 personally buy it or --
22     A. I would have made a deal for my stores, you
23 know. But I made a personal deal with the -- with the
24 company. I said, "Go out and buy that." And then I
25 got with my managers, and everybody picked out what

Page 47

1  they wanted, and we distributed the inventory between
2  the stores.
3      Q. So one of your stores at the time purchased
4  the inventory, and you distributed it throughout --
5      A. Yes.
6      Q. -- the stores?
7      Did that inventory include some number of
8  photo albums manufactured by Gift Connections under the
9  design depicted in Exhibit-30?
10     A. I -- I can't tell you that. I do not -- I do
11 not recall that, if it did. It was basically
12 everything that they had left in their warehouse at
13 that time. But I don't recall the -- I don't recall
14 that photo album, if it was or was not.
15     In other words, it was such a good selling
16 item, that my intuition would be probably it wouldn't
17 have been in there, because it probably would have
18 already been gone. When a company goes out of
19 business, they -- all the good stuff is slowly gone,
20 and then pretty soon they're only left with the bad
21 stuff. And -- and they don't have the money to replace
22 the good stuff. So that's kind of the way -- when
23 companies go out of business, that's what happens a
24 lot.
25     Q. Too much inventory of unpopular items?

Page 48

1      A. That stuff. An 80-20 rule. 80 percent of
2  your inventory is what sells 20 percent of your sales,
3  and 80 percent of your sales is in 20 percent of your
4  inventory. And people get confused, and they don't pay
5  attention, and they get skewed, and then they go broke.
6      Q. After Gift Connections went out of business,
7  you mentioned Ms. Roth started manufacturing the photo
8  albums. Did she start making the same photo albums
9  that Gift Connections had made?
10     A. I don't recall specifically. In other
11 words -- but I -- I think so. I -- I think that she
12 was -- but it could have changed a little bit. I know
13 that Arctic Circle sued her for doing whatever photo
14 album that was, but I can't get into the exact
15 specifics -- did she change the design, was it exactly
16 the same or not -- because I just don't recall.
17     Q. But, I mean, that -- my question was: Did,
18 after Gift Connections went out of business, Sandy Roth
19 start manufacturing an Alaska map photo album with an
20 embossed Alaska map and symbols of Alaska on the cover?
21     A. Yes.
22     Q. You mentioned that Ms. Roth and Arctic Circle
23 had a lawsuit that involved those albums. What do you
24 recall about that lawsuit?
25     A. I just recall that they sued her for a number

Page 49

1  of items and then they eventually settled the lawsuit.
2      Q. You mentioned the lawsuit in the context of
3  your answer regarding the photo album. You do remember
4  that the album that -- or that lawsuit between Arctic
5  Circle and Ms. Roth, to some degree, involved that
6  photo album?
7      A. I do believe so. Maybe not this exact one,
8  but the version that -- the original version that -- I
9  think according to this artwork.
10     Q. Okay. You understand that the lawsuit between
11 Arctic Circle and Ms. Roth involved a dispute over, at
12 least in some part, the -- her manufacturing of a photo
13 album like the one depicted in Exhibit-30?
14     A. Yes, that's my understanding.
15     Q. Do you remember anything else about the
16 lawsuit?
17     A. Like? I mean, I could go on for days.
18     Q. Why -- why -- you -- you had some involvement
19 in the lawsuit? Is that why you could go on for days
20 about it?
21     A. Right, right, right. Because I was her main
22 customer at that time. And, you know -- and I got an
23 injunction to take certain items off the shelf and not
24 sell them, you know, during this period of time.
25 And -- and, you know, I had spoken with her attorneys

### Page 50

1  at that time and -- and did a deposition for them
2  regarding, you know, the practices that were going on
3  and the items that were in question.
4      Q. Including the Gift Connections photo album?
5      A. Yes.
6      Q. That by then was the Roth photo album?
7      A. Right.
8      Q. Or the Tandem Imports photo album?
9      A. Yes, sir.
10     Q. Okay. Do you recall when the lawsuit was
11  active?
12     A. I don't recall the -- I don't have the exact
13  dates. I mean, I could kind of try and guess, but I
14  mean, it was -- you know, I don't know if it went on
15  for a year or a year and a half or two years. I
16  don't -- I don't recall all that.
17     Q. Do you recall when your deposition was taken?
18     A. I don't recall right now, no. I have a copy
19  of it at -- I don't know if -- I think I have a copy of
20  it at my house here, so I could look at it if you
21  needed to know that.
22     Q. Your deposition in that lawsuit and the
23  injunction that was issued in part against you in that
24  lawsuit was before you contacted Hayes Specialties to
25  design or manufacture the photo album depicted in

### Page 51

1  Exhibit-30, right?
2      A. Yes.
3      Q. What is your understanding, if any, about what
4  Arctic Circle contended in that litigation?
5      A. Well, I do believe that they -- they contended
6  that she was copying their products. But I don't think
7  that they knew at the time that she was using the
8  artwork that was -- a lot of it even that she had
9  developed when she was instrumental in the management
10 of Indian Arts and Crafts. I don't think they had that
11 knowledge at that time. And -- and that she had
12 that -- that she was doing a lot of that same artwork.
13     Q. Ms. Roth had not designed, though, to your
14 knowledge, the photograph -- or the photo album
15 depicted in Exhibit-30?
16     A. I do not believe she did.
17     Q. Mr. Knutson designed that?
18     A. I believe so.
19     Q. To the best of your knowledge?
20     A. To the best of my knowledge.
21     Q. When Arctic Circle contended that Ms. Roth
22 was, in your words, copying their products, did you or
23 do you have any understanding of the legal rights
24 Arctic Circle was asserting in that lawsuit?
25     A. No. I mean, I -- my version of what I believe

### Page 52

1  that they were asserting, that she had copied their
2  items.
3      Q. Okay.
4      A. I think there were two issues. One that she
5  maybe violated a noncompete clause that she had
6  actually waited until it expired and then, two, that
7  she had copied some of their items.
8      Q. Did you understand at the time that Arctic
9  Circle contended that Ms. Roth's design and
10 manufacturing of her items in some way violated Arctic
11 Circle's copyrights?
12     A. Would you say that one more time.
13         MR. McBRAYER: Can you read back the question,
14 please.
15         (Reporter read back as requested.)
16     A. That Arctic Circle contended that?
17     Q. Yes.
18     A. I understood that they contended that.
19     Q. And just to make sure, at the time when you
20 had an injunction against your store and you were
21 deposed -- I want to focus on the time of the lawsuit.
22 At the time of the lawsuit, you understood Arctic
23 Circle was asserting its copyrights?
24     A. Yes.
25     Q. And you understood that one of those

### Page 53

1  copyrights was the copyright to Arctic Circle's Alaska
2  map photo album that's Exhibit-14 in the lawsuit?
3      A. Yes.
4      Q. And you understood that Ms. Roth was selling a
5  version of the photo album depicted in Exhibit-30?
6      A. Yes.
7      Q. Okay. Did you understand or believe at the
8  time that Ms. Roth had the right to sell the photo
9  album depicted in Exhibit-30?
10     A. Yes, I believe that she did have the right to
11 sell that.
12     Q. Why?
13     A. Because it was the same artwork that we had
14 purchased and she was using that same artwork to -- to
15 do that.
16     Q. At the time you purchased the Gift Connections
17 artwork, did you evaluate the similarity between the
18 artwork depicted in Exhibit-30 and Arctic Circle's
19 Exhibit-14 photo album?
20     A. At the time that we purchased the artwork,
21 I -- I suppose that I know -- knew that they were
22 somewhat similar. That's what attracted me probably
23 because -- to that line -- to purchasing that artwork,
24 because it was a successful line. I didn't look at
25 that item specifically. It wasn't a sole cause

Page 86

```
 1  know, through the steps of her lawsuit with them, you
 2  know, in trying to support her. And, of course, we
 3  were doing business with her. And I think, you know --
 4  so we -- we just talked stuff in general.
 5      Last week, I think, at the gift show, she told
 6  me that Mitchell walked into their booth and was maybe
 7  writing down stuff -- copying stuff out of their deal
 8  and she went and yelled at him publicly in front of all
 9  the other people. And I think they complained about
10  him at the offices to the gift show management that he
11  was intimidating their -- their people.
12      And so we just talked about little stuff. You
13  know, anything that happens like that, you know, people
14  all of a sudden start talking about it.
15      MR. McBRAYER: Okay. We'll go off the record.
16      (Brief recess.)
17      MR. McBRAYER: Okay. Let's go back on the
18  record.
19      Q. Okay. So we just described a conversation you
20  had with Ms. Roth about last week's gift show. Have
21  you had any other conversations with Ms. Roth about
22  this lawsuit?
23      A. You know, we -- again, we talk so much all the
24  time that -- and I probably haven't really had any real
25  in-depth conversations about what was going on. I --
```

Page 87

```
 1  I've probably tried to keep it more private, because I
 2  just didn't really want to talk about it. But I mean,
 3  you know, there's no secret. There's no specifics
 4  about something has happened in the lawsuit, because as
 5  far as I'm concerned, nothing had really happened. You
 6  know, we were just kind of dragging sideways.
 7      Q. Okay. So do you recall, as you sit here
 8  today, any other conversations with Ms. Roth about this
 9  lawsuit?
10      A. Yeah, I don't -- I don't recall any specific
11  conversations, no.
12      Q. Okay. As you sit here today, you've just
13  described to me your complete knowledge of any
14  conversation that you've had with Ms. Roth about this
15  lawsuit?
16      MR. KEYES: Objection, asked and answered.
17      A. Yeah, there -- lots of general conversations,
18  but we don't really dwell on it every time we talk.
19  You know, we just don't dwell on it every time we talk.
20  And I'm still -- I've got seven companies that I
21  purchased -- I still purchase souvenirs from her, and
22  all of my energy -- most of any energy is focused on
23  working on next year's orders and -- and that. And so
24  I -- I haven't spent a whole lot of time dwelling on --
25  on that.
```

Page 88

```
 1      There hasn't been any great revelations
 2  except, you know, I think she calls Mitchell "Jackass"
 3  or something. And, you know -- and she'll say, "How's
 4  Jackass doing today," you know, or "Are you still
 5  having fun with Jackass," or something like that. And
 6  that would be the only really type of conversations.
 7  They're not really in-depth conversations.
 8      Q. Have you ever discussed with Ms. Roth the
 9  settlement agreement in which she settled her
10  litigation with Arctic Circle?
11      A. I -- I don't recall too many specifics or
12  details except that I -- I thought that the terms of
13  the settlement agreement, you know, dismissed her and
14  her customers, which we are one of her customers, from
15  future litigation. And I -- I -- I thought that
16  that's what I got out of that when it all happened at
17  the time, but I didn't get a whole lot of the
18  specifics.
19      I never read her settlement statement or any
20  of that kind of stuff. But at the time, we were
21  working with some attorneys -- her attorney was Greg
22  Wesner from -- and I thought that at that point that --
23  I gleaned out of that that, you know, her or her
24  customers, which was us, wouldn't be brought into
25  further lawsuits.
```

Page 89

```
 1      Q. Okay. You never read the settlement
 2  agreement?
 3      A. No.
 4      Q. At the time -- well, let me back up.
 5      You -- your impression of that settlement that
 6  you just described, why did you believe that?
 7      A. Why did I believe that?
 8      Q. Yes.
 9      A. You know, I -- I thought it was the attorneys
10  at that time that we had that -- in other words, I had
11  hired an attorney in Ketchikan and then her attorneys
12  through Ken Kagan and Greg Wesner, and I think they
13  contracted -- one of them, either my attorney in
14  Ketchikan or their attorney in Seattle, contracted with
15  an attorney up in Anchorage.
16      And so, at the very, very end, they were all
17  on the phone and they were calling each other and, you
18  know, saying, "Okay. This is what we're trying to get,
19  and this is where we're at." So that's kind of where I
20  got that, and I thought it was from one or some of the
21  attorneys. And sometimes we were on conference calls
22  with two or three of them at one time.
23      I guess I really need to do some work and dig
24  into that and find out exactly the specifics of that.
25  I don't know if you have that information or if Mike
```

Page 90

1  has that. But I guess that's probably an important
2  point for me to find out about.
3       Q. During the Roth lawsuit, were you represented
4  by Mr. -- Mr. Wesner, as your attorney?
5       A. I don't know. I -- I'm not sure. It was very
6  confusing. I hired Geoff Currall in Ketchikan, and he,
7  I think, hired someone in Anchorage. And I'm
8  embarrassed -- I can't remember his name this second.
9  But -- and then they all kind of like were -- were
10 talking together.
11      The guy in Anchorage and Greg were talking an
12 awful lot, because I knew Greg specialized in -- in --
13 what do they call it? -- intellectual properties and --
14 type of -- and -- so I don't -- I don't know that --
15 you know, that Greg was representing me.
16      I think he was representing Sandy because
17 that's who the lawsuit was. But then we had the
18 injunction on our side that was basically, you know,
19 kind of in that same lawsuit. And, again, Sandy -- her
20 involvement was through my artwork. You know, that
21 they were suing her for doing things that I had -- that
22 I had the artwork, that I furnished the artwork for her
23 to do for us.
24      So I just kind of always felt that I was part
25 of the -- of everything, intimately involved in the

Page 91

1  details of the -- you know, of the -- deciding what
2  items to use and not use at that point.
3       Q. I want to talk in a little bit more detail
4  about your understanding of the Roth settlement. You
5  understood it to settle and release Ms. Roth's and her
6  customers' past sales of products that included the
7  photo album, correct?
8       A. I -- no, I actually thought it was past and
9  future.
10      Q. Okay. But let's just -- I understand it may
11 have -- you understand it may have reached several
12 different kinds of acts. I want to split it up one at
13 a time. So you understood at least at the time --
14 amongst other things you might have understood it
15 released, you understood it released past conduct; is
16 that right?
17      A. Okay. I -- I did understand it released past,
18 and -- and I thought future also.
19      Q. Okay.
20      A. It -- with -- use these -- you know, to
21 these items. No sense in settling to say, "Okay.
22 We're not going to beat you up for what happened
23 yesterday, but if it happens again tomorrow, we're
24 going to beat you up again." I mean, there is no
25 reason to settle, I would have thought.

Page 92

1       Q. Did you understand at the time -- or strike
2  that question.
3       Was your understanding at the time that the
4  Roth settlement agreement allowed Ms. Roth's customers
5  to sell any of the remaining inventory they had?
6       A. Yes. And to -- to do them, again, in -- in
7  the future -- to redo those items in the future. Ms.
8  Roth has been doing those same items in the future.
9  But I thought she got a release so we could do those
10 items, because they weren't items that she had stolen.
11 They were items that she had the rights to.
12      And I think it kind of finally came to the
13 point when it was going to come to a trial that
14 probably the owners of Arctic Circle didn't want it to
15 go to trial because they felt that if it came in at
16 trial, they were probably going to lose and be
17 embarrassed because what they had done was --
18 basically, in my opinion, was violation of fair
19 trade -- that they were trying to limit the competition
20 and jack up the prices. And that was just my feeling
21 that I got out of all of this.
22      And I had seen their depositions also. And I
23 know -- I saw how much they lied in their depositions
24 about products, and I had that knowledge to be able to
25 take it to trial. And I think that they didn't want it

Page 93

1  to go to trial.
2       Q. And I don't want to get into the
3  particulars -- I don't want to know what your attorneys
4  said, so I'm going to ask you a yes or no question.
5  Did you receive advice from your attorney about the
6  scope of the Roth settlement agreement?
7       A. You mean, at that time?
8       Q. At the time.
9       A. Not about the scope of the settlement. I
10 don't believe the -- and, again, I don't -- maybe I
11 don't understand the question, what you're asking, to
12 be honest.
13      Q. Did you receive advice from your attorney
14 regarding -- and I don't want to know what the advice
15 was, but did you receive advice from your attorney at
16 the time that settlement was being negotiated that --
17 and you described the conversations that were -- were
18 going on. Did you receive advice from your attorney
19 that the settlement -- or whether the settlement
20 agreement covered future sales of yet to be
21 manufactured photo albums?
22      A. I --
23      MR. KEYES: Mr. Coates, before you answer,
24 just let me clarify. As Mr. McBrayer indicated, he
25 doesn't want you to indicate the substance of any

**Page 106**

1  there is other items -- for instance, film that we sell
2  from Kodak and is so identifiable that Costcos and
3  K-Marts sell it at maybe 20 percent over cost. And so
4  we have to sell it at a lower price. But I know that
5  if you took that same formula that you -- that you were
6  referring to, against that, you would say, "Yeah, I
7  lost money selling film."
8      But there's certain items that you have to
9  have in the store that draw people in and certain
10 things that make the store complete. Maybe you don't
11 make money on everything, but you need certain things
12 and certain price points to make the store complete.
13     Q. Does Alaska Juneau Mining Company's
14 profit-loss statement indicate its expenses were a
15 percentage of your gross revenue?
16     A. That our expenses were a certain percentage?
17 Yeah, I'm sure of that.
18     Q. Okay. Do you know what the percentage is?
19     A. I don't off the top of my head. And, again,
20 every year is -- is -- is different. I think this year
21 we had a -- a substantial increase in sales. Maybe --
22 I don't know. Maybe -- don't quote me -- I don't want
23 to be lying, but I mean, we may have close to a million
24 dollar increase in sales this year.
25     So that would have a major change on the -- on

**Page 107**

1  the percentage of expenses, because our expenses stayed
2  pretty much the same, you know, the -- you know, the
3  utilities and the heat and the rent, which is a big
4  factor. And so that would have a major change on that.
5      Q. Other than the space now occupied by Alaska
6  Juneau Mining Company, do you own or have an ownership
7  interest in any other office space in Juneau?
8      A. In Juneau?
9      Q. In Juneau.
10     A. Office space?
11     Q. Or storefront space.
12     A. Well, we just took over a store last month.
13 One of our competitors, in my opinion, wasn't running
14 their store the way they should have, and they kind of
15 had to, you know, get out of the business. So they
16 approached us about taking that space over, and we're
17 taking that over.
18     Q. What competitor was that?
19     A. It was -- it was a store called Galligaskins,
20 which was probably the other major -- one of the other
21 major souvenir retailers in Juneau. And they just --
22 in my opinion, they weren't running their store right,
23 and they couldn't make it. And they -- so they had two
24 locations, and we took one of them over -- their
25 largest location.

**Page 108**

1      Q. Other than the Galligaskins space, though,
2  have you owned or had an ownership interest in other
3  retail space in Juneau?
4      A. I don't think so, no.
5      Q. Okay.
6      A. You know, we owned a -- you know, we have a
7  jewelry store with -- inside of our store. I don't
8  know if you -- I mean, that's all part of the company
9  though.
10     Q. A jewelry store within the same retail space?
11     A. Um-hum. It's all owned by the same partners,
12 and it's all in the same building.
13     Q. Is the jewelry store within that retail space
14 a separate business, or is it part of Alaska Juneau
15 Mining Company?
16     A. Well, it's -- it's all part of -- Alaska
17 Juneau Mining Company is the name of the -- the
18 company. We call the jewelry Miner's Gem. We call it
19 Miner's Gem, but it's all -- the sales and the sales
20 tax and the tax return is all under Alaska Juneau
21 Mining Company.
22     Q. If I look at Alaska Juneau Mining Company's
23 profit-loss statement, is it going to reflect sales
24 made by the jewelry store?
25     A. Yes. Um-hum.

**Page 109**

1      Q. Okay.
2      A. I mean, we keep it -- we separate them, but we
3  put them together so we can keep track of where the
4  profits are coming from.
5      Q. Okay. Does Alaska Juneau Mining Company have
6  any remaining inventory of the 100- or 200-pocket photo
7  albums?
8      A. I -- I can't tell you that. I don't keep
9  close track of that. They may have a few, you know,
10 but I -- I'm not expecting that they have a lot. I
11 don't think they have a lot. But I -- I'd have to --
12 I'd have to go look. Again, I've got seven stores
13 that, you know, sell these type of items. And I
14 just -- I'm not in the warehouse looking, and I don't
15 look at every item, every store. That's kind of what
16 the managers do. I look at --
17     Q. Do you maintain a central warehouse for some
18 of your stores?
19     A. In -- in Ketchikan, I have a warehouse that I
20 try and stock some of the bigger orders for in
21 Ketchikan, and we let Juneau have one small aisle.
22     Q. In the Ketchikan warehouse?
23     A. Um-hum.
24     MR. McBRAYER: It's 12:00. Why don't we --
25 my next line of exhibits will take some time to go