# EXHIBIT 14

Exhibit 14 Page 1

| Copyright | Search Records Results |

Registered Works Database (Claimant Search)
**Search For:** ARCTIC CIRCLE ENTERPRISES, INC
**Items 21 - 29 of 29**
For a list of commonly used abbreviations that appear in the catalog record, <u>click here</u>.

[ Conduct Another Search ]

---

| 21. Registration Number: | VAu-565-972 |
|---|---|
| Title: | Poopin' moose key chain. |
| Description: | Sculpture. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 2001 |
| Registered: | 30Dec02 |
| Special Codes: | 5/S |

---

| 22. Registration Number: | VAu-567-176 |
|---|---|
| Title: | Alaska. |
| Description: | Art reproduction. |
| Note: | Die stamped & screen printed photo album cover. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 1999 |
| Registered: | 24Jun03 |
| Title on © Application: | 200 pocket Alaska map photo album. |
| Special Codes: | 5/S |

---

| 23. Registration Number: | VAu-567-177 |
|---|---|
| Title: | Alaska. |
| Description: | Art reproduction. |
| Note: | Die stamp & screen print design on photo album cover. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 2001 |
| Registered: | 24Jun03 |
| Title on © Application: | Alaska map panoramic photo album. |
| Miscellaneous: | C.O. corres. |
| Special Codes: | 5/S |

---

| 24. Registration Number: | VAu-567-178 |
|---|---|
| Title: | Alaska. |
| Description: | Art reproduction. |
| Claimant: | acArctic Circle Enterprises, Inc. |

Exhibit 14 Page 2

|   |   |
|---|---|
| Created: | 1998 |
| Registered: | 25Jun03 |
| Title on © Application: | 100 pcoket Alaska map photo album. |
| Miscellaneous: | C.O. corres. |
| Special Codes: | 5/S |

| 25. Registration Number: | VAu-574-156 |
|---|---|
| Title: | Poopin' brown bear. |
| Description: | Sculpture. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 2002 |
| Registered: | 30Dec02 |
| Title on © Application: | Poopin' brown bear with fish key chain. |
| Special Codes: | 5/S |

| 26. Registration Number: | VAu-654-791 |
|---|---|
| Title: | Salmon moveable key chain : no. 04146. |
| Description: | Sculpture. |
| Note: | Cataloged from appl. only. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 2004 |
| Registered: | 7Feb05 |
| Special Codes: | 5/S |

| 27. Registration Number: | VAu-654-792 |
|---|---|
| Title: | Bear moveable key chain : no. 04147. |
| Description: | Sculpture. |
| Note: | Cataloged from appl. only. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 2004 |
| Registered: | 7Feb05 |
| Special Codes: | 5/S |

| 28. Registration Number: | VAu-660-749 |
|---|---|
| Title: | 14" vinyl face doll with brown & white parka : item no. 04350. |
| Note: | Cataloged from appl. only. |
| Claimant: | acArctic Circle Enterprises, Inc. |
| Created: | 2004 |
| Registered: | 24Jan05 |
| Miscellaneous: | C.O. corres. |
| Special Codes: | 5/S |

29. Registration Number: VAu-660-750
    Title: 14" vinyl face doll with brown & tan parka : item no. 04349.
    Note: Cataloged from appl. only.
    Claimant: acArctic Circle Enterprises, Inc.
    Created: 2004
    Registered: 24Jan05
    Miscellaneous: C.O. corres.
    Special Codes: 5/S

Home | Contact Us | Legal Notices | Freedom of Information Act (FOIA) | Library of Congress

U.S. Copyright Office
101 Independence Ave. S.E.
Washington, D.C. 20559-6000
(202) 707-3000

# EXHIBIT 15

Exhibit 15 Page 1

**COPYRIGHT ASSIGNMENT**

This agreement is between PAMELA J RUATTO, an individual and sole proprietor with a principal place of business at Pam Ruatto Illustrations, 44 Manetta Road, Asheville, NC 28804, on behalf of herself and the unnamed sole proprietorship through which she acted while working in Alaska during at least 1997 ("Assignor"), and ARCTIC CIRCLE ENTERPRISES, LLC., a limited liability corporation doing business at P.O. Box 92650, Anchorage, AK 99509-2650 (Assignee").

**BACKGROUND**

A. Assignor may possess certain rights in aartistic design work as shown in Exhibit A attached hereto (the "Work").
B. Assignee wishes to acquire all of any right, title, and interest Assignor may have in and to the Work.

**AGREEMENT**

NOW, THEREFORE, in exchange for good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, and in accordance with the agreement to perform the project resulting in the Work, Assignor hereby agrees as follows:

1. Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to the Work, including all copyright rights (including but not limited to the right to make derivative, collective, and compilation works thereof and therefrom) and the registration and enforcement rights therefor. Assignor hereby releases and relinquishes any and all of its right, title, and interest in and to such copyright and other rights, including moral rights, in the Work and in all renewals and extensions of the copyright that may be secured under the laws now or hereinafter in force and effect in the United States of America or in any other country or countries.

2. Assignor hereby warrants that the Work is Assignor's sole, exclusive and original creation and, except as provided in this Agreement, she has not pledged, mortgaged, assigned or otherwise granted any rights in the Work to any third party. Assignor further warrants that he is the sole author and owner of the Work within the meaning of relevant copyright law.

IN WITNESS WHEREOF, the parties have executed this Agreement on September 14, 2006.

**ASSIGNOR**

By:
Pamela J. Ruatto

*[signature: Pamela J. Ruatto]*

**ASSIGNEE**

*[signature]*
Mitchell Godfred,
Arctic Circle Enterprises LLC

Exhibit 15 Page 2
ACE 00056

ACE 00058

Exhibit 15 Page 3

**Paul L. Davis**
Email: paul.davis@klgates.com
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
420 L Street, Suite 400
Anchorage, AK 99501-1971
Phone: 907-276-1969
Fax: 907-276-1365

**Gregory Wesner,** *Pro Hac Vice*
Email: gregory.wesner@klgates.com
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Phone: 206-623-7580
Fax: 206-623-7022

**J. Michael Keyes,** *Pro Hac Vice*
**Brooke Kuhl,** *Pro Hac Vice*
Email: mike.keyes@klgates.com
Email: brooke.kuhl@klgates.com
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
618 West Riverside Avenue, Suite 300
Spokane, WA 99201
Phone: 509-624-2100
Fax: 509-456-0146

Attorneys for Defendant
Alaska-Juneau Mining Company, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| ARCTIC CIRCLE ENTERPRISES, LLC., <br><br>　　　　　　　Plaintiff, <br>v. <br><br>ALASKA-JUNEAU MINING COMPANY LLC., <br><br>　　　　　　　Defendant. | Case No. 3:06-cv-00170-TMB <br><br> **AFFIDAVIT OF J. Michael Keyes** |

**Exhibit 16 Page 1 through Exhibit 16 Page 4** withheld pursuant to Protective Order filed February 6, 2007, designated "ATTORNEYS' EYES ONLY." Exhibit will be provided to counsel and courtesy copy to Honorable Timothy M. Burgess.

# EXHIBIT 17

Exhibit 17 Page 1



Ryan J. McBrayer
PHONE 206.359.3073
FAX: 206.359.4073
EMAIL: rmcbrayer@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

August 18, 2006

*VIA EMAIL*

J. Michael Keyes
Preston Gates & Ellis LLP
1400 Seafirst Financial Center
W. 601 Riverside
Spokane, WA 99201

Re:   **Arctic Circle Enterprises v. Alaska-Juneau Mining Company**

Dear Mr. Keyes:

This responds to your letter of August 16, 2006. Arctic Circle has no desire to pursue claims that were released in earlier settlements. Alaska-Juneau Mining Company's infringing sales, however, do not fall within the release you discuss for at least three independent reasons.

First, the release does not apply to acts or sales that occur after the date of the settlement agreement. We understand from your letter that its knock-off photo albums Alaska-Juneau Mining Company manufactured and sold this year in accordance with Mr. Coates' instructions. In *Martech Const. Co. v. Ogden Environmental Svs., Inc.*, 852 P.2d 1146 (Alaska 1993), the Alaska Supreme Court addressed a release with very similar language to the release in the Roth litigation, and reiterated that independent acts arising after the date of a release are not covered. The result here is the same; the infringing product was made and sold after the release was signed, and is not covered.

The release also does not apply to Alaska-Juneau Mining Company because the release is not transferable and Alaska-Juneau Mining Company was not a party to or otherwise addressed in the Roth settlement agreement. Third, the release does not

[59840-0003/SL062290.154]

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES
MENLO PARK · OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates

Exhibit 17 Page 2

J. Michael Keyes
August 18, 2006
Page 2

apply because the knock-off photo albums here are different than those at issue in the Roth litigation

We are nonetheless interested in the timing and scope of Mr. Coates' alleged contract with Ms. Roth regarding the photo albums at issue in the Roth litigation. To the extent this contract is otherwise relevant, please provide a copy and I will be happy to discuss its asserted relevance at your convenience.

Very Truly yours,

Ryan J. McBrayer

RJM:nr

# EXHIBIT 18

Exhibit 18 Page 1

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
                     DISTRICT OF ALASKA
 2

 3   ARCTIC CIRCLE ENTERPRISES, LLC,     )
                                         )
 4            Plaintiff,                 )
                                         )
 5       vs.                             )
                                         )
 6   ALASKA-JUNEAU MINING COMPANY, LLC,  )
                                         )
 7            Defendant.                 )
                                         )
 8   CASE NO. 3:06-cv-00170-TMB

 9
    _____
10
         VIDEOTAPED DEPOSITION OF MITCHELL GODFRED
11
    _____
12

13              February 22, 2007
                    8:03 a.m.
14

15               Taken at:
              K & L Gates LLP
16        420 L Street, Suite 400
             Anchorage, Alaska

17

18

19

20

21   Reported by:  Leslie J. Knisley
                   Shorthand Reporter
22

23

24

25
```

RECEIVED MAR 22 2007 KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

Page 6

1  Perkins Coie, LLP, for plaintiff Arctic Circle
2  Enterprises, LLC.
3          THE VIDEOGRAPHER: We ask now
4  that the court reporter swear in the witness.
5          MITCHELL GODFRED,
6     having been sworn, testified as follows:
7              EXAMINATION
8     Q   (BY MR. KEYES) Mr. Godfred, good
9  morning. We've had an opportunity to meet
10 before. As you know, I'm Mike Keyes
11 representing Alaska-Juneau Mining Company in
12 this lawsuit that's been brought by your
13 company.
14         I know you've had your deposition
15 taken before; is that correct, sir?
16    A   Correct.
17    Q   So you know some of the rules of the
18 road and you've sat in these depositions before.
19 You are being videotaped this morning, and we
20 will have videotape running throughout the
21 course of the deposition today.
22         (Exhibit 40 marked.)
23    Q   You've been handed Exhibit 40 to your
24 deposition this morning. Have you seen this
25 document before, Mr. Godfred?

Page 7

1     A   Yes, I have.
2     Q   Okay. And you understand that you are
3  the 30(b)(6) witness designee for Arctic Circle
4  Enterprises, LLC?
5     A   Yes.
6     Q   And that you are here to give
7  testimony on behalf of Arctic Circle
8  Enterprises?
9     A   Correct.
10    Q   Okay. Can you tell me a little bit of
11 background about what Arctic Circle is?
12    A   We are a 52-year-old company that was
13 founded by my father, Henry Godfred. And we are
14 a supplier to the visitor industry, supply
15 product, and that's our primary -- primary
16 business.
17    Q   When you say "supply product," what
18 type of products do you supply?
19    A   Giftware.
20    Q   And is this a wholesale -- is ACE --
21 and actually I should back up.
22         Do you mind if I refer to Arctic
23 Circle as ACE for purposes of our deposition
24 today?
25    A   That's fine.

Page 8

1     Q   Is ACE a wholesaler or retailer of
2  souvenirs?
3     A   We are not -- we are not a retailer.
4  We are a wholesaler and manufacturer.
5     Q   And where is ACE's principal place of
6  business?
7     A   In Anchorage.
8     Q   What's the address?
9     A   3812 Spenard Road.
10    Q   And is that where the ACE
11 manufacturing facilities are located?
12    A   No.
13    Q   Where is the manufacturing plant?
14    A   It's in Kent, Washington.
15    Q   And what's the address of --
16    A   I don't have the address here.
17    Q   Okay. You mentioned that ACE is a
18 52-year-old business.
19    A   Correct.
20    Q   Has it always been involved in the
21 wholesaling and manufacturing of Alaska souvenir
22 and gifts?
23    A   I would say for at least 47 years,
24 yes.
25    Q   What did it do for the five preceding

Page 9

1  years?
2     A   My father was a military
3  representative and sold -- he was a sales
4  manager for an air conditioning company, and he
5  traveled all over the world selling air
6  conditioners to military installations, some of
7  them being Alaska. And that was the origins of
8  the company.
9     Q   When did you start working for the
10 company?
11    A   I have been with the company for 42
12 years.
13    Q   And how long have you been its
14 president?
15    A   I do not have an exact date for -- but
16 for most of its existence.
17    Q   Are you an owner --
18    A   Yes.
19    Q   -- of ACE?
20    A   Yes.
21    Q   Are you a sole owner?
22    A   No.
23    Q   Who are the other owners?
24    A   Shuji Murasaki, Paul Serventi, Peggy
25 LaMaitre, Mario de la Torre, Gordon Godfred,

3 (Pages 6 to 9)

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Exhibit 18 Page 3

8208973c-148c-4a54-8038-6b4de1b55baf

**Page 22**

1  A  No, it was not on a computer or
2  server. It was duplicated -- because the art
3  files are so large that they have to be
4  converted to computer disks and --
5  Q  Okay. And who had access to that
6  archive file?
7  A  Lorraine Wyles and Jason Reynolds.
8  Q  Anyone else?
9  A  Those are the -- those are the ones
10  who have access to it.
11  Q  Just those two art department
12  employees?
13  A  Correct.
14  Q  Okay. And when you say the archive
15  that you pulled up and looked at, what was that
16  archive exactly?
17  A  It was the original work product.
18  When we created this, we created an original
19  design, and it was a collaboration with Lorraine
20  and Jason and it was done in -- I don't know the
21  exact date in June, but June of 1998, and it was
22  date stamped in there as far as when the
23  elements were put together.
24  Q  Let me see if I can help you out here.
25  (Exhibit 42 marked.)

**Page 23**

1  Q  Mr. Godfred, you've been handed
2  Exhibit No. 42. It's previously been marked as
3  an exhibit in these depositions. But is Exhibit
4  No. 42, is this the archive that you're speaking
5  of?
6  A  It's only a portion of the archive.
7  Q  Okay.
8  A  There was previous work done on June
9  of '98. This is from July 21st of '98, but
10  there was work done the previous month in June,
11  and that was provided to you previously.
12  Q  Okay. So back to the conversations
13  you had with Jason and Lorraine during the
14  course of your investigation.
15      You pulled up the archive,
16  Exhibit 42 being part of it?
17  A  Yes.
18  Q  And then there were a few other
19  documents, I guess, that you pulled up?
20  A  Well, there -- what I provided
21  previously with your requests was a whole
22  cataloging of all of the -- it's date stamped
23  every time this products was worked on. We have
24  a very detailed system and this was provided
25  with you. There was about five or six entries

**Page 24**

1  as far as when it was started, and this is --
2  looks to me like a completion date because it
3  says "Version: Final" on it.
4      So it was worked on for
5  approximately a month until we got it right, and
6  there's an omission here of the previous
7  documents that support it.
8  Q  And I appreciate that. Okay.
9      So, after you looked at the
10  archive, did you speak with anyone else?
11  A  I spoke with Paul Serventi.
12  Q  And what did you and Mr. Serventi talk
13  about?
14  A  We looked at the albums side by side,
15  and both of us determined that there was a
16  copyright problem.
17  Q  Okay. Who else did you speak with?
18  A  That's it.
19  Q  At the time you filed the Complaint,
20  you knew that Dave Coates was a customer of
21  Sandy Roth?
22  A  I knew he was buying some product from
23  Sandy. I had no contact with Mr. Coates or
24  Ms. Roth, and I really did not know the extent
25  of his business dealings with her.

**Page 25**

1  Q  Okay. So the answer is yes, you knew
2  that he was a customer of Ms. Roth's?
3  A  It was my assumption that he was a
4  customer, but I really no way of knowing.
5  Q  And you didn't inquire specifically of
6  Mr. Coates or of Ms. Roth if Mr. Coates was a
7  customer of Ms. Roth?
8  A  No. I really focus on my customers
9  and my product. I'm not focusing on
10  competitors.
11  Q  Did you inquire as to whether
12  Alaska-Juneau Mining Company was a customer of
13  Ms. Roth?
14  A  No, I never inquired. I assume that
15  that was so.
16  Q  I want to talk about the creation of
17  the artwork itself.
18      Who created this photo album
19  design?
20  A  This original design was created in
21  collaboration with Lorraine Wyles, Jason
22  Reynolds, and with my direction and oversight.
23  Q  I believe Ms. Wyles testified during
24  her deposition that one day you told her you
25  wanted an embossed map created. Is that

Page 86

1  A  I doubt it.
2  Q  Which Intracorp owns 80 percent of
3  ACE?
4  A  I believe it's Intracorp Capital, LLC.
5  Q  Okay. And Mr. Coates contacted
6  Mr. McFadden to discuss potential settlement;
7  that's been your testimony?
8  A  Mr. Coates walked in off the street
9  with a preplanned strategy.
10 Q  What's unethical about that?
11 A  Well, I don't think that -- you know,
12 he was trying to end run dealing with me. And I
13 think that if he wanted to settle it, he could
14 have either contacted me directly or contacted
15 you to work with Ryan with a proper settlement.
16 Q  So, did it upset you that Mr. Coates
17 contacted Mr. McFadden?
18 A  I thought this was typical for
19 Mr. Coates.
20 Q  And what do you mean by that?
21 A  It doesn't surprise me that he did
22 that.
23 Q  Why?
24 A  Because he doesn't respect our
25 original work product, and I think it's -- it's

Page 87

1  a whole -- you know, it goes around to, if he
2  respected my work product and my copyrights and
3  my original things, you know, it speaks to his
4  behavior.
5  Q  Why do you say he doesn't respect your
6  copyrights?
7  A  That's why we're here.
8  Q  What other copyrights has he not
9  respected in your opinion?
10 A  We have had other instances with
11 Mr. Coates.
12 Q  Such as?
13 A  A incident with Hayes Specialties
14 where he copied one of my items. It was a
15 proprietary key chain. And the end result was
16 Mr. Coates disgorged, I think, about 20,000
17 pieces, delivered it to our Kent facility after
18 it was obvious that he was going to lose. We
19 have had other instances with Mr. Coates.
20 Q  Such as?
21 A  He was selling a -- one of my
22 copyrighted hats that was produced by Triangle
23 Sport Headwear, and I asked him not to do it and
24 he continued to sell it. Finally, Triangle
25 Sport Headwear agreed with me that there was a

Page 88

1  copyright problem and they withdrew the
2  production of the item.
3  Q  When was that?
4  A  Probably about 2001.
5  Q  What other instances are you referring
6  to?
7  A  There was also the incident with Sandy
8  Roth and Tandem Imports where he was the seller
9  of what I deemed to be copyright infringement
10 photo albums.
11 Q  So, in your opinion this isn't the
12 first time Mr. Coates and his businesses have
13 infringed on this photo album?
14 A  You -- you know, we've provided the
15 settlement agreement with Sandy Roth and Tandem
16 Imports, and Mr. Coates was the seller of that
17 product in his different retail operations.
18 Q  So, is that a "yes" or a "no" to my
19 question?
20 A  I'm sorry?
21 Q  My question was: Did that Roth
22 lawsuit involve the alleged infringement by Mr.
23 Coates and his businesses of the copyright in
24 Exhibit 4 here?
25 A  He was the seller of the infringed

Page 89

1  copyright products that Roth ended up agreeing
2  to settle with us after a lawsuit.
3  Q  I'd like to reference Exhibit 47 here.
4     Have you seen this document
5  before, Mr. Godfred?
6  A  Yes.
7  Q  And what is it?
8  A  The title of it says, Settlement
9  Agreement and Mutual Release.
10 Q  Did you draft this document?
11 A  No.
12 Q  Did your attorney draft it?
13 A  Correct.
14 Q  Is this your signature at the --
15    MR. MCBRAYER: I just want to
16 confirm, as we talk about this document, my 408
17 objection?
18    MR. KEYES: Yeah.
19    MR. MCBRAYER: All right.
20 A  It is my signature.
21 Q  (BY MR. KEYES) So, this is a
22 settlement proposal that you have made to
23 Alaska-Juneau Mining Company?
24 A  Correct. And to the best of my
25 knowledge, they have not responded to it.

23 (Pages 86 to 89)

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Exhibit 18 Page 5

Page 110

1  Q  Okay. And I appreciate your answer,
2  but it's nonresponsive, Mr. Godfred.
3  A  I answered it the best that I could.
4  Q  It's a yes or no proposition. As you
5  sit here today, can you give me the name of one
6  individual or one company or a representative
7  from a company that said, I purchased the photo
8  album from Alaska-Juneau Mining Company instead
9  of the photo album from ACE?
10 A  At this point, no.
11 Q  Okay. Thank you.
12    Did ACE create the 100-pocket
13 photo album format?
14 A  I don't recall.
15 Q  Okay. Do you know if ACE created the
16 200-pocket photo album format?
17 A  I don't recall.
18    MR. KEYES: I've got about 11:25.
19    THE WITNESS: Let's break for
20 lunch.
21    MR. KEYES: Do you want to break
22 for lunch now?
23    MR. MCBRAYER: Let's break for
24 lunch.
25    THE VIDEOGRAPHER: Going off the

Page 111

1  record at approximately 11:23 a.m.
2    Stand by.
3    (Lunch break taken.)
4    THE VIDEOGRAPHER: One moment,
5  please.
6    We're on the record. The time is
7  approximately 12:44 p.m.
8  Q  (BY MR. KEYES) Mr. Godfred, before
9  the lunch break, we were talking a little bit
10 about the damages that ACE has incurred in this
11 matter, or alleged damages. We talked about
12 your supposed lost sales and you had also
13 mentioned statutory damages.
14    Is it your opinion that ACE is
15 entitled to statutory damages?
16 A  We will --
17    MR. MCBRAYER: Calls for a legal
18 opinion.
19 Q  (BY MR. KEYES) No, I'm not asking for
20 a legal opinion. I'm asking for your personal
21 opinion, and I understand you're not a lawyer.
22 A  We will assess damages in different
23 ways and make a final determination.
24 Q  And when are you going to make this
25 final determination?

Page 112

1  A  Whenever it's required by the lawsuit.
2  Q  Okay. Who's Sandy Roth?
3  A  Could you be more specific?
4  Q  Do you know who she is?
5  A  I know of a Sandy Roth, yes.
6  Q  Okay. Sandy Roth was an employee of
7  yours at some point?
8  A  Yes.
9  Q  That's the Sandy Roth I'm referring
10 to.
11 A  Okay. I understand.
12 Q  I think you had mentioned previously
13 this morning Sandy Roth is a competitor of
14 yours?
15 A  Yes.
16 Q  How so?
17 A  Well, I think she creates product and
18 imports it and distributes it to people like
19 Mr. Coates.
20 Q  Okay. So, she is an importer of
21 Alaska gifts and souvenirs?
22 A  I would assume so.
23 Q  You don't know that to be the fact?
24 A  I don't know the scope of her
25 business. I know that she seems to be hooked up

Page 113

1  with a company and appears to have some
2  activity. As far as the scope of activity, I
3  can't speculate on.
4  Q  What company is she hooked up with?
5  A  It's a company in Seattle that
6  supplies rain gear to the national market. I
7  don't know. Dutch Harbor could be the name, but
8  I'm not a hundred percent certain. I focus on
9  my business rather than other people.
10 Q  And Ms. Roth was an employee of ACE's,
11 was she not?
12 A  Yes, she was.
13 Q  Okay. And you sued Ms. Roth a number
14 of years ago, did you not?
15 A  That's correct.
16 Q  For what? What did you sue her for?
17 A  Several issues. Copyright damages and
18 also I believe it was breach of employment,
19 breach of contract.
20 Q  In that lawsuit you sued Ms. Roth and
21 Tandem Imports; is that correct?
22 A  That was her company.
23 Q  To your knowledge is that still her
24 company?
25 A  I don't know. I think you'd need to

29 (Pages 110 to 113)

Page 114

1  ask Ms. Roth on that.
2      Q   Okay. One of the allegations in the
3  suit involving Roth and Tandem Imports was a
4  claim that she had copied the Alaska map design
5  contained on Exhibit 4; is that correct?
6      A   One of the components of it is that
7  she had copied our map photo album, both sizes,
8  and we prevailed.
9      Q   So, is that a yes?
10     A   Well, the way you phrased it was not,
11 you know, was very vague phrasing.
12     Q   Okay.
13     A   So, I'm saying that she produced photo
14 albums and, you know, that infringed on our
15 copyright and we won a settlement.
16         (Exhibit 49 marked.)
17     Q   Have you seen this document before,
18 Mr. Godfred?
19     A   This is very difficult for me to read,
20 to see the designs on these albums.
21     Q   Okay. But have you seen this document
22 before, sir?
23     A   I don't know.
24     Q   Okay.
25     A   I mean, it's -- again, the quality of

Page 115

1  your reproduction here makes it very difficult
2  for me to answer correctly, because I really
3  can't -- really can't determine what these, you
4  know, the components of these things.
5      Q   All right. Well, and it's not my
6  reproduction. This is actually from a prior
7  declaration filed by you in the Roth litigation.
8  Exhibit A, as a matter of fact, one of your
9  declarations.
10         In any event, on the left-hand
11 side, are those the Alaska map photo design
12 albums that are at issue in this case?
13     A   This is a very difficult reproduction
14 here.
15     Q   I understand the quality isn't that
16 great, and all I had was to go with -- I could
17 only work with what I had, and that was the
18 prior quality of your copy from your
19 declaration.
20     A   I understand, but you're asking me to
21 give you a definitive answer on something that's
22 very difficult because of the quality of this
23 reproduction.
24     Q   Well, as definitive as the
25 circumstances allow, sir. Are the photo albums

Page 116

1  on the left-hand side of this piece of paper the
2  same photo album that is at issue in this
3  particular case?
4      A   One of them is.
5      Q   Okay. Which one is that?
6      A   10102.
7      Q   Okay. What about the 10118?
8      A   I would assume that that's the
9  hundred-pocket that's here. Again, due to the
10 reproduction quality, I have a difficult time
11 with it.
12     Q   Well, if you'll look underneath the
13 11 -- the 10118, it does indicate 100 Pocket
14 Photo Album Alaska Map Design, doesn't it?
15     A   Okay.
16     Q   Okay. So, these are the same photo
17 albums -- or the 10 -- excuse me.
18         The 10102 and the 10118 contained
19 in Exhibit 49 here are the same photo albums
20 that are at issue in this case; isn't that
21 correct?
22     A   I would assume so, but withholding
23 judgement on the quality of your reproduction.
24     Q   Okay. As you sit here today,
25 Mr. Godfred, do you recall suing Ms. Roth over

Page 117

1  the Alaska map photo album design here in
2  Exhibit 4?
3      A   I'm sorry, I didn't understand your
4  question.
5      Q   Yeah. This --
6      A   Is this Exhibit 4?
7      Q   Yes, this is Exhibit 4.
8      A   Okay.
9      Q   This is, of course, the ACE photo
10 album.
11     A   Yes. We sued Ms. Roth over that photo
12 album as well as the 200-pocket.
13     Q   Okay. So, you sued her over the
14 100-pocket and the 200-pocket?
15     A   That's correct.
16     Q   Who else was a party to that lawsuit?
17     A   Keystar International.
18     Q   Who's Keystar International, if you
19 know?
20     A   Keystar International was her partner
21 in Hong Kong.
22     Q   Okay. Was Keystar manufacturing the
23 alleged infringing photo albums in that case?
24     A   I don't know the answer to that,
25 whether that was actually brought out who

30 (Pages 114 to 117)

Page 118

1  manufactured it. But Roth claimed
2  responsibility for manufac -- for having the
3  item manufactured, but I don't know who actually
4  manufactured the item.
5      Q   Okay. And you indicated that there
6  was a settlement in the Roth litigation?
7      A   That's correct. It was supposed to be
8  a confidential settlement.
9      Q   Okay. And there's a settlement
10 document reflecting the settlement between the
11 parties?
12     A   Yes, it was given -- provided to you.
13     Q   Okay. Tell me about Ms. Roth's
14 conduct in that case as far as who she was
15 selling her allegedly infringing photo albums
16 to.
17     A   Well, she was selling the infringed
18 photo albums to Dave Coates' operations.
19 There's four or five at that time that he was
20 partners in, which was Ketchikan Mining Company,
21 Skagway Mining Company, Ketchikan Outlet Store,
22 and there's another one or two that I can't
23 recall, but he had a chain of stores. And what
24 he did is he brought the photo albums in and had
25 them disbursed to his five or so outlets at that

Page 119

1  time.
2      Q   And Mr. Coates and his businesses
3  received these allegedly infringing photo albums
4  from Ms. Roth; is that correct?
5      A   That is correct.
6      Q   Do you recall allegations made in that
7  lawsuit where you claimed that Mr. Coates and
8  his businesses were in active concert with
9  Ms. Roth and her business?
10     A   Well, Mr. Coates was selling the
11 infringing products.
12     Q   Is that a yes?
13     A   Yes, I think he knowingly knew about
14 this since he had been purchasing these photo
15 albums from us for at least three years prior,
16 and he knew the fact that it was the No. 1 and 4
17 item in our company. And, yeah, he was a -- he
18 was involved with it.
19     Q   How did he know that it was the No. 1
20 and No. 4 item in your company?
21     A   Mr. Coates came into our showroom with
22 very detailed computer printouts on sales of his
23 sales. He had a history in his store -- knew
24 that it was the No. 1 item that he was ordering
25 from us.

Page 120

1      Q   From -- how did he know that from his
2  store? What do you mean? That it was a No.
3  1 --
4      A   Mr. Coates started ordering this item
5  for the '99 season. And he had ordered it for
6  several years, and every year the quantities
7  would be going up where the last year we were
8  doing business with him he was ordering very
9  large quantities of these albums from us. And
10 then he decided not to order from us and order
11 the infringing products from Sandy Roth and
12 Tandem Imports and Keystar.
13         But he had a full -- Mr. Coates
14 is very organized. He came into our showroom
15 with computer printouts of sales of his items.
16 He showed us -- he made numerous comments what a
17 great item it was. And he worked with Paul
18 Serventi and myself, and Mr. Coates knew the
19 powerful selling qualities of this item.
20     Q   When did he come into your showroom
21 with the computer printouts?
22     A   He had appointments every year in the
23 end of summer and, you know -- I have kept my
24 calendars. I wasn't -- but we also made
25 presentations to Mr. Coates and at that time

Page 121

1  Glacier Bear Gifts in the fall of '98, which we
2  have documented in one of the previous things
3  where we showed them -- both Tony Murphy and
4  Mr. Coates, we showed them the photo albums.
5  And both of them -- both Tony Murphy and
6  Mr. Coates had ordered the photo albums from us
7  for several years before Mr. Coates decided to
8  purchase the infringing products from Sandy
9  Roth.
10     Q   Are you familiar with a business by
11 the name of Indian Arts & Crafts?
12     A   They're no longer in existence.
13     Q   Were you familiar with this company
14 when it was in business?
15     A   Yes.
16     Q   What did you know about it?
17     A   They were a competitor.
18     Q   When were they a competitor?
19     A   Well, Indian Arts & Crafts, first of
20 all, had about four different transitions there,
21 so it's very difficult to pin down because they
22 were sold, sold again, sold again -- excuse
23 me -- they were sold, I think, four times before
24 they finally collapsed. So I think you need to
25 be real -- you know, you have to be a little bit

31 (Pages 118 to 121)