# Exhibit 11

2/27/2007 RUATTO, PAM

```
0001
 1           UNITED STATES DISTRICT COURT
         CASE NO.: 3:06-CV-00170 USDC ALASKA
 2
 3   _____
                                    )
 4   ARCTIC CIRCLE ENTERPRISES, LLC,)
              Plaintiff,            )
 5        v.                        )  DEPOSITION OF
                                    )
 6                                  )  PAM RUATTO
     ALASKA-JUNEAU MINING COMPANY, LLC,)
 7            Defendant.            )
     _____)
 8
 9
         On Tuesday, February 27, 2007, commencing at 9:36
10   a.m., the deposition of Pam Ruatto was taken on behalf of the
     Defendant at the home of Pam Ruatto, 44 Manetta Road, Asheville,
11   North Carolina, and was attended by Counsel as follows:
12
     APPEARANCES:
13
14
         RYAN MCBRAYER, ESQ.
15       Perkins Cole, LLP
         1201 Third Avenue, Suite 4800
16       Seattle, Washington  98101-3099
         on behalf of the Plaintiff
17
18
         J. MICHAEL KEYES, ESQ.
19       K&L Gates
         618 West Riverside Avenue, Suite 300
20       Spokane, Washington  99201
         on behalf of the Defendant
21
22
23
24   REPORTED BY:  Amanda A. Johnson, Court Reporter
25           ASHEVILLE REPORTING SERVICE
```

1

2/27/2007 RUATTO, PAM

```
 1   (Document aa145)
 2           Index
 3   Signature (Waived) . . . . . . . . . . . . .  3
 4   Direct Examination by Mr. Keyes. . . . . . .  4
 5   Cross-Examination by Mr. McBrayer. . . . . . 89
 6   Redirect Examination by Mr. Keyes. . . . . . 104
 7   Recross-Examination by Mr. McBrayer. . . . . 110
 8   Re-redirect Examination by Mr. Keyes . . . . 112
 9   Certificate. . . . . . . . . . . . . . . . . 116
10   EXHIBITS:
11   Defendant's Exhibit No. 1 Marked . . . . . .  24
12   Defendant's Exhibit No. 2 Marked . . . . . .  54
13   Defendant's Exhibit No. 3 Marked . . . . . .  54
14   Defendant's Exhibit No. 4 Marked . . . . . .  71
15   Defendant's Exhibit No. 5 Marked . . . . . .  71
16   Defendant's Exhibit No. 6 Marked . . . . . .  74
17   Defendant's Exhibit No. 7 Marked . . . . . .  88
18   Defendant's Exhibit No. 8 Marked . . . . . . 104
```

2

2/27/2007 RUATTO, PAM

```
 1       PURSUANT TO NOTICE and/or Agreement to Take
 2   Depositions, the within Deposition was taken by me,
 3   Amanda A. Johnson, a Notary Public as required in
 4   Rules 26 and 30 of the North Carolina Rules of Civil
 5   Procedure.
 6   SIGNATURE:
 7       The Deponent did agree that both the reading
 8   over and signing of the transcript are hereby
 9   waived.
10       Pam Ruatto, being duly sworn to tell the truth,
11   the whole truth, and nothing but the truth of her own
12   knowledge concerning the within matter, testified as
13   follows:
```

3

2/27/2007 RUATTO, PAM

```
 1   DIRECT EXAMINATION BY MR. KEYES:
 2   Q   Good morning, Ms. Ruatto.  We had an
 3       opportunity to meet briefly.  My name is Mike
 4       Keyes.  I'm an attorney with K and L Gates and
 5       I represent a company by the name of Alaska-
 6       Juneau Mining.
 7   A   Okay.
 8   Q   This is a case that is pending in Federal
 9       Court in Juneau, Alaska.
10   A   Okay.
11   Q   The lawsuit has been brought by Arctic Circle
12       Enterprises.  It's my understanding that
13       you've done some work for Arctic Circle over
14       the years?
15   A   Uh-huh.  (Affirmative)
16   Q   Have you had your deposition taken before?
17   A   No.
18   Q   I'll just tell you a couple of preliminary
19       housekeeping items that will help both of us.
20       What we're doing here is, of course,
21       transcribing your testimony today.  You know
22       you're under oath?
23   A   Uh-huh.  (Affirmative)
24   Q   As far as ease of getting through this
25       process, I'm going to ask you a series of
```

Ex. 11 - 2

4

Page 5:

1   questions to find out what you know and what
2   you recall and what you do not recall.
3   A   Okay.
4   Q   It's beneficial for the court reporter if you
5   wait until I'm through asking the question and
6   then provide your answer.
7   A   Okay.
8   Q   We'll try not to talk over each other. It's
9   best for transcription purposes. If at any
10  time you don't understand a question that I
11  ask, which is entirely possible, I admit, just
12  let me know. I'm happy to rephrase it or
13  restate it to the best of my ability. I'd
14  like to know a little bit of background
15  information about you. How long have you
16  lived here in Asheville?
17  A   September of 2001, we moved to Asheville.
18  Q   What brought you out here?
19  A   My husband's mother was dying, we thought, and
20  so he took an early retirement from BP and we
21  relocated to be near her. She's down in
22  Laurens in a nursing home, and he went back to
23  work on the North Slope some six months later
24  doing contract -- as a contract electrical
25  engineer, and that's where he is now. But

Page 6:

1   that -- we needed to be near her.
2   Q   What's the North Slope?
3   A   Of Alaska? He's in Kuparuk now. He was for
4   -- while we lived in Alaska, he was at Prudhoe
5   for the most part. He's an electrical
6   engineer for the oil -- you know, oil
7   companies. He's not freelance, but contract.
8   Q   Are you currently employed?
9   A   Self-employed. I do freelance illustration,
10  but I'm primarily working on a children's book
11  of my own. There's not a whole lot of
12  illustration work local. It's a very -- it's
13  not the best area for that kind of work, but
14  (pause) --
15  Q   You, you say, moved out to Asheville in 2000?
16  A   2001. 2001. We got here -- actually, we
17  arrived, got off the plane, September 10,
18  2001.
19  Q   Where did you reside prior to your stint here?
20  A   We were 12 years in Alaska, in Anchorage, and
21  prior to that, Seattle.
22  Q   Let's talk about your 12 years in Anchorage.
23  Were you employed during that 12-year stint?
24  A   I worked -- I was direct hire for Arctic
25  Circle for a while and for Anchorage

Page 7:

1   Convention and Visitors Bureau for a while,
2   and with Alaska Newspapers, which is a
3   conglomeration of bush newspapers, meaning
4   small communities in the outlying areas of
5   Alaska, and I was a advertising art director
6   for them, in between which I constantly worked
7   freelance out there. So I did both freelance
8   and direct hire for different people that I
9   worked for.
10  Q   What do you mean by "direct hire"?
11  A   Well, if I worked for them -- if I was working
12  for somebody and I produced an illustration
13  while I was working for them, then that's
14  called direct hire and anything I did was
15  theirs. And if I was working freelance for
16  them, anything I did was mine, unless I -- you
17  know, and they got to use it for the purposes
18  for which I did it, unless I gave them other
19  rights. So -- but anything I did for Alaska
20  Newspapers they got to keep and reuse, and if
21  I said -- this is my way of doing it anyway,
22  and if I kept it, it would be to promote
23  myself. I would -- you know, I usually let
24  people have as much usage as they wanted on
25  most things, unless I knew I could probably

Page 8:

1   use it again myself, and then I showed them
2   that I was copyrighting it for me or that I
3   was claiming it as mine, and I'd put a
4   signature on it. Illustrators don't always
5   sign their work because you don't want that to
6   show up in an ad. It's not like -- you know,
7   if you do a painting, you want your name on
8   it. But an ad, you know, they're not going to
9   use an illustration in an ad that has a
10  signature. Anyway -- so I had various
11  relationships with several different people
12  while I was there.
13  Q   I want to talk a little bit more about your
14  work in Alaska, but can you tell me a little
15  bit about your educational background?
16  A   Yeah. I have a BSA in design from Cornish
17  Institute in Seattle.
18  Q   Bachelor of fine arts?
19  A   Uh-huh. (Affirmative)
20  Q   What year was that?
21  A   Pardon me?
22  Q   What year was that?
23  A   '85.
24  Q   That's in design?
25  A   Uh-huh. (Affirmative)

Ex. 11 - 3

1  Q  Do you have any post-secondary degrees or
2     studies anywhere?
3  A  Huh-uh. (Negative) No. No, I went straight
4     to work as an illustrator in Seattle.
5  Q  Let's talk about your work that you did for
6     Arctic Circle Enterprises.
7  A  Okay.
8  Q  When did you first start working for Arctic
9     Circle, if you recall?
10 A  I don't know. Somewhere in the '90s. I went
11    -- I'm trying to pouch them in my own mind. I
12    think that I did -- I was doing work for
13    Alaska Newspapers and for Anchorage Convention
14    and Visitors Bureau. In other words, direct
15    hire for a while for both of those people
16    before and after Arctic Circle. But Arctic
17    Circle has got to be sometime around, I'm
18    thinking, '97, '98. But I'm not positive.
19 Q  How did you first come in contact with Arctic
20    Circle?
21 A  I was doing freelance and someone asked me to
22    show a guy who used to work for them -- I'm
23    trying to think of how I got connected with
24    him. But I was invited to bring some of my
25    work as a sample of a very loose illustration.

1     But an Asian guy was -- used to work for them.
2     And so I met them there and then I'm trying to
3     think why I -- how they found me. Somebody
4     found me. They were looking for somebody who
5     could do -- you know, just -- who could really
6     well really quickly and be in house, and so --
7     and I can't remember who found me. I don't
8     know if it was the boss or if it was the woman
9     named -- a woman named Tallya, who I worked
10    with all the time. I don't know which one of
11    them me. Maybe I could call to see -- and at
12    that point, freelance gets, you know -- so it
13    would be like I wouldn't have enough work, so
14    I could work for someone part-time and then
15    also work freelance, and that was worth it to
16    me, and that was my arrangement with them, was
17    that when I was doing it, I was in a down-
18    time, not having a job.
19 Q  The Asian gentleman that you mentioned, do you
20    recall if his last name was Murisaki?
21 A  No. I would probably recognize his first
22    name. But he was just some guy. I'm sorry.
23 Q  So it was some point, you think, around 1997
24    that you were approached or ---
25 A  Well, I -- you know, it was -- it could just

1     as easily have been 1999, you know, or 1995.
2     The '90s -- the late '90s are a blur. You
3     know, I can tell you what I produced around
4     that time, what I had my hands in, and who I
5     -- and the -- you know, the series -- the
6     different people that I did jobs for. But
7     there was -- you know, that's all.
8  Q  Do you recall the terms of your employment?
9     Were you a W-2 employee at Arctic Circle?
10    Were you an independent contractor?
11 A  I probably -- I want to tell you that I was a
12    -- yeah, I'm sure it was W-2. I'm sure I
13    remember seeing the little W-2 form come in.
14    Yeah, and if I could get up, I know exactly
15    where those taxes would be. But I'm not going
16    to get up. They're downstairs. You know who
17    would know is my husband. And actually, he
18    wouldn't know necessarily. He'd have to look
19    at the file. But yeah, I believe so, that I
20    was W-2.
21 Q  So you started out as a W-2 employee and ---
22 A  I don't think I ever did freelance for Arctic
23    Circle. I think what's his name was very --
24    the big guy was very avid about that, you
25    know, or knowledgeable about that, where other

1     people that I had done for-hire work didn't
2     know the difference. I thought that he did,
3     and it didn't matter to me, but I was clear on
4     him being sort of forceful and savvy about
5     business.
6  Q  The big guy, who is the big guy?
7  A  For some reason, I should know his name. But
8     I'm drawing a blank.
9  Q  Is this big guy Mitchell Godfred?
10 A  Yes, Mitchell Godfred. Mitchell Godfred.
11    Yeah. He just liked things to be very clear.
12    So whereas other people -- like Anchorage
13    Convention and Visitors Bureau, they didn't
14    know that I had full rights to anything I
15    produced for them freelance until I told them,
16    you know, and I figured that Mitchell knew
17    that, because he just talked differently than
18    other people who hired me. You know, most
19    people don't know what -- and they don't feel
20    a need to know, and lots of newspapers
21    certainly wouldn't know that anything I did
22    for them freelance remained mine. But -- you
23    know, so I had some that was up to me. If I
24    did something for people for hire, it was
25    theirs, and if I did it freelance, it was

Ex. 11 - 4

2/27/2007 RUATTO, PAM

1  mine, and I kept that straight and I didn't
2  bother them with it, because they don't --
3  most people don't know about that.
4  Q  Do you remember the specific work that you did
5     for Arctic Circle when you started out working
6     for it?
7  A  Yeah, I remember several pieces that I did.
8  Q  What do you remember?
9  A  I remember a map that I did, and it was based
10    on a map that I had done freelance. I brought
11    that in, and had Tallya scan it and then I did
12    further illustrations for it and she put them
13    on top of the original watercolor base, if you
14    will, that I had done. And I remember -- I
15    mean, do you really want to know other jobs?
16 Q  Sure, if you recall others.
17 A  Okay. Well, I did stuff like -- two or three
18    drawings of salmon that could be used to make
19    children's puzzles. I did that in the
20    computer, and then I did a lot of black-and-
21    white pencil drawings that could be used to
22    make molded figurines, like polar bears and
23    huskies howling and, you know, very
24    stereotypical Alaskan scene-type stuff.
25 Q  When you say Alaska scene stuff, are you

13

2/27/2007 RUATTO, PAM

1  generally familiar with Alaska gifts and
2  souvenirs that are offered by various vendors?
3  A  Yes, some stuff around. Yes. It's not stuff
4     that a real Alaskan would ever buy. But yes.
5  Q  Let's talk about the map.
6  A  Okay.
7  Q  Well, in general, where did you work? Did you
8     go in to Arctic Circle?
9  A  Yes. I always worked -- when I worked for
10    them, I always worked at the office.
11 Q  Did you have specific hours that you had to be
12    there?
13 A  I had -- I think they were a little looser
14    with me probably than other people, because I
15    believe it was always -- just about always
16    part-time. But yeah, they had to know when I
17    was coming, yes, and so it was probably, like,
18    nine to two or nine to three or something like
19    that.
20 Q  How were you compensated, if you recall?
21 A  I was paid hourly and it was -- gosh, I don't
22    think it was much. I remember it was, like,
23    $12 an hour and I remember the conversation
24    that I had with Mitchell about that, and --
25    yeah.

14

2/27/2007 RUATTO, PAM

1  Q  Were you instructed to draw certain things
2     when you would show up?
3  A  Uh-huh. (Affirmative) And some projects for
4     me to work on.
5  Q  Who would instruct you on that?
6  A  I think Mitchell would usually tell Tallya and
7     Tallya would tell me, and sometimes Mitchell
8     would come in and say something. But mostly
9     Tallya told me what I needed -- what I was to
10    do.
11 Q  Would they dictate how you would go about
12    drawing things?
13 A  To a point, not too far.
14 Q  Can you give me an example of how ---
15 A  Well, they might want me to draw a cute fish
16    and I would be able to tell, all right, how
17    much cuteness, and then, you know -- or I
18    would -- the method in which I did it or,
19    like, whether or not it had more or less
20    detail, I mean, I would just balk. If it was
21    something that was not me, then I would just
22    balk, and Tallya would give it to someone
23    else. There was another illustrator there
24    named Bill, very, very good at pen and ink,
25    and I -- if I didn't -- I wouldn't draw

15

2/27/2007 RUATTO, PAM

1  something that I really couldn't stand the way
2  it looked, no matter what. So that was where
3  I had some creative balking. You know, I just
4  wouldn't do it if I didn't like it that much.
5  Q  Did you ever tell Mr. Godfred that you
6     wouldn't draw a certain design?
7  A  No, I'd just go balk. I never -- you know, he
8     was a very easy guy, but, you know, I know one
9     time he came in and said, "This is not just
10    what I want, this is what the client wants,"
11    because I was arguing about whether or not --
12    it could have been where a fin on a fish would
13    go, I don't know, just something that bothered
14    me about being that heavily directed. And he
15    was very nice, but no, I wouldn't head to head
16    with him. You know, I don't remember how long
17    I was there, but no. I didn't butt heads with
18    anybody. I just -- Tallya knew where I was
19    often. She would just have someone else do it
20    if it was something that I couldn't do what I
21    wanted to do , because I just can't stand to
22    do something I don't like the looks of.
23 Q  So would it be fair to say that the person
24    with the ultimate decision-making authority,
25    as far as a particular design is concerned,

16

Ex. 11 - 5

1   was you?
2   A   Well, as to what I would do. But as to what
3       would be printed, it would be him, because he
4       would just -- you know, Tallya would work on
5       everything that I worked on. And so she would
6       take it into Photoshop and enhance it, like a
7       -- I often did very soft watercolor work so
8       that it could be skewed in the Photoshop to be
9       darkened or to be -- there were things she
10      could do digitally that I couldn't do, and she
11      could just finish it visually for me. So she
12      and I worked hand in glove for Arctic Circle.
13      I don't think there was an illustration that I
14      worked on that she didn't also work on, and I
15      didn't worry about it once it left my hands.
16      You know, it was hers to do as she wished.
17  Q   Did you have a written agreement with ACE?
18  A   I don't know. I might have. I don't
19      remember. If I did, it wasn't anything that I
20      was worried about. I mean, I don't remember
21      having one or not having one.
22  Q   If you had one, would it be with your W-2
23      records or your employment records?
24  A   No. No, it wouldn't have -- I would have --
25      he would have the copy of it. I wouldn't have

1       kept it, because I wouldn't have agreed to
2       anything that wasn't common for me anyway,
3       like work for hire belongs to you, work for
4       freelance belongs to me. And so I wouldn't
5       have -- you know, I'm not going to sign it
6       over to you. I wouldn't have agreed to
7       anything that was outside of that comfort and
8       I wouldn't have cared. You know, I don't
9       really care about stuff as long as I know and
10      I think they know I don't care. So I -- and
11      the work I was doing for him I would never use
12      for myself. So I wasn't worried about it.
13  Q   When you did your illustrations, how did you
14      do that? Did you do them on a computer?
15  A   Sometimes. I did -- almost entirely, always,
16      start with line work in pencil and then scan
17      it. If I'm going to work on a computer, I
18      still start with some loose lines and scan
19      them mostly. Sometimes I can do the whole
20      thing that's going to be illustrated and just
21      -- but mostly I'd start with loose work. If
22      it was water color, I'd do the whole thing by
23      hand and then scan it and maybe alter it by
24      color or whatnot. But to me, as a loose hand,
25      you have to do that by hand. So a lot of my

1       work for him, you know, the drawings that I
2       did were all of course -- those were mine.
3       Those were graphite, just heavy pencil, and
4       those were all by hand.
5   Q   When you would sketch things, did you have
6       your own sketch pad, pens or pencils, that
7       sort of stuff, or would you use ACE's
8       materials?
9   A   Yeah. That was one of the perks of working
10      for someone else. They had to supply what I
11      needed, which I liked. You know, sometimes
12      I'd bring in a favorite something, like if I
13      had a favorite eraser or an odd kind of paper
14      that I knew they didn't have and I wanted
15      something to have a certain texture, while --
16      at least while I was working on it, I'd bring
17      that in and -- but they wouldn't know that.
18      You know, if they -- they provided everything.
19      I would just sometimes bring something in to
20      work on and work from.
21  Q   So when you started out, did you provide
22      specific items which you needed? Did you
23      provide, say, like a list of items that you
24      would need for your artistic endeavors?
25  A   No, because they were used to working with

1       illustrators. They had a guy who had been
2       working for them, you know, for a really long
3       time, Bill, and he had all his stuff and I
4       think that they had another guy who was trying
5       to be an illustrator and, you know, they had
6       all gone -- I think he had been to art school.
7       Jason was his name, and he was there at the
8       computer. But, you know, they all had tools.
9       So I didn't -- if I brought anything with me,
10      it was just out of preference, you know, just
11      out of -- but I didn't try to do everything
12      while I was there. You know, I didn't need
13      all my tools because the work I did for him
14      was very prescribed and typical. So his tools
15      were great. The tools they had were great.
16  Q   You had mentioned before that when you would
17      show up to work, you had to tell them you were
18      coming?
19  A   No. I mean -- no, it was arranged. Like, I
20      mean that I didn't have to tell them I was
21      coming. I had to -- we would agree on when I
22      would be there, you know, like Tallya would --
23      whatever projects were coming that week that I
24      was going to be working on, then, you know --
25      and honestly, I don't remember if I worked,

**Ex. 11 - 6**

2/27/2007 RUATTO, PAM

## Page 21

1  like, nine to two every day or if I worked,
2  like, from eight until eleven one day and from
3  nine to five another. I don't remember it
4  that well. You know, I remember being there
5  and I remember, you know, what everybody was
6  like and what the work was like. But I don't
7  remember hours that much except that I was
8  never completely full-time. I think I was
9  always part-time, and then I started getting
10 real busy with projects, with big projects,
11 and I left because I wasn't being paid enough
12 there. I mean, I wanted to be paid bigger as
13 a freelance artist. So -- yes.
14 Q  Do you remember if you were given break times
15    and lunch time?
16 A  I took them. I don't remember -- I worked for
17    myself for so long that I didn't consider
18    anyone telling me when I should take a break
19    as an option for them or when I could go to
20    lunch. I just didn't think of it that way,
21    and I don't think Mitchell saw me that way
22    either. But I think I probably worked through
23    lunch hour with other people because I would
24    come in at odd times, you know. No.
25 Q  Did you have a supervisor?

2/27/2007 RUATTO, PAM

## Page 22

1  A  It would have been Tallya, yeah. Yeah.
2  Q  So Tallya, it doesn't sound like she dictated
3     when you would take breaks or when you would
4     take your lunch break?
5  A  Well, no. I mean, it's just all responsive.
6     You know, it's just responsive to the needs.
7     If we were in a hurry for some reason, then of
8     course I wouldn't take a break. You know --
9     because they needed me and, you know, so of
10    course I would get something done. But no,
11    it's -- I mean, Tallya was -- I was older than
12    she was, I had more experience than she did,
13    and so she didn't boss me around much. But
14    she knew what I needed to be doing and she
15    told me and I did it, you know.
16 Q  Let me go back. I asked a question before
17    about when it ultimately came to the final
18    product that you would produce, a particular
19    illustration, that final decision was made by
20    you; correct?
21 A  Well, no, because I wouldn't produce something
22    that they didn't want, you know. I mean, it
23    was made by Mitchell. But as I said, if I
24    didn't like the way something was done or if
25    it wasn't my style, they had Bill, and it was

2/27/2007 RUATTO, PAM

## Page 23

1  always -- you know, he had a very prescribed
2  style and he could really draw on command, and
3  I don't really draw on command in that same
4  way. It's like -- just an illustrator feels
5  that there is a looseness to some people's
6  hands that doesn't lend itself to just being
7  dictated completely. Like you couldn't just
8  say, "Draw this and I want it to look that
9  way." I would just say, you know, "Find
10 someone else. I don't work that way." You
11 know, you tell me what you want and I'll get
12 as close to it as I can, and then you can come
13 in and say, "I want you to move the eyeball,"
14 and most of the time I would go, "Yeah, I'll
15 move that eyeball," or, "I want that eyeball
16 bigger," you know, on a fish or something, and
17 I'd be happy to do that. But I have a looser
18 hand than Bill did, and so it was different
19 working for someone -- working with someone
20 like me, because there is just stuff that I
21 cannot do. I cannot -- like I can't do line
22 work with ink very well. I just can't do it.
23 So if you're hiring me to do it, then you need
24 to agree that I don't work for you, because
25 I'm not going to be good, you know. And so it

2/27/2007 RUATTO, PAM

## Page 24

1  would be -- I'm sure -- I mean, they wouldn't
2  ask Bill to do watercolor, because he didn't
3  feel comfortable with it. It's not tight
4  enough. And so, you know, I would just -- it
5  taught -- it was never like a showdown. It
6  was just -- if Tallya would tell me to do
7  something, she would look at me and I would
8  look at her and she would go -- or maybe --
9  you know, because it's not me to do it. It's
10 -- I don't know how to explain it. That's the
11 -- that's what illustration work is, is you're
12 never wholly a hired wrist, because you're --
13 it's too human, you know, it's too human. You
14 can't really draw on command in the way that
15 you can plumb, I suppose, on command. I don't
16 know.
17 (DEFENDANT'S EXHIBIT NO. 1 MARKED)
18 DIRECT EXAMINATION RESUMED BY MR. KEYES:
19 Q  Ms. Ruatto, you're being handed Exhibit No. 1
20    to your deposition this morning. Have you
21    seen this before, this subpoena or amended
22    subpoena? (Tenders)
23 A  (Upon review) Yes, I have.
24 Q  Do you see on the third page there's an
25    exhibit asking you to produce certain

Ex. 11 - 7

1  looks like what he e-mailed to me except the
2  color is weird and the -- it's not very --
3  it's -- it just looks like the color has been
4  kind of -- like you ran it through a copier
5  that doesn't do a very good job, is all I'm
6  saying. But the glaciers are mine, the -- I
7  mean, that's all mine.
8  Q  Well, let's refer to Exhibit 2 for a moment.
9     Maybe we can clarify this. If you look down
10    under the heading "Background," it reads,
11    "Signer may possess certain rights in artistic
12    design work as shown in Exhibit A attached
13    hereto"?
14 A  Uh-huh. (Affirmative)
15 Q  There's been testimony previously, I'll
16    represent to you, by Mr. Godfred that Exhibit
17    No. 3 here is Attachment A to the copyright
18    assignment. Is that consistent with your
19    understanding?
20 A  Well, yes. Yes. I mean, this is mine. Yeah.
21 Q  So is it your testimony, Ms. Ruatto, that ACE
22    Document 00057, which has been marked as
23    Exhibit 3, is in fact Exhibit A to the
24    copyright assignment?
25 A  Yes, yes.

1  Q  Other than the copyright in Exhibit No. 3, did
2     you assign anything to Arctic Circle
3     Enterprises?
4  A  No. No. I mean, anything I did for them was
5     theirs, because I was -- well, I was working
6     for hire. But I didn't exclusively assign
7     anything other than this.
8  Q  When you say "other than this," you mean other
9     than the depiction ---
10 A  Yes, this exhibit. Well, yeah. I mean, I
11    think we might be -- this is a copy of
12    something, and that's -- I keep going back to
13    that and I probably don't need to. But isn't
14    this weird? I can recognize this as mine and
15    I know what it's a copy of, but it's a very
16    bad copy.
17 Q  When did Mr. Serventi contact you?
18 A  I think he contacted me back -- I'm not --
19    last fall, and then I didn't hear from him for
20    a while. I signed this over. I don't know
21    when I signed this over to him. There's
22    probably a date somewhere. Yeah. So (pause)
23    ---
24 Q  Were you surprised that you would be contacted
25    about this assignment?

1  A  Actually, I was really glad, but yes, I was.
2  Q  Why is that?
3  A  Well, because -- I was just surprised that
4     there would be any controversy over original
5     work, that anyone would -- you know, I was
6     surprised that there was controversy and I was
7     surprised -- yes. I mean, I've never had
8     anyone ever contact me for a legal reason
9     before. So, you know (pause) ---
10 Q  Why were you surprised that there was
11    controversy?
12 A  Well, I was surprised that anyone would look
13    at this and not know that it was someone
14    else's.
15 (INTERRUPTION AND OFF THE RECORD)
16 DIRECT EXAMINATION RESUMED BY MR. KEYES:
17 Q  So you were surprised that there was
18    controversy over this why?
19 A  Well, just because there rarely is controversy
20    over anything that I -- I can only think of
21    one other time when I heard that someone had
22    taken my work and used it without
23    authorization, and I just -- that just doesn't
24    happen very often in illustrations. So I was
25    really -- at first, I was surprised. I

1     thought, "Well, maybe I" -- you know, maybe --
2     again, I thought, "It must be ACVB, because
3     people don't do this." So, you know, that was
4     my first thought, and then I was very worried,
5     "What if it's not my work," and so, you know,
6     he sent me something that I recognized as I do
7     here. And so, yeah, I was just surprised
8     because I don't think it's so much -- it's not
9     normal. Work is clearly not generic. But,
10    you know, to not recognize its origin.
11 Q  Did Mr. Serventi show you a copy of the ---
12 A  He e-mailed it to me. Before we went on, I
13    said, "I need to see this, because, you know,
14    I don't know. I need to know this is my work
15    here."
16 Q  No. Hold on just a second. Did Mr. Serventi
17    e-mail you a copy of the allegedly infringing
18    work?
19 A  No. He e-mailed me a copy of the map I had
20    done for him, you know, that I had worked on
21    after, you know, the period which (pause) ---
22 Q  Again, that, the map he e-mailed you, is
23    Exhibit No. 3?
24 A  Yes.
25 Q  Let's look at Exhibit 3 for a minute.

**Ex. 11 - 8**

2/27/2007 RUATTO, PAM

1  A  Yes, yes.
2  Q  You created it prior to your employment or
3     association with Arctic Circle Enterprises?
4  A  Yes.
5  BY MR. KEYES:
6     Mr. McBrayer?
7  CROSS-EXAMINATION BY MR. MCBRAYER:
8  Q  I want to start out by asking you some
9     questions, Ms. Ruatto, about the assignment
10    you executed assigning Exhibit 3, the document
11    marked ACE 00057, to Arctic Circle. Before
12    you executed that assignment, can you describe
13    for me your understanding of the ownership of,
14    not only that work, but all the work you did
15    for Arctic Circle?
16 A  It was theirs.
17 Q  Why do you say that?
18 A  Because it was -- that's the terms of working
19    for someone else. Anything that I produced
20    under that -- while I'm working for them on an
21    hourly basis is theirs. Anything, you know,
22    that I produced there, in their shop, unless
23    I'm working for someone else freelance on the
24    side. But if I'm producing it for them, I'm
25    producing it for-hire, which is different than

89

2/27/2007 RUATTO, PAM

1     freelance.
2  Q  Did you have a specific conversation regarding
3     ownership of your work before you started work
4     at Arctic Circle?
5  A  I don't know if I did. I (pause) ---
6  Q  You testified earlier that Mr. Godfred had
7     made some remarks and was ---
8  A  Well, he was pretty exacting about -- what I
9     can tell you is that I knew that it would
10    matter to him and I felt he was protected
11    because I would not take something and use it,
12    that I had produced for him. So I wasn't
13    worried about it. You know, he -- and I knew
14    that I did not have the same rights I normally
15    keep. When I'm working freelance, I keep
16    those rights. So we may have talked about it.
17    I -- you know, it seems like we might have
18    because Mitchell Godfred was like that, but I
19    don't remember a specific -- I mean, if we had
20    a conversation, it was quick and to the
21    complete agreement that, "Of course what I
22    produce for you is yours."
23 Q  So there's no doubt in your mind that as you
24    started working on ---
25 A  The next version.

90

2/27/2007 RUATTO, PAM

1  Q  --- Exhibit 3, when you scanned your original
2     artwork, including all aspects that you had
3     created prior to this, the outline ---
4  A  Yes. Everything became theirs.
5  Q  Everything became theirs at that time?
6  A  Yes, yes.
7  Q  I'm going to return to your watercolor. I'll
8     hold it here where you'll be able to see it.
9     I want to ask you some questions about the
10    different components of this. I want to make
11    sure that when you created the outline of the
12    state, you were working from a copyright-free
13    source?
14 A  Yes.
15 Q  After that, you painted on here some -- I
16    think you testified they were blobs from an
17    artist's perspective?
18 A  Yes.
19 Q  Sort of dark brown ---
20 A  Just freehand brush strokes of general areas.
21 Q  So when you made those on this original
22    watercolor, you were freehanding?
23 A  Yes.
24 Q  You testified that before that work started,
25    you had looked at some reference material of

91

2/27/2007 RUATTO, PAM

1     some sort?
2  A  Yes.
3  Q  I want to make sure. Do you recall any single
4     specific reference that you looked at?
5  A  No. I had a hard time finding anything that
6     gave me the whole state and finally had to end
7     up with a really small -- those little
8     copyright-free outlines, because they gave the
9     whole state. So (pause) ---
10 Q  But before you started painting ---
11 A  Right.
12 Q  --- here, like, mountain ranges are the
13    topographical features, other than the
14    outline. Once you had the outline, you blew
15    it up on here; correct?
16 A  Right.
17 Q  Then you had to add features?
18 A  Yes.
19 Q  So before you added the features, you looked
20    at some reference material; is that right?
21 A  Yes. I looked at Rand McNally-type maps. I
22    don't know that they were Rand McNally, but I
23    (pause) ---
24 Q  That's what I want to get to. Do you remember
25    any specific source that you looked at?

Ex. 11 - 9

92