**Paul L. Davis**
Email: paul.davis@klgates.com
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
420 L Street, Suite 400
Anchorage, AK 99501-1971
Phone: 907-276-1969
Fax: 907-276-1365

**Gregory Wesner,** *Pro Hac Vice*
Email: gregory.wesner@klgates.com
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Phone: 206-623-7580
Fax: 206-623-7022

**J. Michael Keyes,** *Pro Hac Vice*
**Brooke Kuhl,** *Pro Hac Vice*
Email: mike.keyes@klgates.com
Email: brooke.kuhl@klgates.com
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
618 West Riverside Avenue, Suite 300
Spokane, WA 99201
Phone: 509-624-2100
Fax: 509-456-0146

Attorneys for Defendant
Alaska-Juneau Mining Company, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| **ARCTIC CIRCLE ENTERPRISES, LLC.,**<br><br>Plaintiff,<br><br>v.<br><br>**ALASKA-JUNEAU MINING COMPANY LLC.,**<br><br>Defendant. | **Case No. 3:06-cv-00170-TMB**<br><br>**SUPPLEMENTAL AFFIDAVIT OF J. MICHAEL KEYES IN SUPPORT OF ALASKA-JUNEAU MINING COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ITS MOTION TO STRIKE** |

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

STATE OF WASHINGTON        )
                                                    ) ss.
County of SPOKANE            )

J. Michael Keyes, being duly sworn, deposes and states:

1.    I am over 18 years of age.  I reside in Spokane, Washington.  I am fully competent to make this affidavit and have personal knowledge of the facts stated herein.  To my knowledge, all the facts stated in this affidavit are true and correct.

2.    I am counsel of record for defendant Alaska Juneau Mining Company, LLC ("AJMC").

3.    Arctic Circle Enterprises ("ACE") filed its Complaint against AJMC on July 17, 2006.

4.    On August 16, 2006, I sent a letter to ACE's counsel regarding AJMC's reliance on the Settlement Agreement entered into between Roth and ACE as precluding ACE's claims against AJMC.  A true and correct copy of this letter was attached to my Affidavit in Support of AJMC's Motion for Summary Judgment as Exhibit 16.

5.    On August 18, 2006, AJMC filed its Answer and Affirmative Defenses alleging that "To the extent the accused album is infringing, Alaska-Juneau operated under [a] . . . release from Arctic Circle."

6.    On September 18, 2006, this Court entered its Scheduling and Planning Order directing the parties to exchange their preliminary Fed. R. Civ. Pro. 26(a)(1) disclosures by September 25, 2006.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

7.     In September 2006, AJMC's counsel received ACE's 26(a) initial disclosures. The documents now relied upon by ACE in opposing AJMC's motion for summary judgment, *see* McBrayer Decl., ¶ 22, Ex. 21, were not produced nor listed as a category of documents that ACE intended to use in support of its claims or defenses.

8.     AJMC filed its motion for summary judgment on March 29, 2007.

9.     On April 10, 2007, ACE's counsel produced a series of documents that it claimed illustrated the negotiation history of the Settlement Agreement entered into between Sandy Roth and ACE. Those documents are attached to the McBrayer Decl., at Ex. 21.

10.     On April 24, 2007, ACE filed its opposition papers to AJMC's motion for summary judgment offering the "negotiation documents" and subsequent testimony of its principal, Mitchell Godfred, in opposition to AJMC's motion. ACE Memorandum, p. 9-13.

11.     On March 14, 2007, ACE took the deposition of its competitor James Cottrell, the owner of JC Marketing. Attached as Exhibit 1 is a true and correct copy of excerpts from the deposition of James Cottrell.

12.     Attached as Exhibit 2 is a true and correct copy of the Settlement Agreement between U.S. Wheel Corporation and Hispec Wheel & Tire, Inc. dated June 20, 2003. I obtained this document by accessing the Federal Court ECF on-line database. In opposing AJMC's motion, ACE alleges that the facts in *Hispec* are similar to those before this court. *See* ACE Memorandum, p. 29.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

ARCTIC CIRCLE ENTERPRISES vs.
ALASKA-JUNEAU MINING COMPANY LLC     - 3 -
Case No. 3:06-cv-00170-TMB
K:\55853\00001\XRH\XRH_P255L

EXECUTED this 14th day of May, 2007 at Spokane, Washington.

_____

J. Michael Keyes

SIGNED AND AFFIRMED before me on the ____ day of May, 2007, by J. Michael Keyes.



NOTARY PUBLIC

Print Name: Sherry A Marison

My commission expires: 11/4/09

Residing at Spokane

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
420 L STREET, SUITE 400
ANCHORAGE, ALASKA 99501-1971
TELEPHONE: (907) 276-1969

ARCTIC CIRCLE ENTERPRISES vs.                    - 4 -
ALASKA-JUNEAU MINING COMPANY LLC
Case No. 3:06-cv-00170-TMB
K:\55853\00001\XRH\XRH_P255L

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

James N. Leik, jleik@perkinscoie.com

Ramsey M. Al-Salam, RalSalam@perkinscoie.com

Ryan McBrayer, RMcBrayer@perkinscoie.com

By /s J. Michael Keyes
    J. Michael Keyes, *Pro Hac Vice*
    KIRKPATRICK & LOCKHART PRESTON
    GATES ELLIS LLP
    618 W. Riverside Ave. #300
    Spokane, WA  99201
    Telephone:  509-624-2100
    Facsimile:  509-456-0146
    Email:  mike.keyes@klgates.com
    Attorneys for Defendant
    Alaska-Juneau Mining Company
    LLC

ARCTIC CIRCLE ENTERPRISES vs.
ALASKA-JUNEAU MINING COMPANY LLC          - 5 -
Case No. 3:06-cv-00170-TMB
K:\55853\00001\XRH\XRH_P255L

# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


ARCTIC CIRCLE ENTERPRISES, LLC.,

          Plaintiff,

     vs.

ALASKA JUNEAU MINING COMPANY, LLC.,

          Defendant.
_____

Case No. 3:06-cv-170 (TMB)




DEPOSITION OF JAMES COTTRELL

Taken March 14, 2007
Commencing at 1:00 p.m.

Volume I - Pages 1 - 52, inclusive



Taken by the Plaintiff
at
PERKINS COIE
1029 W. Third Avenue, Suite 300
Anchorage, AK  99501



Reported by: Susan J. Warnick, RPR

EXHIBIT 1, PAGE 2

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                                James Cottrell

---

**Page 2**

```
 1  A P P E A R A N C E S
 2  For Plaintiff:
 3      PERKINS COIE
          BY: Kyan Olanna
 4      1029 W. Third Av., Suite 300
          Anchorage, AK 99501
 5      (907) 279-8561
 6  For Defendant:
 7      K&L GATES
          BY: Brooke C. Kuhl
 8      618 West Riverside Avenue, Suite 300
          Spokane, WA 99201-0602
 9      (509) 624-2100
10  For Mr. Cottell:
11      GREEN LAW OFFICES, LLC.
          BY: Harold Green
12      P.O. Box 11312
          Anchorage, AK 99511-1312
13      (907) 276-2733
14  Taken by: Susan J. Warnick, RPR
15
16  BE IT KNOWN that the aforementioned deposition was taken
17  at the time and place duly noted on the title page, before
18  Susan J. Warnick, Registered Professional Reporter and
19  Notary Public within and for the State of Alaska.
20
21
22
23
24
25
```

---

**Page 3**

```
 1          P R O C E E D I N G S
 2          JAMES COTTRELL,
 3  called as a witness herein, being first duly sworn to
 4  state the truth, the whole truth and nothing but the truth
 5  by the Notary, testified under oath as follows:
 6          MR. GREEN: May I just introduce a beginning
 7  exhibit, and that is so we don't make repeated objections.
 8  Mr. Cottrell will answer some of questions. It depends on
 9  what the questions are. And the objections that we had
10  served on the 9th of March of '07, we'd like to mark that
11  as a exhibit. It was served on both counsel. It may not
12  be relevant, depending on the questions.
13          MS. OLANNA: We will deal with it as it comes
14  along. How does that sound?
15          MR. GREEN: Okay.
16          (Exhibit 1 marked.)
17          EXAMINATION
18  BY MS. OLANNA:
19  Q   I'm Kyan Olanna. I'm an attorney with Perkins Coie.
20  We're representing the Arctic Circle Enterprises in a case
21  against the Alaska Juneau Mining Company, and I was
22  wondering: Have you ever been deposed before?
23  A   No.
24  Q   No?
25  A   I just sent documents, but not in person.
```

---

**Page 4**

```
 1  Q   Okay. Well, this is sort of how it will work. I'll
 2  ask you a number of questions, and if any of them are
 3  unclear, please feel free to ask me to repeat them or to
 4  rephrase them. If Mr. Green objects to anything, my
 5  questions still stands and you still have to answer the
 6  question. It's just noting the objection for the record.
 7          And you'll notice that there is a court reporter
 8  here to record our conversation. She can't record
 9  nonverbal answers, so please don't nod or gesture in
10  response; answer audibly.
11  A   Okay.
12  Q   Also she can't record us when we speak at the same
13  time, so please try to wait for me to finish my questions
14  and I'll try not to interrupt you in your answers.
15  A   Okay.
16  Q   If you need a break at any time, please feel free to
17  say so and we can break at any at any time as long as I
18  haven't asked a question that you haven't yet answered.
19          So you are here in response to a subpoena?
20  A   Yes.
21  Q   And this is a notice of that deposition and the
22  subpoena is attached to it (indicating). Does that look
23  correct?
24          MR. GREEN: For the record, is that the one
25  dated the 26th?
```

---

**Page 5**

```
 1          THE WITNESS: Yeah. Yup, that looks correct.
 2          MS. OLANNA: Let's have that marked as Exhibit 2
 3  2.
 4          (Exhibit 2 marked.)
 5  BY MS. OLANNA:
 6  Q   So this is a subpoena for J.C. Marketing; correct?
 7  A   Correct.
 8  Q   And it asks that someone be designated on the
 9  company's behalf; correct?
10  A   Correct.
11  Q   And are you the person that has been designated?
12  A   Yes, that would be me.
13  Q   The subpoena also asks you to produce any relevant
14  records.
15  A   Uh-huh.
16  Q   Have you brought documents?
17  A   Yes, I did.
18  Q   What records did you search in gathering these
19  documents?
20  A   Well, records prior to '99, I was able to get some
21  off of my computer, but my computer only goes back to '96
22  and, like I told Mr. Green, we have some files in a garage
23  buried behind fixtures that we can't get to until spring,
24  and there may be -- I don't know if there is anything in
25  there or not, but there are other records prior to '96,
```

---

2 (Pages 2 to 5)

Case No. 3:-06-cv-170 (TMB)                    James Cottrell

---

Page 6

1  but from '96 forward I was able to get the pictures of
2  designs and my photo album, Alaska Designs, which we began
3  with, and I have pictures of that.
4      I actually found the letter to the manufacturer
5  dated '95 describing the album, and so there is that. And
6  there is invoices to customers from as far back as '96,
7  and a purchase order from Pioneer '95 and '96.
8  Q   Well, very good. Thank you. And sort of in the
9  interests of time --
10 A   I made a copy for everybody. Would you like one?
11 Q   I would. I think in the interest of time we will
12 mark the exhibits in response to questions as they come
13 up --
14 A   Okay.
15 Q   -- rather than taking the time to copy them now.
16     What is your name?
17 A   James A. Cottrell, IV.
18 Q   And what is your business address?
19 A   1020 East 4th Avenue, Anchorage.
20 Q   And who is your employer?
21 A   I own the company.
22 Q   What company is that?
23 A   J.C. Marketing.
24 Q   So what is your job title?
25 A   Owner.

---

Page 7

1  Q   And --
2  A   President. Chief of all operations.
3  Q   So what are your duties as owner, president and chief
4  of all operations?
5  A   I mean, I just oversee -- I have about 14 employees
6  working for me, and I'm the big picture guy, and I
7  delegate things to other people as need be. But we're a
8  marketing company. We sell souvenirs.
9  Q   And how long have you owned J.C. Marketing?
10 A   Since '83.
11 Q   And that was when the company began?
12 A   Uh-huh.
13 Q   Prior to this, what line of work were you in?
14 A   Basically, sales.
15 Q   For a similar company or for --
16 A   Yeah, from '79 to '83 I worked as a sales rep for
17 another company, and we sold t-shirts and we sold other
18 souvenirs items back then, as well as photo albums. And
19 so in '83 I started my own company, and in '83 I didn't do
20 souvenirs. I was doing lots of other products, but I was
21 still a marketing rep representing, among other companies,
22 I represented Pioneer Photo Albums, so I represented them
23 since '83.
24 Q   As owner, you're very familiar with J.C. Marketing's
25 products and business practices?

---

Page 8

1  A   Yes.
2  Q   And you're familiar with all the agreements --
3  A   Yes, I am.
4  Q   Has J.C. Marketing produced any photo albums with
5  Alaska maps on them?
6  A   Yes, we have.
7      Do you want to see them?
8  Q   That would be great.
9  A   These are all the designs prior to '99, per the
10 subpoena (indicating). I didn't bring anything after '99.
11 Q   No. That's fine. I'll have that marked, please.
12     (Exhibit 3 marked.)
13     MS. KUHL: Do have multiple copies there?
14     THE WITNESS: Yes, I do. Would you like one?
15     MS. KUHL: Yes, please.
16     MR. GREEN: How did you mark these exhibits?
17     THE WITNESS: Designs prior to '99, and I put
18 attorneys eyes only on it.
19     MR. GREEN: Okay. I'm Mr. Green. I represent
20 Mr. Cottrell or J.C. Marketing. We're not waiving our
21 objections to Exhibit A. We're just trying to work
22 through this so at some later date -- I want to make sure
23 it's clear: He is not waiving his objections to go in and
24 get a more specific protective order or something like
25 that, but he is, until that happens, he has marked the

---

Page 9

1  exhibits to keep the items as limited as possible under --
2  I can't remember the date, but a pre-existing -- what are
3  you calling it -- a protective order?
4      MS. OLANNA: Yes. Joint stipulated protective
5  order.
6      MR. GREEN: It's called joint stipulated
7  protective order. I believe it's dated February or --
8  let's get the exact date. February 6, 2007.
9      Go ahead. Is this going to be marked as Exhibit
10 3?
11     MS. OLANNA: Yes.
12 BY MS. OLANNA:
13 Q   So the dates that you have written under each of
14 those photo albums -- there are four photo albums on
15 Exhibit 3 -- does that represent the date they were
16 created?
17 A   That was the date of production, yeah, and the design
18 probably a few months prior.
19 Q   Was Pioneer Photo Album involved in the
20 manufacture --
21 A   Uh-huh.
22 Q   -- of all of those --
23 A   All these albums, uh-huh.
24 Q   And do you still have agreements with Pioneer Photo
25 Album regarding their manufacture?

---

3 (Pages 6 to 9)

EXHIBIT 1, PAGE 4

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                                    James Cottrell

---

Page 10

1   A   Yes, I do.
2   Q   All of them?
3   A   Yes.
4   Q   Do you have a copy of those agreements?
5   A   Well, you know, all we really have is a verbal
6   agreement, but I do have a letter that I wrote in '95 to
7   Shell Plutsky who is the president of Pioneer Photo
8   Albums. and '95 was the first mass production. Prior to
9   '95, we produced these albums, and that's why I said in
10  '94 and maybe even '93 -- I'm not certain, but prior to
11  '95 when I wrote this letter, he had these done in
12  California, and they were just silk-screened, and it was
13  lot more expensive. So in '95 we actually made a big
14  large order to be done in the Orient, and I have a letter
15  where I discussed what I wanted done and the quantities,
16  and, you know, working with Shell Plutsky, the owner of
17  Pioneer. So that would be the closest thing to an
18  agreement I have with him and attached to that is also the
19  purchase order.
20  Q   Thank you.
21      Can I have this marked.
22      (Exhibit 4 marked.)
23  BY MS. OLANNA:
24  Q   Does Pioneer Photo Album have any type of agreement
25  for ownership of any portions of these designs or use of

---

Page 11

1   any portion of these designs?
2   A   No, they don't. Back -- way back in '83 or '84 --
3   '83, I guess it was, I did sign a rep agreement. You
4   know, it's like a standard I-get-a-percentage-of-sales-
5   for-all-Pioneer-products-in-Alaska, but I don't know where
6   that is. It's so old. And it has a 30-day, you know,
7   notice that either party could terminate it, so, you know,
8   in all those years we have never renewed it. It's just
9   been verbal, you know.
10  Q   So under that agreement, you sell Pioneer Photo Album
11  merchandise and received a percentage?
12  A   A commission, uh-huh.
13  Q   But that agreement doesn't in any way give Pioneer
14  Photo Album ownership of any of your designs or products?
15  A   No, it's a standard sales rep agreement, standard in
16  the industry for salesmen working for companies or
17  manufacturers.
18  Q   And, let's see, are there any other agreements that
19  you have related to any of these four albums that would
20  give any other company the right to use the designs?
21  A   No. I have no agreement other than just commissions.
22  Q   Commission, you mean just with, like, stores and
23  retail --
24  A   Commissions for any product sold in Alaska.
25  Technically, any Pioneer product sold in Alaska I should

---

Page 12

1   get commission on; although, Arctic Circle did -- that one
2   (indicating), and I complained about it. I wanted to get
3   commission on that one, and they never gave me commission
4   on that one.
5   Q   What were their grounds for denying?
6   A   Because it was shipped to Seattle, not to Alaska, to
7   a consolidator, and it was just discussed with Shell that
8   they weren't going to do it on that one. I did get
9   commission on Arctic Circle copied me, did a similar album
10  to this (indicating), after 94 -- it was probably '96 --
11  and I complained to Shell about that, and he made sure I
12  got commission on those orders.
13  Q   So I'm sorry, just to clarify, when you say that you
14  complained about -- actually, I'll have these marked
15  first.
16      (Exhibit 5 marked.)
17  BY MS. OLANNA:
18  Q   So when you say that you complained that Arctic
19  Circle had a product manufactured by Pioneer Photo Album
20  that you did not receive a commission on, you're referring
21  to Exhibit 5?
22  A   Right. I just remembered the other reason he said I
23  couldn't get commission is because it wasn't an album they
24  had in their line; it was something they went out and did
25  for Pioneer. That style of album Pioneer was not making.

---

Page 13

1   Q   So Pioneer -- your understanding was because Pioneer
2   didn't have any ownership in --
3   A   In that album, right. They were just acting as an
4   agent, I guess, for Arctic Circle. In that case, I didn't
5   get commission for those albums.
6   Q   So you have no financial ties to this album?
7   A   None whatsoever.
8   Q   And you noted here on Exhibit 3, the 1994 album with
9   the Alaska map on it, that says "Alaska" underneath it,
10  that you said that Arctic Circle had produced an album
11  that was very similar to this one?
12  A   Right.
13  Q   And that you had received a commission on that?
14  A   Yes.
15  Q   So I guess, what was the grounds for that, for
16  receiving that commission?
17  A   Because it was an album being shipped to Alaska and
18  it was an item that was already in their line. This is a
19  T2-246AD is the model number, and so since it was a
20  production album, under the terms of my agreement I should
21  get commission for it, and I did.
22  Q   You said -- so I guess if it was an album that you
23  had created and that Pioneer was manufacturing, what was
24  Arctic Circle's role in that particular album?
25  A   No, it wasn't that I created the album. It was that

---

4 (Pages 10 to 13)

EXHIBIT 1, PAGE 5                                    45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                              James Cottrell

---

**Page 14**

1  it was an album that Pioneer had in their line already,
2  and under the terms of my rep agreement, I received
3  commission for it.
4  Q   So when Pioneer started, I guess, filtered those
5  through Arctic Circle, you still got a commission through
6  it?
7  A   Yeah, they were selling them to Arctic Circle.
8  Q   Okay. Thank you. I'm not in this business, so I may
9  ask some questions that seem silly.
10 A   Okay.
11 Q   So with regard to any of these albums here on Exhibit
12 3, do you have an agreement for their use -- for the use
13 of their design with any company?
14 A   No, those are my designs.
15 Q   Your designs and they are wholly owned by you?
16 A   Right.
17 Q   And so nobody else has, I guess, any license to use
18 them?
19 A   No.
20 Q   We will come back to this album here of Arctic
21 Circle's that is marked Exhibit 5.
22 A   Okay.
23 Q   Are you familiar with this photo album?
24 A   Yes, I have seen it.
25      MR. GREEN: Pardon me. Just so I understand,

---

**Page 15**

1  this Exhibit 5, is that also the same album that is listed
2  in your complaint for copyright infringement?
3      MS. OLANNA: Yes. Well, this is Arctic
4  Circle's. It's not --
5      MR. GREEN: Well, that's the one that's Exhibit
6  1 in the complaint?
7      MS. OLANNA: I believe so.
8      MR. GREEN: Okay.
9      MS. OLANNA: There may be a different size.
10     MR. GREEN: Okay. Or Exhibit A, actually.
11 Thank you.
12 BY MS. OLANNA:
13 Q   Does J.C. Marketing have any interest to this
14 album -- in this album?
15     MR. GREEN: Off record just a second.
16     THE WITNESS: Sure.
17     MS. OLANNA: I'm sorry. Could he answer the
18 question?
19     THE WITNESS: I will --
20     MR. GREEN: I would like him to go off record.
21 Well, go ahead, answer the question. Yeah, go ahead,
22 answer the question. If you don't answer it completely,
23 then we may have to go off record.
24     MS. OLANNA: I'm sorry. We can take a break,
25 just not while there is a question pending.

---

**Page 16**

1  BY MS. OLANNA:
2  Q   So does J.C. Marketing have any interest in this
3  photo album?
4  A   No. I have no financial interest. I have no -- I
5  can't think of any interest I would have, no.
6      MS. OLANNA: Did you want to take a break?
7      MR. GREEN: Yeah, I just needed to get
8  clarification for myself.
9      THE WITNESS: Okay.
10     MR. GREEN: Is this the one that is in the
11 copyright notice attached to the complaint, the copyright
12 registration?
13     THE WITNESS: Yeah.
14     MS. OLANNA: I believe so.
15     MR. GREEN: Okay. Off record.
16     (Off record.)
17 BY MS. OLANNA:
18 Q   We're back. So J.C. Marketing doesn't own any
19 portion of this design?
20 A   No, we don't.
21 Q   Has anyone ever shown you this album?
22 A   No. I have seen it in stores. Nobody has shown it
23 to me.
24 Q   Do you feel that this album is in any way like J.C.
25 Marketing's album which you have here in Exhibit 3?

---

**Page 17**

1  A   Well, yeah, there is -- I mean, it's embossed; mine
2  are embossed. It has animals on it; mine have animals.
3  It says Alaska; mine says Alaska. So, you know, the
4  general feel of the album and the size, so, yeah there is
5  definitely similarities.
6  Q   Just to clarify, some of your albums have animals on
7  them?
8  A   Yes. Right.
9  Q   Then others have maps of Alaska?
10 A   Right.
11 Q   But you don't have an album that combines both the
12 maps and the animals?
13 A   Not prior to '99.
14 Q   Does this photo album remind you, aside from these
15 four albums, of any other J.C. Marketing products, aside
16 from just the general Alaskana?
17 Q   I would say it's more similar to another album I do
18 that was created after '99, or, actually, created -- yeah,
19 '99.
20 Q   Could you describe that album for me. I know we
21 didn't ask you to produce it, but just to describe it?
22 A   It's an album with the outline of the state and it
23 has animals in it and it's more colorful. The animals are
24 in color rather than black and white, like these animals
25 are all in color (indicating). And it has a moose and a

---

5  (Pages 14 to 17)

EXHIBIT 1, PAGE 6

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                          James Cottrell

---

Page 18

1  caribou and a lot more animals than this has.
2  Q   Do you feel that they are alike enough that people
3  would be confused by them?
4  A   I don't know. If I thought they were, I probably
5  would have sued.
6  Q   And when did you begin producing that photo album?
7  A   The artwork was done in '99, but the production was
8  done in 2001.
9  Q   And do you have any type of fee or royalty agreement
10 regarding the use of that product?
11 A   Yes, I do.
12 Q   And who is that with?
13 A   It's a company called Hoffmaster. They are -- they
14 make placemats. It's a placemat that you would find in
15 every restaurant, and it's been in every restaurant -- the
16 copyright says '99, but I think it's been in restaurants
17 since about '97 or '98.
18 Q   Okay. Do you know if Arctic Circle has any dealings
19 with that company?
20 A   Not that I know of.
21 Q   And you don't have any similar agreement for the use
22 of that design with Pioneer Photo Albums?
23 A   What do you mean by that?
24 Q   Do you have any agreements regarding, I guess, the
25 photo album that you said was more like this one

Page 19

1  (indicating) with Pioneer Photo Album?
2  A   Well, I have an agreement with them to produce it,
3  and that nobody else could use it.
4  Q   So it's just a manufacturing agreement, then,
5  protecting your copyright?
6  A   Right.
7  Q   And I'm assuming that is still being produced?
8  A   Yes.
9  Q   Are there any other photo albums that you have that
10 would be similar to this one?
11 A   No.
12 Q   Do you have any other products that are like this
13 album or the design on this album?
14 A   I have other products with the state and maps and,
15 you know, I have a clock, and I have a mug, and I have,
16 yeah, a few other things.
17 Q   Okay.
18 A   They are not necessarily -- I mean, they are nothing
19 in terms of exact, but they may have similar components.
20 Q   And are any of the components -- I guess which of the
21 components do you feel you have products --
22 A   The outline of the state with all the names of the
23 cities, you know, similar to just a map. I have a map
24 that has an outline of the state with all the cities, and
25 I believe it has -- all the maps probably has the compass

Page 20

1  on it, too, so.
2  Q   Okay. Are these specific town locations or just
3  towns in general?
4  A   Yeah, I don't know if those are the specific towns,
5  the same ones, but definitely towns in general. All the
6  tourist spots. You know, all the towns the cruise ships
7  go to, plus Fairbanks, plus all the cities you would want
8  to put on it to be attractive to tourists, you know.
9  Q   I think you mentioned earlier that if anything was
10 really similar, you would have filed a copyright suit?
11 A   On that maps in particular.
12 Q   So I'm assuming that none of your other products are
13 similar enough to trigger that type of a reaction?
14 A   Not of mine, no.
15 Q   I guess, is there anything else that I should know
16 about this album, any agreements in connection to it?
17 A   No. I don't know of any agreements. I really don't
18 know much about that album at all.
19 Q   Thank you. Now, you indicated that you were familiar
20 with Pioneer Photo Album Company?
21 A   Uh-huh.
22 Q   And you're dealings with them began when?
23 A   '83.
24 Q   '83. So you mentioned that you have a commission as
25 a sales representative for Pioneer Photo Album?

Page 21

1  A   Uh-huh.
2  Q   And that they manufacture a number of your products?
3  A   Uh-huh.
4  Q   Do you have any other agreements with them aside from
5  sales representation and manufacturing?
6  A   Nope.
7  Q   Have they purchased copyrights from you?
8  A   No.
9  Q   Do they have any agreement to use any of your
10 designs?
11 A   No.
12 Q   And no agreement that would be sort of similar to
13 that, you know, no sales royalties?
14 A   No. Nothing like that.
15 Q   And I know I'm being a bit repetitive here, but has
16 J.C. Marketing ever dealt with Pioneer with respect to
17 Arctic Circle Enterprises?
18 A   Well, other than I wanted to make sure I got
19 commission on their purchases, and I did, like I said, get
20 commissions of purchases of album that were similar to
21 this one (indicating).
22 Q   To this one, being Exhibit 3, the album with the 1994
23 underneath it?
24 A   Uh-huh.
25 Q   Are you still receiving those commissions?

6  (Pages 18 to 21)

EXHIBIT 1, PAGE 7                          45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                          James Cottrell

---

Page 22

1   A   No. Because I believe Arctic Circle is not using
2   Pioneer for those albums anymore. They are getting them
3   done over in some Chinese factory.
4   Q   Do you have any type of a record regarding that
5   exchange or those dealings?
6   A   No. I mean, I would have -- you know, I have
7   commission reports showing no Arctic Circle commission. I
8   mean, that's the only thing I would have.
9   Q   Okay. Do you feel -- is there any connection between
10  this album marked in Exhibit 3 and this marked in Exhibit
11  3 with the 1994 underneath it?
12  A   Just that they are embossed, souvenir albums with the
13  word "Alaska" on them and the state of Alaska.
14  Q   So aside from those similarities, there is no link
15  between their copyrights?
16  A   I couldn't tell you that. I'm not an attorney.
17  Q   Okay. And so essentially, aside from the fact that
18  they both have a map on them, this album here in Exhibit 3
19  with the 1994 didn't lead to the creation of this here in
20  Exhibit 5?
21  A   I don't know.
22  Q   Have you received anything of value from Pioneer
23  Photo Album that is related to Pioneer's ability to
24  manufacture photo albums for ACE -- I'm sorry -- for
25  Arctic Circle?

---

Page 23

1   A   Just like I said, I got a commission a few years back
2   on these albums.
3   Q   Those are the Exhibit 3, 1994 album?
4   A   Uh-huh. I haven't received a commission for those
5   albums for at least three years. About three years since
6   I stopped receiving commission on those.
7   Q   Okay. And the parties to that agreement were just
8   yourself and Pioneer?
9   A   Uh-huh.
10  Q   What do you know about Arctic Circle Enterprises just
11  generally?
12  A   I know they are a competitor. I know they like to
13  copy people. They copied me. They copied my other
14  colleagues in the industry. I don't particularly like
15  them.
16  Q   I guess that is understandable. Now, who are your
17  colleagues?
18  A   Oh, like Roger Zack (ph). He produces souvenirs.
19  Just this year they copied his lure of Alaska, which is a
20  lure key ring, and they have it in their catalogue now.
21  Poor guy has to go out and a hire a lawyer for a $1.50
22  item, you know, but that is typical of the way they work.
23           They copied my album. I mean, they took this
24  exact same album, the only thing they did was put a big
25  dipper in the middle and took out "The Last Frontier" on

---

Page 24

1   the top.
2   Q   So that's why you received the commission?
3   A   No. I received commission because I'm the rep, and I
4   should receive commission.
5           They just copied another company, Alaska Jack,
6   who makes antler carvings, simulated antler carvings. Did
7   really well with it last year. Now Arctic Circle is doing
8   it this year. So they are notorious in the industry for
9   doing that.
10  Q   Has anyone ever taken legal action against them to
11  your knowledge?
12  A   I don't know.
13  Q   Do you know Mitchell Godfred?
14  A   Yes.
15  Q   In what capacity?
16  A   I just know of him. I know who he is, you know.
17  Q   What do you think of him?
18  A   Not much either way.
19  Q   Have you ever spoken to him?
20  A   Yes, briefly.
21  Q   When was this?
22  A   He had filed a small claims suit against my company
23  because we have a collage map, and we were selling state
24  of Alaska, multiple openings, had the state of Alaska on
25  it, and it was out there for a couple of years and

---

Page 25

1   somebody said you should put pictures in there to show
2   people what you can do, you know. So somebody put in the
3   office cut up some postcards and stuck them in there to
4   show at a show what it would look like with pictures in
5   it, and he sued me because the postcards -- some of them
6   were his postcards. I settled for, like, $400. Talked to
7   him in court. That was it.
8   Q   When was that?
9   A   Three or four years ago.
10  Q   What do you know about the Alaska Juneau Mining
11  Company?
12  A   Just, I know Dave Coats (ph) from selling him -- I
13  have sold him photo albums since the beginning, probably
14  since '94.
15  Q   So they are a customer?
16  A   Yes.
17  Q   So do you have a personal relationship with Dave
18  Coats?
19  A   Just business.
20  Q   Have you spoken with him recently?
21  A   Yeah, I spoke to him -- actually, I spoke to him a
22  couple of months ago because his attorney had sent me a
23  request for whatever you call it, a deposition, and I sent
24  a response, you know. And I called asking what is this
25  about. He told me that Arctic Circle was suing him. I

---

7  (Pages 22 to 25)

EXHIBIT 1, PAGE 8

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                    James Cottrell

## Page 26

1  said okay.
2  Q   Do you remember any specifics about that
3  conversation?
4  A   Just that he was sorry that they drug me into it, and
5  that he didn't think it was a big deal, that he bought the
6  rights to that photo album that is in question from Indian
7  Arts & Crafts, who is another souvenir company that went
8  out of business, and I had seen it in their catalogue
9  before, so I knew what he was talking about.  I just
10  wished him well in the case and that was about it.
11  Q   Did he give you an explanation for dragging you in?
12  A   No.  He just said that he was sorry I was brought
13  into the case.
14  Q   Did he indicate that they brought you in because he
15  felt that you owned any portion of this photo album on
16  Exhibit 5?
17  A   No.  He said that -- I guess maybe the reason he
18  brought me in is because he said he knew I had been doing
19  photo albums before Arctic Circle, that I was the first
20  one doing Alaska photo albums, and he thought this case
21  was silly, and I agreed with him.  So that's, I guess,
22  would be why, because he knew I was doing photo albums for
23  a long time with Alaska designs.
24  Q   Did he indicate that he thought that this might have
25  been, I guess, stemming from any of your designs here?

## Page 27

1  A   I don't recall exactly, no.  I just recall that he
2  said I was doing them first, but he didn't specifically
3  say that came from that.
4  Q   Did he say anything else about the lawsuit?
5  A   That was about it.
6  Q   About how long was the phone call?
7  A   Maybe 10 minutes.  I was talking about other things,
8  too.  I always try to sell somebody when you get them on
9  the phone.
10  Q   Have you spoken to anybody else about this lawsuit?
11  A   Well, all my employees know about it.  That would be
12  about it.
13  Q   Do they know about it just sort of because they are
14  in the industry?
15  A   Or because I'm working on it.  I've got to get copies
16  of this, copies of that, go see an attorney.  You know,
17  they know it's taken a lot of time out of my schedule.
18  Q   So what's your opinion on the lawsuit?
19  A   I don't know.  You know, copyright law is so vague,
20  who knows?  They are definitely not identical albums, you
21  know, and if Indian Arts & Crafts sold the rights to that
22  album, I think Dave should be in clear.
23  Q   Is there anything else about this lawsuit that you
24  have been told that might be relevant to anything we have
25  discussed today?

## Page 28

1  A   No.
2  Q   Just to make sure we have gotten everything.  So just
3  to clarify, the only interaction that you've had with
4  Pioneer Photo Albums regarding Exhibit 5 was a dispute
5  over whether or not you were entitled to commission on
6  this product?
7  A   Uh-huh.
8  Q   And that dispute was based solely on the fact this
9  was a item manufactured by Pioneer Photo Albums?
10  A   And shipped to Alaska, yeah.
11  Q   And it didn't have to do with anything specific to
12  this item?
13  A   No.
14  Q   So if this had been a mug with a moose on it, you
15  would have had the same complaint?
16  A   Exactly.
17  Q   Is there anything else that you know about this photo
18  album that I haven't asked that might be relevant?
19  A   No.
20  Q   Are there any other products or prior art that you
21  have that you're going to go back to your office and take
22  a look at after looking at this album in Exhibit 5 because
23  they look so similar that, you know, you want to double
24  check?
25  A   No.

## Page 29

1  Q   So again, just to recap, the only link you have to
2  Pioneer Photo Albums is as a sales representative and that
3  they manufacture things for you?
4  A   Right.
5  Q   And so just to clarify, you don't have any -- they
6  don't own any copyrights of your products?
7  A   No.
8  Q   You don't have any type of a fee agreement with them
9  regarding the use of any of your designs?
10  A   No.
11  Q   So you have never received anything of an in-kind, or
12  a check, or a discount or anything like that regarding the
13  use of any of your designs or products?
14  A   No.
15  Q   Is there anything else about Pioneer Photo Album that
16  I haven't asked you that you think might be helpful or
17  relevant to this lawsuit?
18  A   Not that I can think I of.
19  Q   And there is nothing about any conversation you've
20  had with Dave Coats or anyone else at Alaska Juneau Mining
21  Company that was with regard to this lawsuit?
22  A   No.  I pretty much told you what we discussed.  I
23  can't think of anything else, no.
24  Q   Well, I noticed you brought a few other documents
25  here.

8  (Pages 26 to 29)

EXHIBIT 1, PAGE 9

45c73595-bc80-44bc-90c0-4b8a878cd0d7

---

**Page 30**

1  A   Well, yeah, these were just some invoices, like I
2  said. They were '96, '97 invoices where I whited out the
3  sales, the cost, you know, but I did have the customer's
4  name and the item number. So those are invoices,
5  shipments, that I made to customers.
6         MS. OLANNA: Let's have that marked.
7         (Exhibit 6 marked.)
8  BY MS. OLANNA:
9  Q   So these just relate -- so Exhibit 6, these invoices
10 relate to the sales of these photo albums here in Exhibit
11 3?
12 A   Yeah.
13        MR. GREEN: So I understand, you said you whited
14 out something on these?
15        THE WITNESS: The cost, what I sold them for.
16 The extension, and the totals. That is basically it, yup.
17 BY MS. OLANNA:
18 Q   Okay. And I noticed that they are all marked
19 "Attorneys Eyes Only", so that's fine with us.
20 A   Okay.
21        MS. OLANNA: That's all that I have. Thank you.
22        MS. KUHL: I have a couple of questions for you.
23 Are you done?
24        MS. OLANNA: I'm done.
25               EXAMINATION

---

**Page 31**

1  BY MS. KUHL:
2  Q   For the record, I'm Brooke Kuhl. I'm with
3  Kirkpatrick & Lockhart Preston Gates and Ellis. We
4  represent Alaska Juneau Mining Company. And I'll try to
5  be pretty brief.
6  A   Okay.
7  Q   Mr. Cottrell, do you know anything about Alaska Gift
8  dot com?
9  A   Yeah, that is my company also.
10 Q   So is Alaska Gift one of the websites under J.C.
11 Marketing?
12 A   Right.
13        MR. GREEN: Is this being marked as an exhibit?
14        MS. KUHL: Maybe.
15 BY MS. KUHL:
16 Q   Now, in this, it's a little synopsis about your
17 company; is that correct?
18 A   Uh-huh.
19 Q   Your company was started in 1985?
20 A   Uh-huh.
21 Q   The photo album you were discussing --
22 A   Actually, '83, but oh, well. Who cares?
23 Q   The photo album that you're discussing, is this the
24 same photo album that we talked about a little bit ago on
25 Exhibit 3, this 1994 photo album?

---

**Page 32**

1  A   Yes.
2         MS. KUHL: Now I'd like to go ahead and make
3  this an exhibit.
4         (Exhibit 7 marked.)
5  BY MS. KUHL:
6  Q   Now, on this website, you sell some photo albums;
7  correct?
8  A   Correct.
9  Q   Including the photo albums you showed us here today?
10 A   Correct.
11 Q   I'm handing you a printout from that website that
12 shows some of these albums.
13 A   Right.
14 Q   Are these all albums that are currently in your line?
15 A   Yes, they are.
16 Q   Now, turning to, I believe, the second page of that
17 exhibit. These photo albums that are further down the
18 page, the brown photo albums?
19 A   Uh-huh.
20 Q   Can you tell me: Is this the photo album you were
21 talking about that came from Hoffmaster?
22 A   Right.
23 Q   The placemat design?
24 A   Right.
25 Q   Can you tell me when you began selling that photo

---

**Page 33**

1  album?
2  A   2001.
3  Q   Now, you had indicated that was originally a
4  placemat?
5  A   Uh-huh.
6  Q   What changes did you make to that to make that into a
7  photo album?
8  A   Very little. I think the only thing I did was put
9  the "Alaska" on the spine. Everything else is -- I
10 actually brought the placemat. There is the back
11 (indicating).
12 Q   Now, is there any reason that you chose for that to
13 be on a tan album background?
14 A   Well, that -- it's tan. I mean, that's the placemat,
15 so.
16 Q   So you didn't make any choices regarding the album?
17 A   No.
18 Q   Now, what sizes does that photo album come in?
19 A   It comes in a one hundred, a small one. It comes in
20 a 208, and it comes in 300, a big tall one. It also comes
21 in a three-ring binder that's your standard three-ring
22 binder, and it comes in a scrapbook.
23 Q   Now, would you agree that the sizes of your photo
24 albums are dictated in part by the size of the pictures?
25 A   Yes.

---

EXHIBIT 1, PAGE 10

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                    James Cottrell

---

**Page 34**

1  Q   We talked a little bit about Hoffmaster. You said
2  you had a license from them?
3  A   Right.
4  Q   Is it your understanding that that is an exclusive
5  license?
6  A   Yes, it is.
7  Q   So as far as you know, they don't license this design
8  to anyone else?
9  A   No, they don't.
10  Q   You indicated earlier that Pioneer Photo Album is
11  manufacturing this album; is that correct?
12  A   Yes.
13  Q   Now, have you ever sold this particular album to
14  Arctic Circle?
15  A   No.
16  Q   Do you know who Lorraine Wyles is?
17  A   No.
18  Q   Jason Reynolds?
19  A   No.
20  Q   Pam Ruatto?
21  A   No.
22  Q   You've indicated earlier that you had started
23  creating Alaska map embossed albums in 1990 --
24  A   '4.
25  Q   -- is that correct?

---

**Page 35**

1  A   Right.
2  Q   Now, this is a copy of your album (indicating); is
3  that correct?
4  A   No. That's Arctic Circle's album.
5  Q   This isn't a copy of your --
6  A   No.
7       MR. GREEN: Excuse me. So we don't get
8  confused, could we mark that as an exhibit?
9       MS. KUHL: Yes. I'm sorry.
10      (Exhibit 8 marked.)
11  BY MS. KUHL:
12  Q   Then let's have you look at this. Let's see if
13  we can determine -- so this is not your album?
14  A   No. That is theirs. A year and a half after I did
15  this, they did that one (indicating). That's a blatant
16  copy also.
17      MS. KUHL: Let's go ahead and have this marked.
18      (Exhibit 9 marked.)
19  BY MS. KUHL:
20  Q   I also have an album with me. That's where the copy
21  was made from.
22  A   Right.
23  Q   Is this your album or is this Arctic Circle's?
24  A   That is the Arctic Circle's album.
25  Q   Arctic Circle produced this album when?

---

**Page 36**

1  A   It didn't show up until their 2003 catalogue. I
2  remember seeing it in stores around the end of 2002.
3  And -- which was why I believe they copied me.
4  Q   I can see you have your placemat there in front of
5  you?
6  A   Uh-huh.
7  Q   If you could, can you look at the placemat and at
8  this Arctic Circle album and tell me if there is any
9  similarities --
10  A   Well, actually, my album is even more similar because
11  the "Alaska" goes down the spine on that one. It's the
12  change I made to it. So, yes, there, you know, they used
13  all the same animals that I did: The eagle and the moose,
14  the caribou, bears and even the inset that I did.
15  Q   So to make sure the record is clear, right now we're
16  comparing Exhibit 9, which is an Arctic Circle album, to
17  the placemat that Mr. Cottrell has brought with him that
18  is substantially what his photo album is.
19       And, Mr. Cottrell, would you agree with me that
20  your album was on the market in approximately 2001?
21  A   Exactly.
22  Q   And Arctic Circle's came on the market in 2002 or
23  2003?
24  A   Right.
25  Q   So your album would have been available on the market

---

**Page 37**

1  before Arctic Circle's album?
2  A   Definitely. If you look at the picture, you can
3  really see the similarities. Well, you wouldn't have an
4  opening here (indicating), but how the "Alaska" went down
5  the spine on mine.
6  Q   Now you're referring to what has been marked as
7  Exhibit 8; correct?
8  A   Right.
9  Q   That's a photograph of your album?
10  A   Right.
11  Q   That is similar to the Arctic Circle album in Exhibit
12  9?
13  A   Uh-huh. And the other similarity was they put the
14  facts on the back of the album which they had not done
15  before until I did it.
16  Q   Did you ask for a copyright lawsuit or any other kind
17  of a lawsuit against Arctic Circle for this design?
18  A   Yes, I did. In fact I contacted Hoffmaster. I told
19  them about the infringement, and they agreed with me, too,
20  that it looked like an infringement, and so they sent
21  Arctic Circle a cease-and-desist letter, and I guess my
22  wife actually talked to the person at Hoffmaster, Cindy, I
23  believe her name was, and she said that their attorney had
24  sent Arctic Circle a cease-and-desist letter, that Arctic
25  Circle had called them and ask to buy the rights to the

---

10 (Pages 34 to 37)

EXHIBIT 1, PAGE 11

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                    James Cottrell

---

**Page 38**

1  album, at which point Hoffmaster said no, and then Arctic
2  Circle threatened to sue them back for something. I don't
3  know. They said they would file a countersuit and get
4  real expensive. At that point, the attorney said he
5  didn't feel it was worth the expense to litigate it, and
6  if I wanted to spend the money, I could, and I decided I
7  didn't want to spend $20,000 or whatever it was going to
8  cost to go through litigation with Arctic Circle, so I
9  didn't at that point, but I still reserve the right to do
10 it.
11 Q  So in your opinion, is this Exhibit 9 a copy of your
12 earlier album?
13 A  I believe so, yes.
14 Q  Mr. Cottrell, I'm handing you a copy of a cover page
15 of Arctic Circle's 2006 catalogue.
16 A  Uh-huh.
17 Q  Have you seen this catalogue?
18 A  Yes, I have -- no, not 2006. I saw 2007.
19 Q  Now, if you could turn to page two of that catalogue.
20 A  Uh-huh.
21 Q  Now I'm looking at the magnets, and there is one
22 03765 map and 03768 map.
23 A  Uh-huh.
24 Q  Now, do you have any opinion about the similarities
25 of these magnets to your photo album design?

---

**Page 39**

1  A  Yeah, I believe they copied a lot of the same
2  elements that I had in my photo album and that were in the
3  placemat.
4  Q  And you have never licensed Arctic Circle to create
5  any of these items; is that correct?
6  A  No, I never did.
7  Q  And it's your understanding that your license with
8  Hoffmaster is an exclusive license?
9  A  Yes, it definitely is.
10    (Exhibit 10 marked.)
11 BY MS. KUHL:
12 Q  I want to go back to Exhibit 3. It's somewhere in
13 this pile in front of you. Looking at your album, the
14 1994 album?
15 A  Uh-huh.
16 Q  I'm looking at the stitching around the outside of
17 the album.
18 A  Uh-huh.
19 Q  Was that a design element that was your design?
20 A  No. That was just the album that was already in
21 production. I just had them put my design on it.
22 Q  So, in your opinion, is the stitching there to hold
23 the album together?
24 A  Yes.
25 Q  You mentioned that this 1994 album was in Pioneer's

---

**Page 40**

1  line?
2  A  Right.
3  Q  What did you mean by that?
4  A  Well, Pioneer makes a whole line of photo albums.
5  You know, probably a hundred different photo albums that
6  they manufacture, and so all I did was pick some of their
7  albums to put Alaska designs on.
8  Q  So as I understand, you're saying you picked a stock
9  album --
10 A  Right.
11 Q  -- and gave them an artwork for the cover?
12 A  Right.
13 Q  Now, when Arctic Circle began selling maps similar to
14 your 1994 design --
15 A  Right.
16 Q  -- when do you think that was?
17 A  I believe it was '96 or '97. It was, like, two years
18 later.
19 Q  Now, did you consider filing a lawsuit against Arctic
20 Circle at that time?
21 A  Yeah, I did at that time, but then Shell assured me I
22 was going to get my commission on all their orders, and
23 that if we didn't do it -- they would just have it done
24 overseas and change it a little bit, so I figured I might
25 as well get my commission and not fight it.

---

**Page 41**

1  Q  Now, have you had the opportunity to review or look
2  at Arctic Circle's album that is similar to this album?
3  A  Yes.
4  Q  In your opinion, is that a stock album of Pioneer's
5  and then Arctic Circle provided some kind of artwork for
6  the cover?
7  A  Yes. And I think now they don't even use Pioneer.
8  They're having it done overseas in a different factory.
9  Q  Now, we looked earlier at the photograph of Arctic
10 Circle that is at issue in this lawsuit. I think it was
11 Exhibit 5.
12    I know that's it's a photograph and not the
13 album itself, but you had indicated that you are familiar
14 with this album. You have seen it in stores?
15 A  Uh-huh.
16 Q  Is there anything about the size of this album that
17 is special or individual to Arctic Circle?
18 A  No.
19 Q  And either the 100 or 200 pocket, would it be your
20 opinion that those are standard sizes?
21 A  Yes.
22 Q  Is there anything about the color of the album that
23 is special or individual to Arctic Circle?
24 A  No. I have seen other colored albums out there
25 before.

---

11 (Pages 38 to 41)

EXHIBIT 1, PAGE 12

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                        James Cottrell

---

**Page 42**

1  Q   Is there anything about the stitching along the
2  corners along the outside that is special or individual to
3  Arctic Circle?
4  A   No. I mean, you can see the other albums we do are
5  all stitched.
6  Q   Just to backtrack a little, we have been talking
7  earlier that you have your own Alaska maps and have been
8  designing and selling photo albums for essentially the
9  last 15 to 20 years?
10 A   Right.
11 Q   Now, as far as the compass in conjunction with the
12 map, is there anything about that that is special or
13 individual to Arctic Circle?
14 A   No. Almost every map you see has a compass on it.
15 Q   The use of the animals, you've indicated that earlier
16 you had used animals on maps. Would you say that Arctic
17 Circle's choices of animals are choices of animals that
18 are commonly known or identified with Alaska?
19 A   Yes.
20 Q   So would you agree that the selection of a whale, an
21 eagle, a float plane, and a cruise ship are all icons that
22 are symbolic of the state of Alaska?
23 A   Yes.
24 Q   Is there anything about the outline of the state of
25 Alaska that you think is special or individual to Arctic

---

**Page 43**

1  Circle?
2  A   No.
3  Q   The choice of towns?
4  A   No. I mean, like I said, you need to pick all the
5  best spots. They added maybe more than they needed to,
6  but.
7  Q   It's a little busy?
8  A   Yeah.
9  Q   The identification of the actual demarcation of the
10 Arctic circle --
11 A   That is normally on most maps.
12 Q   The use of the word "Alaska" with an outline of an
13 Alaska map?
14 A   Outline of Alaska map?
15 Q   The use of the word "Alaska" in conjunction with the
16 outline of the Alaska map?
17 A   No.
18     I have actually found another old placemat
19 that's probably older than that that's got a lot of those
20 same elements in it.
21 Q   Where did you find this other old placemat?
22 A   Just digging through files, you know, artwork you
23 collect over the years. I don't know where it came from.
24 It's real plain.
25 Q   What color is the other placemat?

---

**Page 44**

1  A   It was more blue-ish. It had blues. I think it was
2  blue and tan, but I think it was more blue-ish than
3  anything.
4  Q   In your opinion, is there any reason why it seems a
5  number of these are on tan background? Is there any
6  reason why the color tan is used for a map?
7  A   Well, it's like that old-time sepia-tone feeling.
8  Klondike.
9  Q   So kind creates an antique feeling?
10 A   Right.
11 Q   Now, the other placement, what leads you to believe
12 it's an older one than this placemat?
13 A   Just that I didn't remember seeing it. I was digging
14 through files, and I found it. I didn't bring it because
15 it didn't have anything to do with my photo albums or
16 anything like that, but it just -- like, it's old. I
17 probably collected it on one of my visits in one of the
18 cities in the '80s.
19 Q   Just something you picked up somewhere?
20 A   Yes.
21 Q   You said it had some common elements. Can you tell
22 me what elements?
23     You're right now looking at the Arctic Circle --
24 A   Just the map and Alaska. I don't remember. I think
25 there was a totem pole or float plane or something. I

---

**Page 45**

1  can't tell you exactly what was on it, no.
2  Q   So common ideas?
3  A   Right.
4  Q   A map, the words "Alaska", a tan background with some
5  other colors that kind of create that old-time feeling?
6  A   Right.
7     MS. KUHL: That's all I have.
8     MS. OLANNA: I think I might have a few follow
9  up.
10    FURTHER EXAMINATION
11 BY MS. OLANNA:
12 Q   Now, you mentioned when you talked about Exhibit 3
13 that you used standard stock albums and put your own
14 original artwork on them?
15 A   Right.
16 Q   Do you do any album where you don't use a stock
17 album, but you create sort of your own, you know, you
18 decide the covering, you decide the type of binding?
19 A   I have done them.
20 Q   And when you do those, do you put a little more
21 thought into the color selections than you would with a
22 stock album?
23 A   Well, one of the ones I did I used the same colors
24 that was in this, which is, like, burgundy, green, blue,
25 anything that looked good with gold, and I did -- I guess

---

12 (Pages 42 to 45)

Midnight Sun Court Reporters   (907) 258-7100

Case No. 3:-06-cv-170 (TMB)                      James Cottrell

---

Page 46

1   that was it.
2   Q   And so I noticed also here in Exhibit 3 that some of
3   these albums have not the only stitching, but they also
4   have gold clips on the side?
5   A   Yes.
6   Q   Was that a conscious design choice you made?
7   A   Well, yeah, because -- well, it was available with
8   the brass corners, and brass looked good with the gold
9   letters, so I had them put on there, but it was actually
10  on the album already.  It was available on that album.
11  Q   So while the stitching is functional, I mean, the
12  choice of the color of the thread or the choice of
13  additional elements is a conscious choice that you make?
14  A   Yeah.
15  Q   I guess, tan backgrounds are common, you indicated;
16  is that true?
17  A   I didn't say they were common.  I said there are
18  other tan albums out there.
19  Q   And there are a lot of different shades of tan?
20  A   Right.
21  Q   When you produce something that has, you know, I
22  mean, there are also a lot of shades of blue?
23  A   Right.
24  Q   When you produce any item, you select a shade of
25  blue?

Page 47

1   A   Right.
2   Q   Or you select of a shade of tan?
3   A   Right.
4   Q   And sometimes small variations can make a big
5   difference?
6   A   Right.
7   Q   Also, when you select a color ink to emboss things
8   with, that takes a little skill; I mean, it's just not
9   something that a lay person could come off and necessarily
10  know what would sell?
11  A   Right.
12  Q   And so I noticed that all of these albums that we
13  have looked at today have moose or bears or eagles, that
14  they are sort of all Alaskan items and reflect that; is
15  that correct?
16  A   Well, not all of them, but some of them do.  I mean,
17  there are not that many with moose on them.
18  Q   No, but the moose, you would agree, is a fairly
19  common Alaska element?
20  A   Yes.
21  Q   So, for example, when you put together this 1997
22  album on Exhibit 3, I mean, sure, anybody could have
23  picked a bear or a wolf and a moose and put it on an
24  album, but you made a conscious decision to do those
25  particular animals?

Page 48

1   A   Right.
2   Q   And you made a decision to put more than one of them
3   on an album?
4   A   Right.
5   Q   You decided where on the album they would look best?
6   A   Right.
7   Q   And so even though things are similar, generally you
8   would say that as an expert in field you would recognize
9   that there were differences?
10  A   Yes.
11  Q   Just to follow up on Alaska Gift dot com., does J.C.
12  Marketing have any subsidiaries?
13  A   Well, Alaska Gift dot com is our company.  And that
14  is, yeah, that is the only business license we have is
15  that -- besides J.C. Marketing.
16  Q   Is that just an Internet site?
17  A   Yes.
18  Q   And so its sole purpose is to sell products by J.C.
19  Marketing?
20  A   Uh-huh.
21  Q   Do you only sell your own products?
22  A   I may have a couple of things that aren't mine.
23  Q   Are those also through Pioneer Photo Album?
24  A   No.  There is a lot of things that aren't through
25  Pioneer Photo Album.

Page 49

1   Q   Are any of them through Alaska Juneau Mining Company?
2   A   No.
3   Q   Are any Arctic Circle's?
4   A   No.
5   Q   Alaska Gift dot com, do you have any agreement
6   through that company with Pioneer Photo Album?
7   A   No.
8       MS. OLANNA:  Okay.  I think that's all I have.
9       MS. KUHL:  I'm done.
10      MR. GREEN:  Do you have extra copy of these?
11      THE WITNESS:  I have another one, but you can go
12  to just about any restaurant in town and get one.
13      MR. GREEN:  Does anybody want this marked as an
14  exhibit?
15      MS. KUHL:  We should.
16  (Exhibit 11 marked.)
17      (Proceedings adjourned at 2:15 p.m.)
18
19
20
21
22
23
24
25

13  (Pages 46 to 49)

EXHIBIT 1, PAGE 14

45c73595-bc80-44bc-90c0-4b8a878cd0d7

Case No. 3:-06-cv-170 (TMB)                              James Cottrell

Page 50

```
1         CERTIFICATE
2      I hereby certify that I have read the foregoing
3   transcript and accept it as true and correct, with the
4   following exceptions:
5   ═══════════════════════════════════════════════════
6   PAGE   LINE   CORRECTION
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  _____      _____
19  _____      _____
    Date: 3/14/07    James Cottrell
20
21      (Use additional paper to note corrections as
    needed, signing and dating each page.)        (SW)
22
23
24
25
```

Page 51

```
1         REPORTER'S CERTIFICATE
2      I, SUSAN J. WARNICK, RPR, and Notary Public in
3   and for the State of Alaska do hereby certify:
4      That the witness in the foregoing proceedings was
5   duly sworn; that the proceedings were then taken before me
6   at the time and place herein set forth; that the testimony
7   and proceedings were reported stenographically by me and
8   later transcribed under my direction by computer
9   transcription; that the foregoing is a true record of the
10  testimony and proceedings taken at that time; and that I
11  am not a party to nor have I any interest in the outcome
12  of the action herein contained; that signature was
13  requested.
14      IN WITNESS WHEREOF, I have hereunto subscribed my
15  hand and affixed my seal this _____ day of _____,
16  2007.
17
18
        _____
19        SUSAN J. WARNICK,
          Registered Professional Reporter
20        Notary Public for Alaska
21
    My Commission Expires:  April 8, 2010
22
23
24
25
```

Page 52

```
1         INDEX TO DEPOSITION
2   WITNESS:  James Cottrell          PAGE
3   Examination by Ms. Olanna:           3
    Examination by Ms. Kuhl:            30
4   Further examination by Ms. Olanna:  45
5
6
    EXHIBIT                    PAGE
7   No. 1                        3
    No. 2                        5
8   No. 3                        8
    No. 4                       10
9   No. 5                       12
    No. 6                       30
10  No. 7                       32
    No. 8                       35
11  No. 9                       35
    No. 10                      39
12  No. 11                      49
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Midnight Sun Court Reporters   (907) 258-7100

EXHIBIT 1, PAGE 15

45c73595-bc80-44bc-90c0-4b8a878cd0d7

# EXHIBIT 2

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT ("Agreement") is entered into by and between U.S. WHEEL CORPORATION ("U.S. Wheel") and HISPEC WHEEL & TIRE, INC. ("HiSpec").

## R E C I T A L S :

A.    HiSpec makes and sells a wheel known as the Series #4 ("Series #4 Wheel").

B.    U.S. Wheel sells a wheel known as the Series #35 ("Series #35 Wheel"), which is a copy of HiSpec's Series #4 Wheel.

C.    On April 8, 2003, U.S. Wheel filed Orange County Superior Court Case No. 03CC05381 (the "California Action") against HiSpec, alleging breach of contract, and mutual, open and current account.

D.    On May 3, 2003, HiSpec filed a Complaint against U.S. Wheel in the U.S. District Court for the Northern District of Indiana, docketed therein as Case No. 3:03CV0322RM (the "Indiana Action"), alleging trademark infringement, unfair competition, and interference with prospective business relations.

E.    The parties hereto now wish to fully, finally and forever settle, compromise and resolve certain outstanding matters between them.

NOW, THEREFORE, for and in consideration of the foregoing Recitals, the mutual undertakings contained in this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

6/18/03

EXHIBIT 2, PAGE 2

## AGREEMENT:

1.    Settlement Payment.  On or before June 24, 2003, HiSpec will cause a company check in the amount of $43,724, payable to "U.S. WHEEL CORPORATION" to be delivered to Stephen Kepler.

2.    Return of Wheels.  For pick-up on or before July 10, 2003, HiSpec will release first-line wheels to U.S. Wheel (on a will-call basis) consisting of the following:  162 PN#17240-65 wheels, also known as 17.5 inch, 8 lug, black wheels.

3.    Dismissal of Actions.  Within ten days after the deliveries set forth in paragraphs 1 and 2 are completed, the parties hereto shall dismiss with prejudice the Indiana Action and the California Action and give notice of same to one another.

4.    U.S. Wheel Representations.  U.S. Wheel hereby represents and warrants as follows:

- U.S. Wheel has purchased 3,204 wheels from Ruedas Argentinas E.B. ("Ruedas") for sale as Series #35 Wheels.

- The foregoing constitutes U.S. Wheel's only purchase of wheels (other than those manufactured by HiSpec) for sale as Series #35 Wheels.

- U.S. Wheel has sold 1,924 Series #35 Wheels to Tredit Tire & Wheel Co., Inc. ("Tredit") in Indiana.

- U.S. Wheel has sold 1,280 Series #35 Wheels to Tredit in Florida.

- The foregoing constitutes U.S. Wheel's only sales of Series #35 Wheels (other than sales of wheels manufactured by HiSpec).

- U.S. Wheel presently possesses zero Series #35 Wheels (except for wheels manufactured by HiSpec).

6/18/03

EXHIBIT 2, PAGE 3

U.S. Wheel acknowledges that HiSpec is relying on the foregoing representations in entering into this Agreement, and the provisions of paragraphs 9 and 12(b) and 12(c) shall not be applicable to these representations.

5.    Admission by U.S. Wheel.  U.S. Wheel hereby admits that it purchased and sold wheels which were copies of HiSpec's Series #4 Wheel, and that such conduct was in violation of HiSpec's trademark rights relating to the Series #4 Wheel.

6.    Limitation of Protection.  HiSpec hereby agrees that it does not currently have, nor has it had in the past, any trademark protection or other legal rights with respect to Series #4 Wheels (or copies or similar versions thereof) which are made, used, purchased and sold outside of the United States of America, Canada or Mexico.

7.    Mutual Releases.  Except for the obligations created by this Agreement, HiSpec, on the one hand, and U.S. Wheel, on the other hand, do hereby release and discharge each other and all of their respective related entities, predecessors, successors, and all of their respective officers, directors, partners, shareholders, employees, servants, attorneys, administrators, executors, representatives and assigns, jointly and severally, from all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, fees (including, without limitation, those of attorneys), expenses, actions and/or causes of action related to or arising out of the Indiana Action or the California Action.

8.    Release of Tredit and Ruedas.  HiSpec does hereby release and discharge Tredit and Ruedas and all of their respective related entities, predecessors, successors, and all of their respective officers, directors, partners, shareholders, employees, servants, attorneys, administrators, executors, representatives and assigns, jointly and severally, from all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, fees (including,

667165.01/OC
C1349-002/6-17-03/sjk/sjk

-3-

without limitation, those of attorneys), expenses, actions and/or causes of action related to or arising out of their manufacture, purchase, sale or advertisement of the 3,204 wheels which are specifically enumerated in paragraph 4 above. The foregoing sentence does not release any claim related to wheels other than the 3,204 wheels which are specifically enumerated in paragraph 4 above. Ruedas and Tredit are third party beneficiaries of this Agreement and shall be entitled to enforce the release set forth above.

9.    <u>Waiver</u>.  The parties understand and agree that the releases provided herein extend to all claims related to or arising out of the Indiana Action or the California Action, whether known or unknown, suspected or unsuspected. It is the intention of the parties through this Agreement and with the advice of counsel to fully, finally and forever settle and release all claims related to or arising out of the Indiana Action or the California Action. In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of such matters notwithstanding the discovery of any additional claims or facts relating thereto. Further, with respect to their release of claims related to or arising out of the Indiana Action or the California Action, the parties expressly agree that they waive and relinquish all rights and benefits they may have under Section 1542 of the Civil Code of the State of California regarding the waiver of unknown claims. That Section reads as follows:

"§ 1542.  [Certain claims not affected by general release.]  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

6/18/03

10.    <u>Cessation of Series #35 Sales</u>. After the execution of this Agreement, U.S. Wheel agrees to forever cease selling or advertising its Series #35 Wheel, unless such wheel is manufactured by HiSpec. HiSpec hereby agrees that it will not in the future prohibit or discourage (in a manner specifically, and without a reasonable commercial basis, targeting U.S. Wheel) any third party from selling HiSpec product to U.S. Wheel.

11.    <u>Binding Upon Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the parties hereto.

12.    <u>Representations and Warranties</u>. The parties hereto represent and warrant to and agree with each other as follows:

a.    Each party has received independent legal advice from attorneys of its choice with respect to the advisability of making this settlement and the releases provided herein and with respect to the advisability of executing this Agreement.

b.    Except as expressly stated in this Agreement, no party has made any statement or representation to any other party regarding any fact, which statement or representation is relied upon by any other party in entering into this Agreement. In connection with the execution of this Agreement or the making of the settlement provided for herein, no party to this Agreement has relied upon any statement, representation or promise of any other party not expressly contained herein.

c.    This Agreement is intended to be final and binding upon the parties hereto and is further intended to be effective as a full and final accord and satisfaction between them with respect to claims related to or arising out of the Indiana Action or the California Action, regardless of any claims of fraud, misrepresentation, concealment of fact, mistake of fact or law,

6/18/03

duress, or any other circumstances whatsoever. Each party relies upon the finality of this Agreement as a material factor inducing that party's execution of this Agreement.

 d. There are no other agreements or understandings between the parties hereto relating to the matters and releases referred to in this Agreement.

 e. All parties hereto and their counsel have made such investigation of the facts pertaining to the releases contained herein as they deem necessary.

 f. The terms of this Agreement are contractual and are the result of negotiation among the parties hereto.

 g. This Agreement has been carefully read by each of the parties hereto and the contents thereof are known and understood by each of the parties. This Agreement is signed freely by each party executing it.

 h. Each party covenants and agrees not to bring any action, claim, suit or proceeding against any party hereto directly or indirectly regarding or relating to the Indiana Action or the California Action, and each further covenants and agrees that this Agreement is a bar to any such claim, action, suit or proceeding.

 i. Each party represents and warrants that it is not presently aware of any claim(s) which it possesses against the other party other than those claims which are released by this Agreement.

 13. <u>Covenant Re Assignment</u>. The parties hereto, and each of them, represent and warrant to each other that each is authorized to enter into this Agreement, and to agree to the covenants and other terms provided herein and therein. Moreover, the parties hereto, and each of them, represent to each other that each is the sole and lawful owner of all right, title and interest in and to every claim and other matter which each purports to release herein, and that they have

667165.01/OC
C1549-002/6-17-03/sjk/sjk

-6-

not heretofore assigned or transferred, or purported to assign or transfer, to any person, firm, association, corporation or other entity, any right, title or interest in any such claim or other matter. In the event that such representation is false, and any claim or matter is asserted against any party hereto (and/or the successor of such party) arising from or relating to such false representation, then the party hereto who made the false representation shall fully indemnify, defend and hold harmless the party against whom such claim or matter is asserted (and its successors) from and against such claim or matter and from all actual costs, fees, expenses, liabilities and damages which that party (and/or its successors) incurs as a result of the assertion of such claim or matter.

14.    Counterparts. This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates set forth below.

DATED: 6/20/03

U.S. WHEEL CORPORATION

By: _____
Name: Eliot Mason
Title:   President

DATED: 6/18/03

HISPEC WHEEL & TIRE, INC.

By: _____
Name: Bradley R.M. Richards
Title:   President

667165.01/OC
C1549-002/6-17-03/sjk/sjk

-7-

EXHIBIT 2, PAGE 8