# Exhibit 5

0001

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ALASKA
 3   ------------------------------------------
 4   ARCTIC CIRCLE ENTERPRISES, )
 5   LLC.,                      )
 6          Plaintiff,           )
 7   vs.                        ) No. 3:-06-cv-170 (TMB)
 8   ALASKA JUNEAU MINING        )
 9   COMPANY LLC,                )
10          Defendant.           )
11   ------------------------------------------
12          Deposition Upon Oral Examination Of
13                  DAVID LEE COATES
14   ------------------------------------------
15   1201 Third Avenue, #4800, Seattle, Washington
16
...
24   DATE: February 5, 2007
25   REPORTED BY: Mindi L. Pettit, RPR, CCR #2519
```

2/5/2007 COATES, David Lee V.1

```
 1   APPEARANCES:
 2   For the Plaintiff: RYAN J. McBRAYER, ESQ.
 3                      Perkins Coie LLP
 4                      1201 Third Avenue
 5                      Suite 4800
 6                      Seattle, Washington 98101-3099
 7                      (206) 359-8000
 8                      (206) 359-9000
 9                      rmcbrayer@perkinscoie.com
10
11   For the Defendant: J. MICHAEL KEYES, ESQ.
12                      Kirkpatrick & Lockhart Preston
13                      Gates Ellis LLP
14                      618 West Riverside Avenue
15                      Suite 300
16                      Spokane, Washington 99201-0602
17                      (509) 624-2100
18                      (509) 444-7863
19                      mike.keyes@klgates.com
```

```
 1                    E X H I B I T S
 2   NO.  DESCRIPTION                          PAGE
 3    3   Alaska photo album ordered from Hayes
 4        Specialties                           4
 5   14   Alaska photo album of Arctic Circle
 6        Enterprises                           4
 7   30   "Antique Alaska Map Photo Album" artwork
 8        by Mr. Knutson                        4
 9   31   Sales: Item Summary for album-map     4
10   32   Excerpt of spreadsheet                4
11   33   Spreadsheet                           4
12   34   Invoice to Dockside Trading Co. from Hayes
13        Specialties Corporation, 6-20-06      4
14   35   Invoice to Dockside Trading Co. from Hayes
15        Specialties Corporation, 4-20-06      4
16   36   E-mail to Mr. Coates from Mr. Hayes,
17        3-31-06                              22
18   37   E-mail string, top one to Mr. and Mrs.
19        Coates from Mr. Hayes, 1-9-06        24
20
21
22                  E X A M I N A T I O N
23   BY              PAGES
24   Mr. McBrayer    4 - 143
25
```

```
 1        Seattle, Washington; Monday, February 5, 2007
 2                        8:56 A.M.
 3                   -------------------
 4        (Exhibits-3, 14, and 30 through 35 marked.)
 5   DAVID LEE COATES, witness herein, having been duly
 6            sworn by the Notary, testified as
 7            follows:
 8                   E X A M I N A T I O N
 9   BY MR. McBRAYER:
10      Q. Good morning, Mr. Coates. My name is Ryan
11   McBrayer. I'm an attorney for Perkins Coie
12   representing Arctic Circle Enterprises in the lawsuit.
13   Have you had your deposition taken before?
14      A. Yes.
15      Q. Okay. I want to cover an -- a version of the
16   background rules for this to make sure we understand
17   each other and can make an effective record today
18   because this deposition is being transcribed. I will
19   do my best to ask questions that are clear and concise.
20   If you don't understand any part of it -- of a
21   question, please let me know, and I will clarify the
22   question as needed so that you can give an answer.
23        Second, the court reporter is -- because she
24   is transcribing this, needs verbal responses, not a --
25   not a head shake. That's hard to record. And try and
```

## Page 13

1  responsible for ordering?
2      A. Well, generally in those cases, Toni would
3  decide what she was going to buy and the quantities of
4  those items. And then she would give them to me, and I
5  would put them on a spreadsheet along with other stores
6  and incorporate them into a single order.
7      Q. For Alaska Juneau Mining Company, who
8  typically makes the decision to order any specific
9  product?
10     A. Toni Murphy.
11     Q. Have you ever suggested to Ms. Murphy that she
12 should order a specific product from JC Marketing,
13 Dutch Harbor Gear, Hayes Specialties, or Greatland?
14     A. I -- probably. Sure. But very seldom.
15     Q. Regarding Alaska Juneau Mining Company's sales
16 of the Alaska map photo album at issue in this case,
17 did you suggest to Ms. Murphy that she should order
18 that item from Hayes Specialties?
19     A. I don't know that I suggested that she order
20 it, but probably more let her know that that item was
21 available, similar to all the other items that were
22 available from Hayes Specialties, and then she had the
23 option to order that, if she wished to.
24     Q. When did Hayes Specialties, to your knowledge,
25 first offer the Alaska map photo album?

## Page 14

1      A. I do believe it was for the 2006 season.
2      Q. And for -- if Hayes Specialties offered an
3  item for the 2006 season, what month would that product
4  have been -- month or months would that product have
5  been available?
6      A. I -- I don't know the exact month. I'm
7  guessing that in the fall of 2005, as we start to
8  prepare for the next year's season, that we had given
9  them our artwork for that item and asked them to make
10 us up a sample.
11     Q. Who gave Hayes Specialties artwork for the
12 Alaska Juneau Mining Company --
13     A. I did.
14     Q. -- photo album?
15        How did you provide that artwork?
16     A. It was in the form of a drawing that was done
17 by an artist -- I do believe that's it on the table
18 there, a black and white copy -- the artist James
19 Knutson -- or Jeff Knutson, excuse me, who did that
20 drawing for Gift Connections, I do believe, in the year
21 1999.
22     Q. When did you provide -- well, let me back up,
23 and I'll hand you what's been marked as Exhibit-30.
24        Do you recognize Exhibit-30, Mr. Coates?
25     A. Yes.

## Page 15

1      Q. What is Exhibit-30?
2      A. Not in the black and white form, but in the
3  color form, I'm more familiar with it.
4      Q. Okay. What is Exhibit-30?
5      A. That's the black and white copy of the artwork
6  of the photo album, the Alaska map photo album.
7      Q. That you provided to Hayes Specialties?
8      A. Yes, that's correct.
9      Q. When did you provide that artwork to -- in
10 Exhibit-30 to Hayes Specialties?
11     A. I -- I don't know exactly, but as I said,
12 probably -- I mean, it was probably in the fall of
13 2005.
14     Q. How did you transmit that artwork to Hayes
15 Specialties?
16     A. I do believe I faxed him a color copy -- faxed
17 or e-mailed. I'm not sure if I scanned it and e-mailed
18 it to him or faxed it, but one way or the other.
19     Q. What did you say to Hayes Specialties when you
20 provided the artwork in Exhibit-30?
21     A. That that was artwork that we purchased from
22 Gift Connections when they went out of business and I
23 would like him to put that exact artwork on a photo
24 album for us.
25     Q. Did you communicate anything else to Hayes

## Page 16

1  Specialties when you transmitted Exhibit-30 to them?
2      A. I could have, but I don't recall what it would
3  be.
4      Q. Before you transmitted Exhibit-30 to Hayes
5  Specialties, did you have any conversations with Hayes
6  Specialties about photo albums?
7      A. I -- again, I could have. I don't recall what
8  they would have been. I'm sure I asked him, you know,
9  if they manufactured photo albums. I could have asked
10 him that. And I don't know if I asked him or if I just
11 knew that they did by visiting one of their booths
12 in -- in Gatlinburg, Tennessee, where they -- where
13 their company exhibits their products.
14     Q. Did you suggest to Hayes Specialties when you
15 transmitted Exhibit-30 that you wanted a particular
16 price for the item?
17     A. No, I did not.
18     Q. Did Hayes Specialties give you a return
19 communication of any kind?
20     A. They ended up sending us a sample, and they --
21 they sent us a sample -- I guess maybe some art
22 drawings or -- and then eventually a sample.
23     Q. Before they sent a sample to you, did Hayes
24 communicate -- Hayes Specialties communicate with you
25 at all about the proposed photo album?

Ex. 5 - 3

A. I'm sure that they did. They've sent some e-mails, you know, basically showing pictures of the photo album and -- and probably talking about price at that point.

Q. Other than an e-mail that contained or might have contained photographs of the album, did Hayes Specialties communicate with you at all about the proposed photo album?

A. You mean, like on the telephone?

Q. Yeah. Did they -- did they call you?

A. I -- I talked to the person that we worked with at Hayes Specialties, you know, probably, you know, once or twice a month. You know, he calls me to see how I'm doing. And we do other items with them as well, so --

Q. Who is that?

A. His name is Jim Hayes, Jr.

Q. Do you recall any phone conversations with Jim Hayes, Jr., about the proposed Alaska map photo album?

A. No particular phone conversations. Again, we -- we talked -- you know, we talked fairly often. He made a sales trip to Alaska. We fished with him and got to be on a casual conversation. We talked just to talk sometimes, but -- but nothing that stands out. There was no special -- again, just one of many items

17

that they were doing for us and didn't dwell on that item.

Q. Do you remember any phone conversations with Mr. Hayes about the Alaska map photo album?

A. I don't recall any specific conversations. The conversation regarding to that would generally be, "We've got a sample coming," or "We've got the artwork," you know, "coming back," or the order will be shipped on this type of a date. Those would be the only types of conversations, but I don't recall any of those specific dates or exact conversations.

They weren't just about that one item. In other words, we talked about lots of items. So I wouldn't dwell -- I -- I wouldn't have been dwelling on that conversation -- on any of those at that time.

Q. You mentioned -- or you testified a little bit ago that you had purchased this artwork from Gift Connections, and I wanted to discuss that in a little bit more detail. Did any companies or -- that you have an ownership interest in or you personally purchase an interest in artwork from Gift Connections, Inc.?

A. Yes, I did personally.

Q. Can you describe that purchase for me.

A. Steve Hogberg, who now works for Dutch Harbor Gear, called me on the telephone when I was in

18

Ketchikan, and he worked for this company, Gift Connections, at that time. He was their sales rep. And he informed me that Mitchell Godfred from Arctic Circle had been trying to buy the remaining inventory from this company and their rights to their artwork.

He let me know that the negotiations had stopped; that they didn't -- weren't making progress, but Mitchell offered $10,000 to purchase the artwork, the trademarks and copyrights of the company, and the owner of the company would have preferred that Mitchell Godfred didn't get those -- that artwork. And they asked me if I would be interested in purchasing it for the same price. And I said sure, but I really wasn't in the manufacturing business.

I asked Steve if he would be interested in buying it with me, and he said yes. And so we paid $10,000. He paid 5,000 -- I don't know in what form that he paid -- in other words, if he wrote them a check or if it was deducted off of commissions they owed him. I'm not sure. And then my 5,000 was $2,500 from me personally and $2,500 from Kathy Fleenor, who is my partner at Dockside. We -- excuse me -- split the cost of the $5,000 of the purchase of the artwork.

Q. When was the purchase conducted?

A. Oh, I -- I can't tell you. I'm -- I -- I can

19

look, if you -- you should have copies of the -- of the purchase agreement, but I don't know. 2002? I'm guessing. And those letters were all submitted, and I'm sure that you have them or Mike has them.

Q. Other than letters that may have been transmitted that are of, say, a paragraph each --

A. Um-hum.

Q. -- is there any sales agreement associated with the purchase of that artwork?

A. The -- what I perceived as the purchase agreement was the -- whatever it was, a paragraph or whatever from -- I think the fellow's name was Chris White who owned -- his family owned the company at that time. They wrote us a letter giving them -- giving us the rights to this -- to this artwork since they were getting out of that business and no longer had any need for that artwork.

Q. Since the purchase, have you transferred your interest to any person or entity?

A. I licensed, at a point, Sandy Roth to be able to use that artwork to -- to do -- to -- to manufacture some of those items for us.

Q. Have you assigned or licensed any rights you purchased in that Gift Connections portfolio other than licensing Ms. Roth?

Ex. 5 - 4

20

2/5/2007 COATES, David Lee V.1

### Page 21

1    A. No.
2    Q. To your knowledge, has Ms. Fleenor licensed or
3    assigned any rights from the Gift Connections portfolio
4    since their purchase?
5    A. Not that I know of.
6    Q. Since Mr. Hogberg purchased the Gift
7    Connections rights, to your knowledge, has he assigned
8    or licensed them to any person or entity?
9    A. I do not know that.
10   Q. Do you own -- let me back up. I want to
11   explore the nature of your ownership of these rights.
12       Do you own the rights personally?
13   A. Yes.
14   Q. You don't hold them in an IP ownership,
15   L.L.C., or corporation --
16   A. No.
17   Q. -- or entity of any kind?
18   A. No.
19   Q. Is your interest at 25 percent undivided
20   interest?
21   A. I -- I don't know the -- I don't know. I
22   don't know how that works. I -- I know that Kathy and
23   I are partners and we purchased 50 percent of -- we
24   paid 50 percent of the price. We paid 50 percent of
25   the price to be able to use any of the artwork that we

### Page 22

2/5/2007 COATES, David Lee V.1

1    purchased any way that we saw fit.
2    Q. Okay. And for instance, Mr. Hogberg, to your
3    knowledge, could license one particular piece of the
4    artwork to somebody else, if he wanted to, without
5    recourse by you or Ms. Fleenor?
6    A. That was our agreement, yes.
7    Q. Let me get back to your communications with
8    Hayes Specialties about --
9        MR. McBRAYER: Madam, can I have this marked
10   as Exhibit-36, please.
11       (Exhibit-36 marked.)
12       MR. KEYES: 36?
13       MR. McBRAYER: Correct.
14   Q. I'll give you a moment to read Exhibit-36, Mr.
15   Coates.
16   A. Okay.
17   Q. Do you recognize Exhibit-36?
18   A. Yes. I furnished that myself.
19   Q. What is Exhibit-36?
20   A. That is an e-mail correspondence from Jim
21   Hayes regarding the photo albums.
22   Q. This was sent from Mr. Hayes to you at an
23   address in the kpu det -- sorry -- kpunet.net domain?
24   A. Um-hum. Yes, that's correct.
25   Q. Is the e-mail address depicted there for you

### Page 23

1    your primary e-mail address?
2    A. That is correct.
3    Q. What is kpunet.net?
4    A. Ketchikan Public Utilities net.net.
5    Q. How long have you communicated via e-mail
6    through an account at Ketchikan Public Utilities?
7    A. Oh, gosh, I -- I -- I don't know. I -- I
8    don't know that. I mean, I -- I just couldn't tell
9    you. I mean, it could be ten years.
10   Q. When you read -- well, let me back up.
11       Is kpunet your -- hosting your e-mail account
12   as an Internet-based or Web-based e-mail similar to
13   Hotmail or Gmail?
14   A. We have a telephone company in Ketchikan that
15   is called Ketchikan Public Utilities, and they furnish
16   phone service and electricity and Internet service.
17   Q. When you get your e-mail in this e-mail
18   account, do you view it in Microsoft Outlook?
19   A. Yes.
20   Q. Do you have an IT or other computer services
21   provider for Alaska Juneau Mining Company? I mean, do
22   you have an employee who runs your e-mail?
23   A. I don't know. Toni lives in Juneau. That is
24   where our Juneau computer would be. I know she has an
25   Internet address. She -- she has an Internet address

### Page 24

2/5/2007 COATES, David Lee V.1

1    in Juneau. This one is the one that goes to my house,
2    and that's where I work out of -- where I live.
3    Q. Okay.
4    A. I don't receive e-mails on her computer in
5    Juneau. I only receive my own. If someone is
6    contacting me, it's through this address.
7    Q. If you had a problem with this e-mail account
8    in reading things on Microsoft Outlook, who would you
9    contact to fix it?
10   A. Maybe Ketchikan Public Utilities.
11   Q. Okay. You don't have an employee or a
12   contractor you use to --
13   A. No.
14   Q. -- configure this?
15       Back to Exhibit-36, Mr. Coates. The shipment
16   being discussed is a sample shipment?
17   A. I do believe this is the -- an or -- the order
18   of photo albums being shipped to us.
19   Q. Okay. You can set aside Exhibit-36.
20   A. Um-hum.
21   Q. I'll come back to that, if necessary.
22       MR. McBRAYER: Let's mark this as exhibit --
23   let me mark this as Exhibit-37, please.
24       (Exhibit-37 marked.)
25       THE WITNESS: Thank you.

Ex. 5 - 5

1   A. Okay.
2   Q. Do you recognize Exhibit-37?
3   A. Yes.
4   Q. What is it?
5   A. It's an e-mail that I forwarded on to -- to
6   your people, I guess, from Jim Hayes.
7   Q. Okay. I'm going to start at the earliest
8   e-mail in time, apparently on page 3.
9   A. Um-hum.
10  Q. Do you know who Ellen is?
11  A. No, I do not. I -- I do believe, by the
12  format of this, that she's probably his agent in
13  China -- Jim Hayes's agent in China. It says right
14  here, "From: Ellen Liu (Hayes Shanghai.)"
15  Q. Do you have any reason to believe that the
16  Ellen signing the e-mail on page 3 is different than
17  the Ellen signing the e-mail at the bottom of page 2?
18  A. Well, what I think is the one on page 3 is --
19  is the original, and then maybe when Jim responded to
20  her on -- or responded to me, he did like a forward of
21  that one, so it added to the -- it added to the --
22  whatever was there.
23  Q. Okay.
24  A. So it looks like the same person to me.
25  Q. Turning again to page 3 of Exhibit-37. Ms.

1   Liu mentions a revised photo album design.
2   A. Um-hum.
3   Q. Did Hayes Specialties revise the design you
4   provided to them in Exhibit-30?
5   A. What I -- what I do believe is we sent them a
6   sample and were -- and there is a sample sitting on the
7   desk, but I do believe the -- the letters or the word
8   "Alaska" was not as dark as we wanted them, and we
9   asked them to darken that word. And that is the
10  revision that they're referring to.
11  Q. When did you send Hayes Specialties a sample
12  of the Alaska map album?
13  A. I -- I do not know. I -- as I told you, I --
14  I do believe it was in the fall of 2005.
15  Q. Okay. Earlier you testified sending Hayes
16  Specialties, via fax or e-mail, the artwork. Did you
17  also send them at that time a sample of the photo
18  album?
19  A. I -- I don't recall at this time what I --
20  I -- I'm sure I sent them a -- the actual artwork. You
21  know, I'm positive now that I didn't send them a sample
22  because I didn't have a sample. They were all gone.
23  And that's why I looked for the artwork from Jim
24  Knutson -- Jeff Knutson, so I could have that artwork
25  for them to use, because I did not have any of those

1   samples in my possession. All of our previous stock
2   had already been sold. And I'm -- I'm very sure of
3   that, but I can't absolutely swear to that, but that's
4   the best of my recollection.
5   Q. When you say that your previous stock of that
6   item had been sold, did Alaska Juneau Mining Company
7   have previous stock of a photo album based on the Gift
8   Connections artwork?
9   A. There was the Gift Connections products that
10  were sold to us from Gift Connections. We -- we had
11  purchased those, not through Alaska Juneau Mining
12  Company, because that store has only been in existence
13  for, I do believe, three years. But we purchased that
14  photo album from Gift Connections back into, say, the
15  year 2000. She would not have had any of those samples
16  from Gift Connections, because that was such a long
17  time ago. I do believe they would have been -- all
18  been gone.
19      Any samples that we could have had might have
20  been ones that Sandy Roth had done for us through her
21  company, Tandem. And, again, I don't recall if we had
22  any of that item left. I -- I don't believe that we
23  had any samples. It was a good seller, and I think
24  that we had sold through them. But, again, I don't
25  know that for a fact, but I think that's the case.

1   Q. Did you send a Tandem Imports manufactured
2   Alaska map album to Hayes Specialties?
3   A. You know, I don't know if I -- if I did or
4   not. You know, I could have, and I may not have. I
5   just don't recall. And, again, to the best of my
6   recollection, I did not have a current sample; that we
7   may have been sold out. And I may have -- that --
8   that's why I was looking for the artwork. But, again,
9   I just -- I just don't recall.
10  Q. In the Gift Connections artwork depicted in
11  Exhibit-30, the word "Alaska" is in black. Is that
12  correct?
13  A. I -- I -- I can't tell you. On this page, it
14  looks black because it's black and white, but I can't
15  tell you -- I just cannot tell you. You guys should
16  have that original sample -- or the original copy, I
17  would assume, because I did get that to -- you know, to
18  the attorneys, but I don't -- I can't tell you.
19  Q. This -- the -- the darkening -- turning again
20  to Exhibit-37 -- that Ms. Liu refers to?
21  A. Right.
22  Q. Did you instruct the letters to be darkened?
23  A. I don't know that I did. It says here, "When
24  I sent Cheri the sample" -- Cheri works for us. It
25  says, She did approve the color of the album, however,

Ex. 5 - 6

**Page 29**

1 she did want to darken the Alaska letters on the front
2 and back. Attached is what they came up with.
3    So, obviously, it sounds like that Cheri,
4 Kathy Fleenor's daughter, instructed them to darken the
5 letters so it would stand out better.
6    Q. Before -- well, let me -- in the e-mail that
7 starts on the bottom of page 1 of Exhibit-37, that was
8 sent on January 5th, 2006, to you from -- I take it
9 that's Jim Hayes.
10    A. Yes.
11    Q. To your knowledge, had Mr. Hayes produced,
12 sometime before January 5th, 2006, a sample of the
13 album you wanted and sent it to Cheri Fleenor?
14    A. I -- I do not know. I do not know if they
15 produced a sample and sent it to her or sent her an
16 e-mail with the -- with the color pictures. I -- I
17 can't tell you what she actually -- what they did. I
18 don't know that.
19    Q. At the top of page 2 of Exhibit-37, Mr. Hayes
20 describes sending Cheri the sample. Do you see that?
21    A. I'm trying to ... Yes. So apparently they
22 did then, according to this.
23    Q. Mr. -- in your dealings with Mr. Hayes, he
24 would not have described sending a, quote, sample,
25 unquote, if he had just sent a picture of some sort.

**Page 30**

1 Is that right?
2    A. I would assume so. I -- I would assume that
3 if he said he sent a sample, then he must have sent a
4 sample.
5    Q. Did you have any conversations with Cheri
6 Fleenor about design changes associated with this photo
7 album?
8    A. I don't recall if I did or not. There is a
9 very good chance that if she would have called me or
10 talked to me and said, "Hey, I like the sample, but I
11 want the word Alaska darker," that I would have just
12 said, "Great, let" -- you know -- "let Jim know." You
13 know, "Let Jim know."
14    Q. When you reviewed your e-mails for material to
15 provide to your counsel, did you review or search for
16 any e-mails between you and Cheri Fleenor involving
17 this album?
18    A. We, at that time, and -- we, at that time, did
19 not communicate by e-mail. I don't think she had
20 e-mail in her office. And it was not until just
21 recently that she had gotten e-mail in her office.
22 She -- none of our offices have -- or had e-mail. I
23 just didn't want e-mail in our offices.
24    Q. Okay. To the extent that there are any other
25 changes between the artwork depicted in Exhibit-30 and

**Page 31**

1 the photo album that has previously been marked as
2 Exhibit-3, did you direct any of the artwork changes?
3    A. I have -- I have to look here, because I have
4 the 2000 Gift Connections catalog. And this is the
5 item. And as far as I can see -- as far as I can see
6 that they're identical except that we darkened the --
7 the letters "Alaska" -- changed the -- the way the font
8 is and darkened the letters on "Alaska."
9    I don't know that we changed that -- like
10 here, it's curved. This one is straight. And I don't
11 know if it was -- sometimes the -- the companies in
12 China, they don't always do things exactly the way you
13 ask, and you go through getting the sample back two or
14 three times. But I'm not sure -- but as close as I can
15 tell looking at the actual picture and looking at the
16 artwork that we submitted, it looks identical to me.
17    I do remember that there were some spelling --
18 some things that they had spelled wrong when they were
19 typing the names onto this in China. And I think we
20 caught those spelling changes and told them that they
21 spelled some cities wrong.
22    Q. So it -- let me back up.
23    The only changes that you see between the Gift
24 Connections artwork and the Exhibit-3 photo album are
25 the darkening of the text and the font and the change

**Page 32**

1 of the shape -- or --
2    A. Yeah.
3    Q. -- call it text flow of the word "Alaska"?
4    A. Right. And, of course, here, the binding is a
5 little bit different, where this one had a darker
6 binding than the original did. And when we sent this
7 to Jim Hayes, he said that his company would have a
8 hard time doing that binding and would we accept a flat
9 binding on the back. And we said sure. We didn't have
10 any problem with that.
11    Q. Okay. Now, when you said that Jim Hayes made
12 that communication, did he communicate that to you?
13    A. I think so, yes.
14    Q. And you accepted that design change?
15    A. Yes.
16    Q. Regarding the change in the word "Alaska" on
17 Exhibit-3 -- change in font, text flow, and color,
18 did -- were you involved at all in that change, to your
19 knowledge?
20    A. I -- I don't know that I was or -- or not.
21 I -- I don't know that. I can't tell you. I don't
22 recall that. By looking, at this, you know, it looked
23 like he had sent Cheri a sample. She did approve the
24 color of the album; however, she wanted to darken the
25 Alaska letters on the front and back.

Ex. 5 - 7

1  And I would have said, you know, "No problem."
2  You know, if that's what she likes, you know, she's the
3  one running the store. She's the one that works in the
4  store. I would assume that she would have the better
5  feeling of what would be a good seller than I would.
6      Q. Okay. The changes to names of some cities
7  depicted on Exhibit-30 that you just testified about,
8  you obviously had some communication with the
9  manufacturer, Hayes Specialties, regarding the names
10 that appear on Exhibit-30?
11     A. I -- I think when they sent us either the --
12 the picture to proof or whatever it might have been, I
13 probably looked at the spellings to see if they were --
14 you know, to see if the spellings were correct. Or --
15 or -- and it could have -- maybe it wasn't me. It may
16 have been one of the girls. You know, maybe it could
17 have been Cheri or someone said, "Hey, they spelled the
18 name wrong." But I don't recall specifically that
19 instant.
20     Q. You have some memory, though, of the -- of
21 Hayes Specialties' Chinese manufacturer misspelling
22 names on some sample or draft artwork for Exhibit-3; is
23 that correct?
24     A. Yes.
25     Q. And you discussed changing the names with Mr.

33

1  Hayes or correctly spelling the names with Mr. Hayes?
2      A. Would have been correctly spelling the name --
3  the names, yes.
4      Q. Do you recall having any other conversations
5  with Mr. Hayes about the design for the photo album
6  depicted in Exhibit-3?
7      A. I don't recall any -- any specific
8  conversations. Again, I would talk to him fairly
9  regularly. And, you know, during that time, he's
10 generally reporting the status of the artwork or where
11 it's at or when it will be to us or those things. And,
12 you know, again, we talked, you know, fairly
13 frequently.
14     Q. Did you have any conversation with Mr. Hayes
15 about the color of the material -- the brownish yellow
16 material in Exhibit-3?
17     A. You know, I -- I may have. I think there was
18 questions on what color. And we wanted the color that
19 was the original color that was in the artwork that
20 we'd produced that was on this colored drawing. And I
21 think that the first color or something wasn't --
22 didn't quite match. The shade was different than what
23 we'd -- than what was on the original drawing. And I
24 don't know if it -- I just don't recall if it was
25 lighter or darker or if that was the actual there that

34

1  it ended up. I don't know.
2      Q. But the first color proposed by Hayes
3  Specialties was incorrect, in your mind?
4      A. Well, I don't know if it was incorrect, but
5  maybe it was a shade different than the -- than the
6  artwork that we had sent him than from before.
7      Q. And you directed Mr. Hayes to change the
8  color?
9      A. Well, I -- I don't remember if I -- if I did
10 or not or if we took it as it was or -- or if we
11 directed him to change it closer to the -- but I
12 remember something about maybe the shade wasn't what
13 we -- wasn't similar -- quite as close to the picture
14 that we had sent him.
15     Q. Did you have any conversations with Mr. Hayes
16 about the map of the state of Alaska that is depicted
17 on the front of Exhibit-3?
18     A. I don't believe so. I -- I just believe that
19 the -- you know, the conversation was that we had sent
20 him the artwork from Jeff Knutson and we wanted to use
21 that same artwork.
22     Q. On page 2 of Exhibit-37 -- and spilling ahead
23 on to page 1, the e-mail from Mr. Hayes to you
24 forwarded the album -- a file called "album-font
25 cfm.jpg."

35

1      A. Um-hum.
2      Q. Do you still have that JPEG photograph?
3      A. Looking for what you're talking about here.
4      Q. In the e-mail header depicted at the bottom of
5  the page 1 --
6      A. Oh, I see, sure. Album font -- album
7  font... I don't know that I -- I don't know if I
8  do. I don't recall or recognize that. It says
9  "forward album font," on the subject, "regarding album
10 font." I don't know. I don't know that.
11     Q. When -- on the cover page of Exhibit-37, in
12 the bottom right-hand corner, there is a depiction of
13 the date of August 24th, 2006. Do you see that?
14     A. Right. Right.
15     Q. Is that the date you printed these e-mails?
16     A. I'm sure, yes.
17     Q. Okay. And as of August 24th, 2006, you had
18 this e-mail string in electronic memory of your
19 computer?
20     A. I -- I'm -- yeah, it looks like it, for sure.
21     Q. Okay.
22     A. But I don't know if that -- you know, if it
23 was -- if that was on there or not. I just don't know.
24 I guess there is a little paper clip or something in
25 the corner and you click on it for the attachment, and

36

Ex. 5 - 8

Page 37:

1  I don't know if -- if that was on here or not. I just
2  don't know.
3    Q. Okay. On page 1 of Exhibit-37, you e-mailed
4  Mr. Hayes to go ahead with the photo album. Do you see
5  that?
6    A. Um-hum. Um-hum. Yes.
7    Q. At -- after that point on January 6th, 2006,
8  were any changes made to the design of the photo album
9  depicted as Exhibit-3?
10   A. I don't know that. I don't know.
11   Q. Do you remember any communication about design
12 changes to Exhibit-3 -- to the photo album that is
13 Exhibit-3 that happened after January 6th, 2006?
14   A. I don't recall any of those. No, I don't.
15   Q. Do you have any reason to believe that the
16 album -- or the design that you approved on January
17 6th, 2006, is in any way different than the album that
18 is now sitting here before us as Exhibit-3?
19   A. And -- and, again, I don't know. That -- I
20 don't know the answer to that. I don't recall that.
21   Q. Well, let me back up, and I want to ask the
22 question again. I understand you don't remember any
23 design changes, but you agree with me that you approved
24 a design for the photo album on January 6th?
25   A. It looks like it, according to this, yes.

Page 38:

1    Q. Do you have any reason to believe that the
2  design you approved on January 6th is different than
3  the Exhibit-3 photo album, as you sit here today?
4    A. I -- I just don't recall, because I just
5  don't -- I -- I don't know -- this doesn't really show
6  a picture of what I approved, so I -- I just don't
7  know.
8    Q. Okay. Is your uncertainty about any
9  difference between the designs, if there is any --
10 well, let me approach this another way. I'll strike
11 that question.
12     As of right now, you don't recall any
13 conversations you had with anybody about changing the
14 design for the photo album that happened after January
15 6th; is that right?
16   A. I don't recall. No, I don't recall that right
17 now.
18   Q. Okay. So right now, you don't recall any
19 conversations?
20   A. Right.
21   Q. Do you recall any e-mails that happened after
22 January 6th that changed the design for the photo
23 album?
24   A. I -- I don't recall that -- I don't recall any
25 other that would have changed it. I don't.

Page 39:

1    Q. Okay.
2    A. We have over 6,000 items in the store, and
3  this is just one. So I -- I move so fast with all my
4  companies, I don't dwell -- you know, I wouldn't spend
5  the rest of my life working on one thing. I move on to
6  the next and let other people take care of their stuff.
7    Q. Okay. You mentioned in testimony before that
8  you -- that Cheri Fleenor was involved in the design
9  process for the album that's depicted in Exhibit-3. Is
10 that right?
11   A. Again, what I -- what I do believe that I sent
12 the artwork or something to Hayes to do that. Cheri
13 would have been in this -- the loop to know that I had
14 done that, and apparently she received a sample, looked
15 at it, and said it should be changed. Or maybe it says
16 here the font needed to be darker.
17     And that's -- that's -- you know, in other
18 words, we didn't spend weeks on end working on this
19 thing. We have so many items and samples that comes
20 in. We look at it, make a decision, move on to the
21 next one.
22   Q. Okay. Cheri would have been in the loop about
23 your direction to Hayes on this product. Would anybody
24 else have been in the loop, as you use that phrase,
25 regarding Hayes Specialties' development of this

Page 40:

1  product in Exhibit-3?
2    A. It's certainly possible. I mean, it wouldn't
3  be a secret, you know, from our other managers. But,
4  you know, generally things like this, you know, Cheri
5  or I or -- I would make a decision and move on to the
6  next item.
7      We wouldn't necessarily have a meeting,
8  inviting all of our people to talk about it, though we
9  wouldn't be hiding those decisions from them. It's
10 just that everybody has other duties that they're
11 doing, and it's just one single item out of thousands
12 of items that we have in our stores. So I don't know
13 that we made a big production about it.
14   Q. Okay. Other than Cheri Fleenor and the people
15 identified in the Exhibit-37 e-mail --
16   A. Um-hum.
17   Q. -- was anybody else involved in the design for
18 the photo album in Exhibit-3?
19   A. Not that I can -- not that I can tell you,
20 because I just don't recall. I mean, we have other
21 managers that -- but I don't know that they would have
22 looked at it until the sample was done, or they
23 probably would have said, "Hey, we're doing" -- you
24 know, we would have said we're doing the same item as
25 we have the artwork for that they were all familiar

Ex. 5 - 9

**Page 45**

1  Company, for sure, and could have been -- the year that
2  we started the outlet store was, I think, around 2000.
3  So they may have bought from them this one year before
4  they had gone out of business.
5      Q. And to your knowledge, when did Gift
6  Connections go out of business?
7      A. I -- I'm not sure exactly when they went out
8  of business. There was a period of time that -- I'm
9  guessing for a year that they were going out of
10 business. And I don't remember the last day, but I do
11 remember that we bought their remaining inventory from
12 them the day they went out of business.
13     Steve Hogberg called me and said, "Hey, we
14 have several hundred thousand dollars worth of
15 inventory left. Would you just take it all?" And we
16 made them an offer on that inventory, and we took it.
17 And I think it was the same inventory that Mitchell
18 Godfred was bidding on also.
19     Q. When was that?
20     A. I -- I can't tell you. I don't -- I don't
21 know -- I just don't know. It might have been 2000.
22 It could have been 2001. You know, I'm guessing, you
23 know, it could have been somewhere in there. I just
24 don't know exactly.
25     Q. Could it have been as late as 2003, or was it

**Page 46**

1  definitely before then?
2      A. No, I'm sure it was before then.
3      Q. Okay. So it was either the 2001 or 2002
4  season?
5      A. Yeah, I'm thinking maybe 2001, because Sandy
6  Roth -- well, let's see. When we bought that
7  artwork -- there should be something on that letterhead
8  of the date that we purchased the artwork. And that
9  would be right around the very end of their -- their
10 existence. I mean, it could have been --
11     Q. Your purchase of the Gift Connections
12 inventory was in the same year -- about the same time
13 as you purchased the artwork?
14     A. Pretty sure. More or less.
15     Q. Okay.
16     A. I mean, it was right about the end. Plus they
17 had a lot of inventory in China that was manufactured
18 that they couldn't pay for, they were going out of
19 business, and I bought that also.
20     Q. When you say you bought that, did you
21 personally buy it or --
22     A. I would have made a deal for my stores, you
23 know. But I made a personal deal with the -- with the
24 company. I said, "Go out and buy that." And then I
25 got with my managers, and everybody picked out what

**Page 47**

1  they wanted, and we distributed the inventory between
2  the stores.
3      Q. So one of your stores at the time purchased
4  the inventory, and you distributed it throughout --
5      A. Yes.
6      Q. -- the stores?
7      Did that inventory include some number of
8  photo albums manufactured by Gift Connections under the
9  design depicted in Exhibit-30?
10     A. I -- I can't tell you that. I do not -- I do
11 not recall that, if it did. It was basically
12 everything that they had left in their warehouse at
13 that time. But I don't recall the -- I don't recall
14 that photo album, if it was or was not.
15     In other words, it was such a good selling
16 item, that my intuition would be probably it wouldn't
17 have been in there, because it probably would have
18 already been gone. When a company goes out of
19 business, they -- all the good stuff is slowly gone,
20 and then pretty soon they're only left with the bad
21 stuff. And -- and they don't have the money to replace
22 the good stuff. So that's kind of the way -- when
23 companies go out of business, that's what happens a
24 lot.
25     Q. Too much inventory of unpopular items?

**Page 48**

1      A. That stuff. An 80-20 rule. 80 percent of
2  your inventory is what sells 20 percent of your sales,
3  and 80 percent of your sales is in 20 percent of your
4  inventory. And people get confused, and they don't pay
5  attention, and they get skewed, and then they go broke.
6      Q. After Gift Connections went out of business,
7  you mentioned Ms. Roth started manufacturing the photo
8  albums. Did she start making the same photo albums
9  that Gift Connections had made?
10     A. I don't recall specifically. In other
11 words -- but I -- I think so. I -- I think that she
12 was -- but it could have changed a little bit. I know
13 that Arctic Circle sued her for doing whatever photo
14 album that was, but I can't get into the exact
15 specifics -- did she change the design, was it exactly
16 the same or not -- because I just don't recall.
17     Q. But, I mean, that -- my question was: Did,
18 after Gift Connections went out of business, Sandy Roth
19 start manufacturing an Alaska map photo album with an
20 embossed Alaska map and symbols of Alaska on the cover?
21     A. Yes.
22     Q. You mentioned that Ms. Roth and Arctic Circle
23 had a lawsuit that involved those albums. What do you
24 recall about that lawsuit?
25     A. I just recall that they sued her for a number

Ex. 5 - 10

## Page 49

1  of items and then they eventually settled the lawsuit.
2      Q. You mentioned the lawsuit in the context of
3  your answer regarding the photo album. You do remember
4  that the album that -- or that lawsuit between Arctic
5  Circle and Ms. Roth, to some degree, involved that
6  photo album?
7      A. I do believe so. Maybe not this exact one,
8  but the version that -- the original version that -- I
9  think according to this artwork.
10     Q. Okay. You understand that the lawsuit between
11 Arctic Circle and Ms. Roth involved a dispute over, at
12 least in some part, the -- her manufacturing of a photo
13 album like the one depicted in Exhibit-30?
14     A. Yes, that's my understanding.
15     Q. Do you remember anything else about the
16 lawsuit?
17     A. Like? I mean, I could go on for days.
18     Q. Why -- why -- you -- you had some involvement
19 in the lawsuit? Is that why you could go on for days
20 about it?
21     A. Right, right, right. Because I was her main
22 customer at that time. And, you know -- and I got an
23 injunction to take certain items off the shelf and not
24 sell them, you know, during this period of time.
25 And -- and, you know, I had spoken with her attorneys

## Page 50

1  at that time and -- and did a deposition for them
2  regarding, you know, the practices that were going on
3  and the items that were in question.
4      Q. Including the Gift Connections photo album?
5      A. Yes.
6      Q. That by then was the Roth photo album?
7      A. Right.
8      Q. Or the Tandem Imports photo album?
9      A. Yes, sir.
10     Q. Okay. Do you recall when the lawsuit was
11 active?
12     A. I don't recall the -- I don't have the exact
13 dates. I mean, I could kind of try and guess, but I
14 mean, it was -- you know, I don't know if it went on
15 for a year or a year and a half or two years. I
16 don't -- I don't recall all that.
17     Q. Do you recall when your deposition was taken?
18     A. I don't recall right now, no. I have a copy
19 of it at -- I don't know if -- I think I have a copy of
20 it at my house here, so I could look at it if you
21 needed to know that.
22     Q. Your deposition in that lawsuit and the
23 injunction that was issued in part against you in that
24 lawsuit was before you contacted Hayes Specialties to
25 design or manufacture the photo album depicted in

## Page 51

1  Exhibit-30, right?
2      A. Yes.
3      Q. What is your understanding, if any, about what
4  Arctic Circle contended in that litigation?
5      A. Well, I do believe that they -- they contended
6  that she was copying their products. But I don't think
7  that they knew at the time that she was using the
8  artwork that was -- a lot of it even that she had
9  developed when she was instrumental in the management
10 of Indian Arts and Crafts. I don't think they had that
11 knowledge at that time. And -- and that she had
12 that -- that she was doing a lot of that same artwork.
13     Q. Ms. Roth had not designed, though, to your
14 knowledge, the photograph -- or the photo album
15 depicted in Exhibit-30?
16     A. I do not believe she did.
17     Q. Mr. Knutson designed that?
18     A. I believe so.
19     Q. To the best of your knowledge?
20     A. To the best of my knowledge.
21     Q. When Arctic Circle contended that Ms. Roth
22 was, in your words, copying their products, did you or
23 do you have any understanding of the legal rights
24 Arctic Circle was asserting in that lawsuit?
25     A. No. I mean, I -- my version of what I believe

## Page 52

1  that they were asserting, that she had copied their
2  items.
3      Q. Okay.
4      A. I think there were two issues. One that she
5  maybe violated a noncompete clause that she had
6  actually waited until it expired and then, two, that
7  she had copied some of their items.
8      Q. Did you understand at the time that Arctic
9  Circle contended that Ms. Roth's design and
10 manufacturing of her items in some way violated Arctic
11 Circle's copyrights?
12     A. Would you say that one more time.
13        MR. McBRAYER: Can you read back the question,
14 please.
15        (Reporter read back as requested.)
16     A. That Arctic Circle contended that?
17     Q. Yes.
18     A. I understood that they contended that.
19     Q. And just to make sure, at the time when you
20 had an injunction against your store and you were
21 deposed -- I want to focus on the time of the lawsuit.
22 At the time of the lawsuit, you understood Arctic
23 Circle was asserting its copyrights?
24     A. Yes.
25     Q. And you understood that one of those

Ex. 5 - 11

## Page 53

1  copyrights was the copyright to Arctic Circle's Alaska
2  map photo album that's Exhibit-14 in the lawsuit?
3      A. Yes.
4      Q. And you understood that Ms. Roth was selling a
5  version of the photo album depicted in Exhibit-30?
6      A. Yes.
7      Q. Okay. Did you understand or believe at the
8  time that Ms. Roth had the right to sell the photo
9  album depicted in Exhibit-30?
10     A. Yes, I believe that she did have the right to
11 sell that.
12     Q. Why?
13     A. Because it was the same artwork that we had
14 purchased and she was using that same artwork to -- to
15 do that.
16     Q. At the time you purchased the Gift Connections
17 artwork, did you evaluate the similarity between the
18 artwork depicted in Exhibit-30 and Arctic Circle's
19 Exhibit-14 photo album?
20     A. At the time that we purchased the artwork,
21 I -- I suppose that I know -- knew that they were
22 somewhat similar. That's what attracted me probably
23 because -- to that line -- to purchasing that artwork,
24 because it was a successful line. I didn't look at
25 that item specifically. It wasn't a sole cause

## Page 54

1  because, in my opinion, probably a third of the things
2  in those two catalogs from those two companies are
3  identical -- or very close to identical.
4      I think that the two companies had a practice
5  of kind of doing things that were just very, very
6  similar. Indian Arts and Crafts was in business, I
7  think, for 50 years when they went out of business, and
8  Arctic Circle was in business for, I think, 30 years.
9      And a lot of the things that we had boughten,
10 we felt that because of the company had been around for
11 so long and so many of these things were in this
12 catalog -- though I was somewhat confused sometimes
13 because there was items that Indian Arts and Crafts
14 held copyrights to ended up in the Arctic Circle
15 catalog, but I just kind of let it slide, because I
16 wasn't going to -- you know, wasn't going to go try and
17 beat up people because of that.
18     Q. What sorts of things in the Arctic Circle
19 catalog and the Indian Arts and Crafts catalog at the
20 time you purchased the Gift Connections artwork were,
21 quote, identical, unquote, as you used the word?
22     A. Can I -- do you mind if I pull out a sample
23 I've got? Is that --
24     MR. KEYES: No, that's fine.
25     Q. If the best way to illustrate your answer is

## Page 55

1  with pictures or photographs --
2      A. Sure.
3      Q. -- that's acceptable.
4      A. Okay. Well, I can do that. I've got it right
5  here. These are ornaments --
6      MR. McBRAYER: Let's go off the record for a
7  sec.
8      (Discussion off the record.)
9      (Reporter read back as requested.)
10     A. This is the year 2000 Gift Connections
11 catalog. There is an item in here that is No. 22637,
12 which is an eagle magnet that they also did in the form
13 of a Christmas ornament, but -- and this is a copy of
14 the U.S. Copyright Office search records showing that
15 Gift Connections had copyrighted that exact item.
16     This is the 2001 catalog from Arctic Circle,
17 and Arctic Circle has that exact item in their catalog
18 that I believe that they had copied at a later date,
19 which is No. 03473. And if you look at these, you can
20 see that they're almost identical -- the same eagle,
21 the same totemic, except there Arctic Circle has
22 changed the totemic design just a little tiny bit.
23     Q. Okay.
24     A. Do you want other examples, or do you want
25 just the one?

## Page 56

1      Q. Well, I --
2      A. You asked --
3      Q. No, that's -- in the context of the photo
4  album, was the -- the Gift Connections photo album one
5  of the ones -- does that fall in your realm of
6  identical, or is that --
7      A. Well, I -- I guess, depending on the -- on the
8  standards, this ornament has been changed just a teeny
9  tiny bit, and those albums are just maybe a teeny tiny
10 bit different also.
11     Q. Did you have any -- well, let me -- let me
12 back up.
13     Before Gift Connections came out with the
14 photo album depicted in Exhibit-30, did your stores
15 purchase the Arctic Circle photo album in Exhibit-14
16 from Arctic Circle?
17     A. I -- I can't tell you. I don't -- I don't
18 recall. I mean, it's certainly a possibility. I -- I
19 just don't recall. During that time, about that year,
20 it was kind of like the Hatfields and the McCoys, and
21 you had Arctic Circle and Indian Arts and Crafts. And
22 the companies kind of dictated that you choose sides --
23 either you choose with Arctic Circle or Indian Arts and
24 Crafts. And like Arctic Circle really didn't want you
25 buying from Indian Arts and Crafts if you were buying

1    Q. Okay. And on both occasions, he told you that
2    the management at Gift Connections had asked him to
3    develop a photo album with a map?
4    A. Yes. He -- I -- I don't know that -- yeah,
5    I'm sure it was a photo album with a map. And, you
6    know, it was Julie Collins who was the -- one of the
7    management people at that time. I think he said her
8    name -- that Julie asked him to develop that.
9    Q. Okay. Did Mr. Knutson tell you anything else
10   during these two conversations?
11   A. I don't believe he did.
12   Q. Did Mr. Knutson discuss the timing of his
13   design work with you?
14   A. No, he did not.
15   Q. Do you have any reason to believe that Gift
16   Connections first displayed a photo album like the one
17   depicted in Exhibit-30 before its 1999 catalog?
18   A. I -- I do not know that, because I don't have
19   that catalog to be able to tell you that.
20   Q. Okay. I -- the question that I asked you
21   wasn't if you were aware of their 1999 catalog. I'm
22   asking you if you have any reason to believe as you sit
23   here today that Gift Connections first displayed a
24   photo album like the one in Exhibit-30 before their '99
25   catalog -- 1999 catalog.

1    A. Yeah, I don't have any knowledge. Again, I --
2    I just don't -- I don't know.
3    Q. So is your answer that -- that sitting here
4    today, that you affirmatively have no reason to believe
5    Gift Connections displayed a photo album like the one
6    depicted in Exhibit-30 before they displayed it in
7    their 1999 catalog?
8    A. You know, and I have no knowledge of that,
9    because I don't have the -- a catalog before. The
10   catalog that I have is a 2000 catalog. The drawing
11   that I had -- I thought it was dated -- from what Jeff
12   Knutson -- I thought it was dated -- the original
13   drawing that I had. And it was -- I thought it was
14   dated in 1999.
15   Q. It's your understanding that Mr. Knutson
16   designed this in 1999 sometime?
17   A. I thought so. That's what I thought.
18   Q. Other than the two face-to-face conversations
19   with Mr. Knutson that you mentioned, have you had any
20   other conversations with Mr. Knutson about this
21   lawsuit?
22   A. Not that I can recall.
23   Q. Have you had any other communications with him
24   via e-mail?
25   A. Oh, you know, I may have had other

1    conversations with him when I was in working the
2    showroom. And maybe this -- Steve or Sandy might have
3    taken me back to his office to show me new things that
4    they were working on, because he is an artist and has
5    an office, and maybe showing me other designs that he
6    was -- he was drawing up or creating for us to sell in
7    our stores to put on products.
8    Q. And my question was if you had any
9    conversations with him about the lawsuit. Were
10   those -- in the times you went into his office, as you
11   just described, did you have a conversation with Mr.
12   Knutson, and perhaps others, about the lawsuit?
13   A. I don't think so, you know, at that time, you
14   know, with him, except for the -- maybe the two times
15   that I specifically asked him about developing that
16   artwork.
17   Q. Okay. The two in-person phone conversations
18   with Mr. Knutson were the only conversations with Mr.
19   Knutson you had about this lawsuit, correct?
20   A. I think so. I believe so. I mean, it's
21   humanly possible that I could have spoken to him a
22   third time, but I just don't recall. And I didn't get
23   much more out of it than I was really asking the
24   question, you know -- you know, did he draw that up and
25   why did he draw it up and who gave him, you know,

1    the -- you know, the -- how did that come to existence.
2    Q. Where is Dutch Harbor Gear's office?
3    A. They're over on Baker Avenue or Street, by
4    Southcenter.
5    Q. When we started talking about Mr. Knutson, we
6    were talking about conversations that you had with Ms.
7    Roth about this lawsuit. You described one
8    conversation with me in which you asked Ms. Roth about
9    Mr. Knutson's artwork. Have you had any other
10   conversations with Ms. Roth about this lawsuit?
11   A. Oh, I'm -- I'm sure of that because her and I
12   talk quite often. And, you know, I'm sure I've talked
13   to her about it.
14   Q. What have you talked about?
15   A. You know, besides being in, you know, this
16   lawsuit, I think I've mentioned to her that -- you
17   know, that I think the reason they're mad is because we
18   were paying $2.65 for this wholesale and they sell it
19   for $7.50 and they're probably upset that people are
20   finding out how much money they were making over and
21   above what would have been a fair profit.
22       And that's probably -- and, you know, I just
23   talked to her about that kind of stuff about, you know,
24   why they're -- why they're trying so hard to keep other
25   people out of the market when competition would

Ex. 5 - 13

**Page 105**

1  Company -- or did, at this time, Alaska Juneau Mining
2  Company sell as what you call a loss leader?
3      A. Yeah. And, again, I'm not saying that we lost
4  money on that. But, I mean, whether we did or not -- I
5  mean, it might be close, but I can't tell you about
6  what other items.
7      You know, I think we had a -- a hat -- a
8  baseball cap and maybe a -- a hat and T-shirt
9  combination. And -- and I don't remember specifically.
10 I think we may have socks. We may have done some totem
11 poles. And there may have been other items. I just
12 don't recall.
13     Q. Back to my question about the 100-pocket
14 album. Is it correct to say that you don't know
15 whether Alaska Juneau Mining Company made a net profit
16 on the 100-pocket photo album?
17     A. On that item, I can't tell you that. If I had
18 the financial statement, I could see if our expenses
19 were more than 36 percent for the year. If they were
20 36 percent, we broke even on it. If our expenses were
21 30 percent for the year, we would have made 6 percent.
22 And if our expenses were 40 percent for the year, we
23 would have lost 4 percent.
24     So I can't tell you on that. I don't look at
25 it that way on every single item. I recognize that

**Page 106**

1  there is other items -- for instance, film that we sell
2  from Kodak and is so identifiable that Costcos and
3  K-Marts sell it at maybe 20 percent over cost. And so
4  we have to sell it at a lower price. But I know that
5  if you took that same formula that you -- that you were
6  referring to, against that, you would say, "Yeah, I
7  lost money selling film."
8      But there's certain items that you have to
9  have in the store that draw people in and certain
10 things that make the store complete. Maybe you don't
11 make money on everything, but you need certain things
12 and certain price points to make the store complete.
13     Q. Does Alaska Juneau Mining Company's
14 profit-loss statement indicate its expenses were a
15 percentage of your gross revenue?
16     A. That our expenses were a certain percentage?
17 Yeah, I'm sure of that.
18     Q. Okay. Do you know what the percentage is?
19     A. I don't off the top of my head. And, again,
20 every year is -- is -- is different. I think this year
21 we had a -- a substantial increase in sales. Maybe --
22 I don't know. Maybe -- don't quote me -- I don't want
23 to be lying, but I mean, we may have close to a million
24 dollar increase in sales this year.
25     So that would have a major change on the -- on

**Page 107**

1  the percentage of expenses, because our expenses stayed
2  pretty much the same, you know, the -- you know, the
3  utilities and the heat and the rent, which is a big
4  factor. And so that would have a major change on that.
5      Q. Other than the space now occupied by Alaska
6  Juneau Mining Company, do you own or have an ownership
7  interest in any other office space in Juneau?
8      A. In Juneau?
9      Q. In Juneau.
10     A. Office space?
11     Q. Or storefront space.
12     A. Well, we just took over a store last month.
13 One of our competitors, in my opinion, wasn't running
14 their store the way they should have, and they kind of
15 had to, you know, get out of the business. So they
16 approached us about taking that space over, and we're
17 taking that over.
18     Q. What competitor was that?
19     A. It was -- it was a store called Galligaskins,
20 which was probably the other major -- one of the other
21 major souvenir retailers in Juneau. And they just --
22 in my opinion, they weren't running their store right,
23 and they couldn't make it. And they -- so they had two
24 locations, and we took one of them over -- their
25 largest location.

**Page 108**

1      Q. Other than the Galligaskins space, though,
2  have you owned or had an ownership interest in other
3  retail space in Juneau?
4      A. I don't think so, no.
5      Q. Okay.
6      A. You know, we owned a -- you know, we have a
7  jewelry store with -- inside of our store. I don't
8  know if you -- I mean, that's all part of the company
9  though.
10     Q. A jewelry store within the same retail space?
11     A. Um-hum. It's all owned by the same partners,
12 and it's all in the same building.
13     Q. Is the jewelry store within that retail space
14 a separate business, or is it part of Alaska Juneau
15 Mining Company?
16     A. Well, it's -- it's all part of -- Alaska
17 Juneau Mining Company is the name of the -- the
18 company. We call the jewelry Miner's Gem. We call it
19 Miner's Gem, but it's all -- the sales and the sales
20 tax and the tax return is all under Alaska Juneau
21 Mining Company.
22     Q. If I look at Alaska Juneau Mining Company's
23 profit-loss statement, is it going to reflect sales
24 made by the jewelry store?
25     A. Yes. Um-hum.

Ex. 5 - 14

## Page 109

1  Q. Okay.
2  A. I mean, we keep it -- we separate them, but we
3  put them together so we can keep track of where the
4  profits are coming from.
5  Q. Okay. Does Alaska Juneau Mining Company have
6  any remaining inventory of the 100- or 200-pocket photo
7  albums?
8  A. I -- I can't tell you that. I don't keep
9  close track of that. They may have a few, you know,
10 but I -- I'm not expecting that they have a lot. I
11 don't think they have a lot. But I -- I'd have to --
12 I'd have to go look. Again, I've got seven stores
13 that, you know, sell these type of items. And I
14 just -- I'm not in the warehouse looking, and I don't
15 look at every item, every store. That's kind of what
16 the managers do. I look at --
17 Q. Do you maintain a central warehouse for some
18 of your stores?
19 A. In -- in Ketchikan, I have a warehouse that I
20 try and stock some of the bigger orders for in
21 Ketchikan, and we let Juneau have one small aisle.
22 Q. In the Ketchikan warehouse?
23 A. Um-hum.
24    MR. McBRAYER: It's 12:00. Why don't we --
25 my next line of exhibits will take some time to go

## Page 110

1  through, so . . . I want to go of the record.
2     (Lunch recess.)

## Page 111

Seattle, Washington; Monday, February 5, 2007
1:11 P.M.
-------------------------
E X A M I N A T I O N (Resumed)
BY MR. McBRAYER:
6  Q. Let's start with Exhibit-35, Mr. Coates. Do
7  you recognize Exhibit-35?
8  A. Um-hum. It looks like a Hayes invoice.
9  Q. Okay. And in the first lines, is this an
10 invoice for photo albums Hayes shipped that were the
11 100- and 200-pocket photo albums that are at issue in
12 this case?
13 A. Yes, that's correct.
14 Q. Of the first line item, the part number is
15 blacked out, but it's $1.65 each. Is that the
16 100-pocket album?
17 A. Yes.
18 Q. How many did -- how many units did Hayes
19 Specialties ship to Dockside Trading on this occasion?
20 A. Well, it looks like they -- it says here
21 5,472, and it says there were another 2,280 on back
22 order. So that would have been five, six, seven --
23 almost 8,000, it could have been, that would have
24 shipped, but only 5,472 at that time.
25 Q. Okay. And then 5,472 of the 200-pocket album?

## Page 112

1  A. Yes.
2  Q. Okay. And turning your attention to
3  Exhibit-34.
4  A. Um-hum.
5  Q. Do you recognize Exhibit-34?
6  A. Um-hum. Yes.
7  Q. Is this an invoice for Hayes Specialties
8  shipping the remaining 2,280 units that had been back
9  ordered in Exhibit-35?
10 A. That's what it looks like to me.
11 Q. Okay. And then 2,496 of the 200-pocket
12 version?
13 A. Um-hum. Um-hum.
14 Q. Okay. You can set those aside.
15 A. Um-hum.
16    MR. McBRAYER: Can you hand him, please,
17 Exhibits-32 and 33.
18 A. Um-hum. Um-hum.
19 Q. Start with Exhibit-32. What is Exhibit-32, if
20 you recognize it?
21 A. You know, I -- I don't -- let me -- let me
22 look here. I don't recognize it, you know, and I may
23 have seen it before. But, again, it could be something
24 from one of our companies, or it could be from Hayes.
25 But I'm guessing it must be from our company, because

1    it has Hayes Specialties. It might be something that
2    our bookkeeper in Ketchikan, Phyllis, has generated.
3        And it's maybe coming to me now what it might
4    be -- that when Hayes ships so many of an item and then
5    she has a purchase order from each of the stores that
6    wants some of that item, that she will keep track of
7    who got what so she can get reimbursed or make sure
8    that the bill gets paid to Hayes. So some sort of a
9    tracking deal --
10   Q. Okay.
11   A. -- for that.
12   Q. In the far -- farther right side of the table,
13   there is a column labeled "JMC"?
14   A. Um-hum. Um-hum.
15   Q. Do you have an understanding of what that
16   stands for?
17   A. Well, that would be like Juneau Mining Company
18   probably.
19   Q. Okay. And "SMC" is Skagway Mining Company?
20   A. Skagway Mining Company, um-hum.
21   Q. Okay. So these are the different stores?
22   A. Um-hum.
23   Q. So, for -- in Exhibit-32, Invoice No.
24   185391-02, is it -- if you'd cross that to Exhibit-35,
25   which is on the table in front of you?

1    A. Okay. Um-hum.
2    Q. Is Exhibit-32 what you might -- is it like a
3    distribution report --
4    A. Right.
5    Q. -- for the photo albums that were received
6    from Hayes Specialties?
7    A. Um-hum, um-hum, um-hum.
8    Q. And Alaska Juneau Mining Company got 1,680 of
9    the 100 pocket?
10   A. Right.
11   Q. And it looks like 1,968 of the two pocket?
12   A. Um-hum, um-hum.
13   Q. Okay. Let me turn your attention to Exhibit-3
14   now -- sorry, Exhibit-33.
15   A. Okay.
16   Q. Do you recognize Exhibit-33?
17   A. Yeah, um-hum.
18   Q. What is it?
19   A. Well, we just talked about that a moment ago,
20   right?
21   Q. We talked about Exhibit-32. Is that what
22   Exhibit-33 is?
23   A. No, I'm sorry, I thought -- no, I thought you
24   talked about 33 first, but maybe I'm, excuse me,
25   confused. Anyway, that looks like a spreadsheet that

1    our bookkeeper would use to know who got what and -- so
2    she could make sure and get an invoice to the
3    appropriate store so they could pay their share of that
4    item, because they all came in on one invoice to
5    Dockside. So our bookkeeper at Dockside would say,
6    "Well, hey, this says Dockside owes" -- however much
7    money -- "and I know that each of these stores got so
8    many," so she's charging them for their share of the --
9    of that item.
10   Q. And then once they were received at Dockside
11   Trading, would the items be shipped to companies that
12   are not in Ketchikan?
13   A. Yes, like Skagway and Juneau, yes.
14   Q. Okay. So, in Exhibit-33, did -- of the 100
15   pocket, the shipment from Hayes Specialties was 2,280
16   units.
17   A. Okay.
18   Q. Do you agree with me?
19   A. I see that's what that says, yes.
20   Q. And Juneau Mining Company got 2,280 of them?
21   Got the whole shipment, in essence?
22   A. 2,280 -- you're saying they got the whole
23   shipment? I think the shipment -- the shipment on that
24   item was 5,472, and they got 2,280 of them.
25   Q. So let's start with Exhibit-33. The invoice

1    number --
2    A. Okay.
3    Q. -- in the top left-hand corner. Does that
4    correspond to --
5    A. Okay.
6    Q. -- what you have in front of you as
7    Exhibit-34?
8    A. Hang on, I got to -- I got to just look here
9    at what we've got. 46903. 46903. Okay. Hayes
10   Specialties -- 46903 -- well --
11   Q. You said -- you testified before that
12   Exhibit-34 was Hayes Specialties shipping the back
13   ordered items.
14   A. Right, right.
15   Q. So, of the 100 pocket, there was 2,280 that
16   had been back ordered.
17   A. Okay. Yeah, I see it now. I understand. So
18   it looks like they got 2,280, which was the balance of
19   that -- of that order, yes. Um-hum.
20   Q. And then of the 200 pocket in Exhibit-33,
21   Alaska Juneau Mining Company received 1,008.
22   A. Okay. 1,008, I see that.
23   Q. Do you have any reason to believe that those
24   numbers aren't accurate?
25   A. No, I wouldn't have any reason to believe that

Ex. 5 - 16

**Page 117**

1 they weren't accurate, but I don't know that they're
2 true or not, because I haven't fully analyzed what --
3 you know, adding them all up and everything.
4     Q. Looking at Exhibits-32 and 33, between the
5 two, these reports indicate that Alaska Juneau Mining
6 Company received 3,960 units of the 100-pocket photo
7 album.
8     A. Okay. Okay.
9     Q. 1,680, plus 2,280.
10     A. Okay. Okay.
11     Q. Do you have any reason to believe that's not
12 the case?
13     A. I don't have any reason to believe that it is
14 or is not because I -- I just don't know. I mean, by
15 looking at these, it looks like the bookkeeper has
16 posted these to -- to those respective stores, so yes.
17     Q. And to your knowledge, the -- the bookkeeper
18 at Dockside Trading and at Juneau Mining Company uses
19 these reports to pay Hayes Specialties --
20     A. Well, she doesn't --
21     Q. -- from each store?
22     A. What she does is, she'll get the invoice
23 and -- and she'll say, "Well, hey, it says Dockside."
24 And she's responsible for Dockside. She says, "Well, I
25 don't want Dockside to pay for everything because they

**Page 118**

1 didn't get everything." So she tries to do these
2 spreadsheets where she separates out the inventory and
3 says, "Well, it says Juneau is supposed to get this and
4 Skagway." And she'll send them an invoice or something
5 for those items.
6     Q. And then Juneau Mining Company will pay
7 Dockside Trading for its inventory, or does Juneau
8 Mining Company pay Hayes Specialties?
9     A. More than likely they're supposed to maybe
10 send a check to Hayes with that invoice number on
11 there. So Hayes would receive that. Or sometimes the
12 stores send it right to Dockside, and then Dockside
13 sends them a check. So, you know, they try to do it
14 one way, but just like sometimes people don't pay
15 attention and things get done differently. Our
16 bookkeeper is kind of old.
17     Q. How might it be done -- I mean, if it's done
18 differently, how might it be done differently?
19     A. Well, it could be done two ways. One, Juneau
20 could send a check right to Hayes, which is easiest,
21 but sometimes, you know, they maybe would send a check
22 to Dockside, you know, thinking that since Dockside
23 invoiced them -- and then in that case, Dockside would
24 either forward a check to Hayes or maybe Dockside paid
25 it accidentally -- the whole invoice. And so then they

**Page 119**

1 would just take that to reimburse themselves.
2     And, again, our bookkeeper in Ketchikan, she
3 does make mistakes, so anything can happen. We just
4 try to -- you know, we try to watch, and if we see
5 something like -- sometimes they'll end up with a
6 credit. Sometimes they say, "Hey, you got a $4,000
7 credit," and we'll go, "Why is that?" We found out
8 maybe she -- they paid direct and then the bookkeeper
9 paid too.
10     So, I mean, any of those things can happen,
11 and they just do, unfortunately. We'd fire her, but
12 it's so hard to fire people these days. You almost got
13 to kind of go along with them until they die. And when
14 they get old, we just kind of think, well, they won't
15 be around forever, so . . .
16     Q. Okay. So turning our attention back to
17 Exhibit-31, which was the sales report --
18     A. Right, right.
19     Q. -- from your Retail Pro system.
20     A. Um-hum, um-hum.
21     Q. It indicates that Alaska Juneau Mining Company
22 sold --
23     A. Okay. Got it. I see it.
24     Q. -- 2,772 --
25     A. Right.

**Page 120**

1     Q. -- of the 100-pocket albums.
2     A. Right. Right. And where it says here -- if
3 you add the two numbers, it's higher on that one item,
4 right?
5     Q. That 3,960.
6     A. Yeah.
7     Q. Leaving a difference of -- remaining inventory
8 of 1,188?
9     A. Right. I -- I can't tell you specifically
10 what happened here. Sometimes a store will sell some
11 of theirs back to another store. Maybe another store
12 needed more, and they'll sell it back to one of the
13 other stores.
14     And -- and this year, on the case of these
15 photo albums -- and I don't have the exact numbers, and
16 again, I think these spreadsheets were created maybe
17 after the fact, but Hayes -- their manufacturer
18 accidentally made, excuse me, a couple thousand more
19 than what we ordered.
20     And Jim Hayes called up and says, "Hey, our
21 people screwed up. They made a couple thousand more
22 than what you ordered. I know that you don't need them
23 or you would have already ordered them, but could we
24 send them to you? And they were a mistake, and
25 maybe next year when your season starts up, maybe you

### Page 121

1  could just pay us for next year."
2      So, if that was the case, the difference might
3  not have gotten onto -- onto her system, because when
4  she puts them into her system is off of her invoice.
5  So, if she's not paying something now, she may not have
6  it into her system.
7      In other words, if they gave her -- said,
8  "Well, I screwed up. Go ahead and pay us for it next
9  year," she might not have entered it into her system
10 because she didn't really want to count it as inventory
11 that she owed -- or that she owned. I think it was on
12 one photo album or the other that they actually made
13 more than what we ordered.
14     Q. And when you say "she" in your answer there --
15 you were using "she" to refer to somebody -- to whom
16 were you referring?
17     A. The bookkeeper in Ketchikan.
18     Q. The bookkeeper in Ketchikan.
19     A. It looked like the other one -- let me add the
20 other one up. 1,008 and 19, so it's 2,900 -- 29 --
21     Q. 2,976.
22     A. So the other one looks, you know, close. And
23 the other one looks like it's about a thousand or 1,200
24 off. So I don't know without talking to Toni. Either
25 Toni had sold some back to another store.

### Page 122

1      What happened with all these other stores is
2  maybe somebody else is selling a bunch of them and
3  they'll call up and say, "Hey, has anybody got more of
4  this item," and they'll say, "Yeah, I've got more."
5      And, "Well, would you sell me some," you know,
6  and that happens. But I just can't tell you what
7  happened in this case because I don't always get
8  involved in those transactions. The stores kind of,
9  you know, work between them.
10     Q. And would that transaction necessarily show
11 up -- that hypothetical transaction to which you
12 referred, if Alaska Juneau Mining Company were to have
13 sold remaining inventory to another store, would that
14 show up in the Retail Pro system?
15     A. Well, it might not in this case. It might
16 generally -- well, I don't know. This is really just
17 showing -- the Retail Pro only shows what they sold.
18 Right here what I'm seeing, it shows -- doesn't show
19 what they bought. It doesn't show what they paid for.
20 It only shows what they sold.
21     Q. And is that based on some sort of SKU or SKU
22 tracking system that the store has?
23     A. Um-hum, that's correct.
24     Q. And so any sales that were made that didn't
25 occur through the cash register wouldn't be reflected

### Page 123

1  in Exhibit-31?
2      A. Right. If they -- if they sold it back to
3  another store -- you know, that -- that could have --
4  you know, that wouldn't go through here, because this
5  only goes through -- you know, went through the cash
6  register. Yeah. Yeah.
7      Q. Does Alaska Juneau Mining Company have an
8  inventory report that would reflect its current
9  inventory for these item numbers?
10     A. You know, we can -- with our system, we can
11 punch in and -- and draw up any combination, you know,
12 of these headings. And, sure, we could do a report and
13 find out how many that we still have in the system.
14     Now, if there was some extra ones of these,
15 they might not even be on their system if they shipped
16 more than what we asked for and they said, "You don't
17 have to pay for them this year." So she probably
18 wouldn't put it in her inventory until next year,
19 because she didn't buy it. She didn't own it, and she
20 was basically storing it for -- you know, for the
21 company.
22     So it may or may not -- that particular
23 item -- now, any other item would be in there. But I
24 know -- on that particular item, I know Jim Hayes
25 called me up and said, "You know what? Our factory

### Page 124

1  screwed up, and they made" -- and I can't tell you how
2  many it was, but he said, you know, "They made a couple
3  thousand more," or whatever, "and we're not expecting
4  you to pay for them. But," you know, "if you would
5  possibly use them next year," you know, "then we could
6  send them." And I -- you know, I'm sure -- I'm a nice
7  guy, and I said, "Yeah, go ahead, and we'll store them
8  and look at them."
9      Now, if she actually -- it says here that she
10 had 2,280 that she was getting -- no, 1,680 the first
11 time and she sold 2,700. So she actually sold 1,100
12 more than what she got on the first order. So she may
13 have taken, out of that next order, another thousand or
14 so, from that next order and probably would have paid
15 him at that point.
16     Q. Is there any report that you have seen that
17 accurately depicts Alaska Juneau Mining Company's
18 current inventory for the 100-pocket or 200-pocket
19 albums?
20     A. No, I don't -- I don't believe so. I don't
21 think so. I tried to get whatever I could get the last
22 time I was in Juneau. And I don't -- I don't know.
23 But whether it was in Juneau or if they were in Skagway
24 or they were in Ketchikan, you know, whatever was on
25 this invoice is what they shipped us.

**Ex. 5 - 18**

**Page 125**

 1  And then wherever they were sold -- again, we
 2  often transfer between stores of -- if one store is out
 3  of something and somebody has a lot, you know, we don't
 4  not, you know, move it to the other store.  So we sell
 5  it to the other store -- or transfer it over or
 6  whatever.
 7      Q.  Okay.  You can set 31 through 35 aside.  Let
 8  me provide you what's been marked as Exhibit-14.  Do
 9  you recognize Exhibit-14?
10      A.  It appears to be the Arctic Circle version of
11  their photo album.
12      Q.  Do you recall when you first saw that album,
13  when it was sold by Arctic Circle?
14      A.  I -- I don't recall the -- the year.  No, I do
15  not.
16      Q.  Do you know how long that album has been on
17  the market in Alaska?
18      A.  Not -- not exactly.  I mean, I -- I'm guessing
19  six or seven years, somewhere in there.
20      Q.  You testified earlier that the album in
21  Exhibit-3 is a strong seller for you --
22      A.  Um-hum.
23      Q.  -- at the Juneau Mining Company store.
24      A.  Yes.
25      Q.  In other stores, when you carried the Arctic

**Page 126**

 1  Circle album, was it also a strong seller for you?
 2      A.  Yeah, I'd say it probably was.  Not as strong
 3  as it is today, with the -- with the price point being
 4  less than what it was at that point -- the Arctic
 5  Circle.
 6      Q.  So Arctic Circle's, to your knowledge, reduced
 7  its price since you last carried Exhibit-14 in your
 8  stores?
 9      A.  Have they?  I have no idea.  I don't know.  I
10  haven't seen their prices in several years.
11      Q.  But it's sold now at a lower price point than
12  it was then?
13      A.  Ours is.
14      Q.  Oh, okay.
15      A.  Ours is.  We found out we could buy it -- I
16  guess it says 2.94.  In our Arctic Circle catalog, it
17  was $7.50.  So, obviously when you get at a lower price
18  point, they sell a lot more.  Price resistance.  Price
19  elasticity.
20      Q.  The JC Marketing photo album that you spoke
21  about buying in -- I forget the name.  Is it
22  Schallerer's?
23      A.  Schallerer's, yes.
24      Q.  Schallerer's Photo.  Did it have -- the JC
25  Marketing album, that is -- an embossed map of Alaska

**Page 127**

 1  on it?
 2      A.  I -- I don't -- I just don't -- can't tell you
 3  that far back.  I don't -- I don't know that it did or
 4  did not.  I just can't tell you that.
 5      Q.  Do you remember any of the features of the JC
 6  Marketing photo album?
 7      A.  A map and this kind of a tan color.  And I
 8  don't recall like what eagle or ship or bird or plane
 9  was on it.  I just -- I just don't recall.
10  There's . . .
11      Q.  Okay.  So, beyond having a map of Alaska and a
12  tan color --
13      A.  Right.
14      Q.  -- you can't remember the features of the JC
15  Marketing photo --
16      A.  I don't -- I can't recall enough to have you
17  ask me specific questions about it, because
18  absolutely -- if you took these two away from me right
19  now and asked me to tell you the difference, I can't
20  tell you.  I'd have to get them out to look at them
21  side by side.
22      Q.  In your answer, the word "these" being -- you
23  were pointing to Exhibit-14 and Exhibit-3?
24      A.  That's correct.
25      Q.  Let me give you Exhibit-3 while we're on the

**Page 128**

 1  topic.
 2      A.  Sure.
 3      Q.  What is different about them, now that they're
 4  both in front of you?
 5      A.  Well, one of them has a round binder.  The
 6  other has got a flat binder.  Both of them are the map
 7  of the state of Alaska, the map of the state of Alaska.
 8  One of them has a cruise ship; one of them doesn't.
 9  The other has a fish, a salmon; the other doesn't.  One
10  of them has a polar bear; the other doesn't.  They both
11  have a float plane.  It's a different float plane,
12  different angle.  And then they both have a different
13  eagle.  All those are generic items of the state of
14  Alaska.
15      They both -- one of them has a compass deal at
16  the top left-hand corner, and the other one has kind of
17  a compass deal with the Big Dipper, the state of Alaska
18  emblem, in the middle of it on the -- on the right-hand
19  side.  The binder -- the back binder, one of them says
20  "Alaska," and the other one doesn't.  Oh, there is a
21  whale's tail on one -- on the Arctic Circle one, and
22  there's not one on the other one.
23      And then this -- let's see, the names of the
24  cities -- they both say "Barrow."  Of course, these are
25  names.  They both say "Prudhoe Bay."  One says