IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Arctic Circle Enterprises, LLC,<br><br>              Plaintiff,<br><br>  vs.<br><br>Alaska-Juneau Mining Company, LLC,<br><br>              Defendant. | Case No. 3:06-cv-00170 TMB<br><br>**O R D E R**<br>**Re: Defendant's Motion for Summary**<br>**Judgment, Plaintiff's Cross-Motion for Partial**<br>**Summary Judgment, and Defendant's Motion**<br>**to Strike** |

### I. MOTIONS PRESENTED

Plaintiff Arctic Circle Enterprises, LLC ("ACE") brought this action against Defendant Alaska-Juneau Mining Company, LLC ("AJMC") alleging copyright infringement in connection with AJMC's production and distribution of souvenir photo albums. The Defendant has moved for summary judgment based on a settlement agreement and mutual release (the "Roth agreement") reached in an earlier case, *Arctic Circle Enterprises, Inc. v. Roth, et al.*, Civil Action No. A-03-0139, and the doctrine of res judicata.[1] Plaintiff has cross-moved for partial summary judgment, seeking an order barring AJMC from using the *Roth* settlement agreement as a defense in this action.[2] In addition, the Defendant has moved to strike exhibits submitted by the Plaintiff that relate to the negotiation history of the *Roth* agreement.[3] The Court held oral arguments on the motions on June 29, 2007, and all three are ripe for review.

For the reasons stated below, the Court GRANTS Plaintiff's motion for partial summary judgment precluding the Defendant from using the *Roth* agreement as a defense in this suit, and DENIES the Defendant's motion for summary judgment. The Court also DENIES the Defendant's motion to strike as moot.

---

[1]     Docket 37.
[2]     Docket 48.
[3]     Docket 62.

## II. BACKGROUND

ACE is a wholesale manufacturer and importer of goods and souvenirs sold in retail shops in Alaska. In 1998, ACE designed and produced a 100-pocket photo album featuring a brown, embossed map of Alaska with symbols of wildlife, a cruise ship, a float plane, and a compass rose. ACE then obtained a copyright for the album, and, in 1999, obtained a copyright for a 200-pocket album with the same cover design.

On June 24, 2003, ACE filed a complaint in federal district court against Sandy Roth, Tandem Imports, Inc., and Keystar International, Ltd., alleging, among other claims, that Roth imported Alaska map photo albums allegedly copied from ACE's Alaska map photo album.[4] The complaint asserted various violations of the Federal Trademark Act and Alaska statutory and common laws.[5] The suit sought injunctive relief against Roth, a former ACE employee, and "all persons acting for, with, by, through, or under [her]."[6]

According to Roth's deposition testimony in that case, she produced the photo album designs at issue in ACE's complaint at the request of David Coates, who owned several retail outlets in southeast Alaska.[7] Coates had asked Roth to produce a "beige color" photo album with a "map design." As a starting point for the design, Coates had given Roth a page from a catalog that had been produced by Indian Arts and Crafts, Inc. ("IAAC"),[8] a former competitor of ACE that had gone out of business and sold its design portfolio to a group of buyers including Coates.[9] The page included a representation of a photo album created by IAAC in 1999 that closely resembled ACE's Alaska map photo album. Coates also gave Roth a sample photo album from another company, J.C. Marketing.[10] Using these sources, Roth developed a new design "concept" in January 2003 and worked with a freelance graphic artist in Shanghai to produce two photo album designs ("Roth I") and ("Roth II") featuring maps of

---

[4] Docket 41, Ex. 3.
[5] *Id.*
[6] *Id.* at 8-9.
[7] Docket 50, Ex. 22 at 4.
[8] *Id.*
[9] Docket 47, Pl.'s Mot. for Summ. J. at 5 n.2.
[10] Docket 50, Ex. 22 at 4.

Alaska and symbols of wildlife, cruise ships and float planes.[11] Roth then manufactured and sold the albums to southeast Alaska souvenir retailers, including Coates.

On March 21, 2005, ACE and Roth mediated their dispute over dozens of souvenir products, including the Roth I and Roth II albums, and agreed in principle to a settlement, which was embodied in the agreement signed by the parties in May 2005. Under the settlement, ACE agreed to dismiss the litigation and granted mutual releases and covenants not to sue Roth or any of the "Roth Releasees" over:

> any and all charges, complaints, claims, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses of any nature whatsoever, known or unknown, that ACE now has, owns or holds, or claims to have, own or hold, or which ACE at any time heretofore had, owned, or held, or claimed to have had, owned or held, against each or any of the Roth Releasees arising out of any facts alleged in any pleading in the Litigation.[12]

The agreement states that the "Roth Releasees" include:

> each of [Roth's] past and present officers, directors, employees, agents, representatives, attorneys, insurers, related entities, licensees, assigns, successors, predecessors and all persons acting by, through, under or in concert with any of them, including Roth's customers and end users of Roth's products or services.[13]

In addition, the agreement's "Recitals" section states that its "express purpose" is to "completely and globally settle and extinguish all possible causes of action, known or unknown as of the date of this agreement, that the parties might be able to bring against one another."[14]

At some point during the fall of 2005, Coates sought a new photo album supplier for his retail souvenir businesses and approached Hayes Specialties, a Michigan-based souvenir manufacturer, about designing and manufacturing an embossed Alaska map photo album.[15] As a starting point, Coates sent Hayes a photograph of the same 1999 IAAC Alaska map photo album design he had given to Roth earlier. A graphic designer in Hayes' Shanghai office, Ellen Liu, then modified the IAAC design, which Coates approved on January 6, 2006.[16] The first albums produced with this design arrived in the United

---

[11] *Id.* at 6.
[12] Docket 59, Ex. 23 at 3-4.
[13] *Id.*
[14] *Id.* at 2.
[15] Docket 50, Ex. 7 at 14.
[16] Docket 50, Ex. 24 at 2-3, and Ex. 7 at 4, 6-7.

States in April 2006 and Coates began selling them through the AJMC store in Juneau, which had opened in 2004.

On July 17, 2006, ACE initiated the present suit in federal district court, alleging that AJMC had copied the ACE Alaska map photo album designs at issue in the earlier Roth litigation.[17] The complaint further asserts that AJMC induced others to distribute the allegedly copied photo albums to other retailers in Southeast Alaska.[18] ACE seeks damages and injunctive relief for alleged violations of 35 U.S.C. § 106 and § 501.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that material facts are not genuinely disputed.[19] To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[20]

Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue of material fact exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial.[21] The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[22]

### IV. DISCUSSION

AJMC asserts that it is entitled to summary judgment based on the express terms of the *Roth* agreement and Alaska cases precluding claims that are "substantially related" to a prior suit settled with a broadly worded "general release." AJMC also argues that ACE is estopped from bringing its current copyright claim under the doctrine of *res judicata*, because ACE's suit against Roth and AJMC share an identity of claims. ACE counters that it did not release AJMC's new photo album because the *Roth*

---

[17] Docket 1, ¶¶ 16, 22.
[18] *Id*. at ¶ 19.
[19] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[20] *Id*. at 325.
[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).
[22] *Id*. at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

agreement did not release future conduct and the photo album at issue in this case did not exist at the time of the settlement. In support of this, ACE points not only to the express terms of the agreement, but also to correspondence purportedly showing that the parties considered but rejected language that would have covered products created after the settlement. Similarly, ACE argues that *res judicata* does not bar its current claim against AJMC because that claim did not exist at the time of the prior judgment.

### A. The *Roth* Agreement

AJMC contends that under the explicit terms of the *Roth* agreement, ACE released all claims against Coates and AJMC for use of the IAAC design. AJMC argues first that Coates and AJMC are "Roth Releasees" under the *Roth* agreement. AJMC then points to the phrases "ACE does hereby . . . forever release and covenant not to sue," Roth and the Roth Releasees over claims "arising out of any facts alleged in any pleading in the Litigation." AJMC also asserts that the *Roth* agreement "looks to the future" based on a provision of Section "E" stating that: "It is the express purpose of this Agreement to completely and globally settle and extinguish all possible causes of action, known or unknown as of the date of this agreement that the parties *might be able to bring* against one another." Finally, AJMC argues that the language of the agreement, coupled with disclosures during the earlier litigation of Coates' ownership of the rights to the IAAC Alaska map photo album and his involvement with Roth in producing copies of that design, indicate the parties intended to extinguish "any and all possible future causes of action, at least insofar as those future causes of action arise out of any facts alleged in any pleading in the Roth litigation." [3]$_2$

In construing the *Roth* agreement, the Court looks to provisions from section "E" and "2(b)," both of which are quoted above. As AJMC points out, the agreement's language is expansive as to claims and causes of action that it releases. But the agreement also imposes a clear temporal limit on the claims released; it provides that only those claims that existed "as of the date of th[e] agreement" or that ACE "at any time heretofore had" are covered by the release. This language unambiguously narrows the release to claims that existed, whether known or unknown by ACE, as of May 2005. The Court rejects AJMC's argument that the phrase "that the parties might be able to bring" in section "E" makes the agreement, as a whole, forward looking. The phrase must be construed not in isolation, but

---

[23]     Docket 65, Def.'s Reply Br. at 8.

in the context of the full sentence in which is appears, which states: "It is the express purpose of this Agreement to completely and globally settle and extinguish all possible causes of action, known or unknown as of the date of this agreement, that the parties might be able to bring against one-another." To adopt AJMC's interpretation would be to strip meaning from the phrase "known or unknown as of the date of this agreement." Thus, the relevant inquiry is whether ACE's current claim against AJMC existed as a cause of action when the *Roth* litigation was settled.

### B.   The *Roth* Agreement Does Not Preclude ACE's Copyright Claim

It is undisputed that the photo album at issue in the present litigation was not produced until 2006, and thus did not exist at the time of the earlier settlement.[24] Nonetheless, AJMC insists that ACE's claim is precluded because ACE could have initiated suit against Coates in connection with the *Roth* litigation. In support of this, AJMC asserts that the following facts were "made known" to ACE during the *Roth* litigation: that Coates had ownership interests in several companies operating gift and souvenir stores; that Coates ordered products for these stores; that in 2002, Coates bought the rights to the IAAC Alaska map photo album; that Coates had given Roth permission to reproduce copies of the IAAC design; that Roth then sold the albums she created from the IAAC design to Coates for resale in his souvenir stores; that the Roth I and Roth II designs at issue in the earlier litigation were reproduced using the IAAC design; and that during the *Roth* litigation, ACE claimed that Coates was "largely responsible" for the design of the Roth I and Roth II photo albums.[25] More specifically, AJMC suggests that ACE could have brought claims against Coates as part of the *Roth* litigation with regard to the ownership of and right to use the IAAC design.

ACE counters that the *Roth* release does not bar its current claim for three reasons. First, the *Roth* release covered claim*s* rather than designs, and the only designs accused in the pleadings were the Roth I and Roth II albums. Second, even if the *Roth* release excused a claim of inducement against Coates for his role in helping Roth produce the designs at issue, the release did not extend to all future

---

[24]   *See* Def.'s Reply Br. at 7 ("It is immaterial that the AJMC photo albums were manufactured after the Roth Settlement Agreement was executed or that there are slight variations between the original IAAC Alaska Map Photo Album Design and the AJMC version of 2006.")

[25]   This claim appears in ACE's reply brief in support of its "Motion For Order To Show Cause." Docket 41, Ex. 8 at 5.

6

uses of the tools of inducement, including the IAAC album design. Third, the release was narrowly limited to claims "arising out of facts alleged in the pleadings," which does not cover the indirect relationship between the *Roth* pleadings, the IAAC design, and the design at issue in the present litigation.

The Court finds ACE's third reason to be persuasive. By its express terms, the *Roth* agreement released claims that ACE could have brought at the time of settlement or "at any time heretofore" that arose "out of any facts alleged in any pleading in the Litigation." As ACE correctly points out, Coates' ownership or use of the IAAC design was not alleged as a fact in any of the *Roth* litigation pleadings. ACE's complaint and first amended complaint against Roth list Coates as an ACE customer, but do not mention the IAAC photo album design or his use of it.[26] Roth's answer and amended answer describe the history of IAAC and Roth's employment with the company from 1985 through 1995, and assert that "Roth owns the rights to purchase the Indian Arts and Crafts products and designs (many of which were designed by her) from suppliers."[27] Roth's answer and amended answer also describe Coates as an ACE supplier and business contact, and state that Coates and his wife "have been close friends of Roth since 1986 when they purchased Schallerer's Photo in Ketchikan, Alaska."[28] Even when the evidence is viewed in the light most favorable to AJMC, the references to IAAC and Coates in the *Roth* pleadings do not give rise to an inference that ACE could have brought a claim against Coates for his ownership or use of the IAAC photo album design based on the facts alleged in the *Roth* pleadings.

Nonetheless, AJMC suggests that ACE could have brought a claim against Coates based on Roth's proposed [second] amended answer, which asserted that "[i]n 2002, Great Northern sold its entire right, title and interest in and to all of its designs . . . which included the IAAC designs, and all intellectual property therein, to a group of individuals comprised of Steve Hogberg, David Coates, and Kathy Fleenor."[29] But as ACE points out, the district court denied Roth's request to file the amended answer, and thus the document did not become a pleading in the litigation.[30] Likewise, AJMC's reliance

---

[26]  Docket 50, Ex. 14 at 4; Docket 50, Ex. 15 at 4.
[27]  Docket 50, Ex. 16 at 10; Docket 50, Ex. 17 at 10.
[28]  Docket 50; Ex. 16 at 11; Docket 50, Ex. 17 at 11.
[29]  Def.'s Reply Br. at 6; Docket 50, Ex. 18 at 13.
[30]  Rule 7 of the Federal Rules of Civil Procedure describes "pleadings" as including: a complaint and answer; a reply to a counterclaim; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint; and a third-party answer.

on depositions and affidavits filed in the *Roth* litigation cannot support its argument that the *Roth* release precludes ACE's current claim. Thus, because the AJMC Alaska map photo album was not produced until 2006, and the pleadings in the Roth litigation do not contain facts that would have supported a claim against Coates or AJMC at that time, the R*oth* agreement does not preclude ACE's current claim.

### C. Alaska Case Law

This Court's interpretation of the *Roth* agreement is supported by the reasoning of two Alaska Supreme Court cases that examined mutual releases and settlement agreements in connection with claims related to post-settlement conduct. In *Martech Construction Co. v. Ogden Environmental Services, Inc.*, the Alaska court construed a settlement and release between a contractor and subcontractor as precluding a claim related to a payment dispute that arose after the settlement was executed.[31] The payment dispute centered on Ogden's refusal to pay for switching gear ordered by Martech prior to Ogden's termination of the subcontract. Martech argued that the settlement agreement and mutual release did not extend to the payment dispute because Ogden's refusal to purchase the switching gear occurred after the settlement was executed and, therefore, was not anticipated at the time of execution. The court disagreed, holding that the plain language of the agreement contemplated post-settlement claims and, based on the facts of the case, Martech's claim was "reasonably ascertainable" at the time of settlement. The court noted the use of the disjunctive "or" in the provision of the release addressing the timing of claims; the release provided that it covered claims by each party against the other "known or unknown, which arose on or prior to November 4, 1988 *or* arose pursuant to the contract for past or future losses, expenses or claims of any nature whatsoever . . . "[32] Given this language, the court concluded that "[c]are was not taken to limit the application of this release. On the contrary, care was taken to include any and all liability which arose, or might arise, pursuant to the parties' contractual relationship."[33] The court found that Martech's claim was "reasonably ascertainable," because both parties were aware of the issue prior to the settlement and had "debated back and forth" as to who would pay for the switching gear.[34]

---

[31] 852 P.2d 1146, 1152 (Alaska 1993).
[32] *Id*. at 1148 (emphasis added).
[33] *Id.* at 1152, n.12.
[34] *Id*. at 1151.

Like the release at issue in *Martech*, the *Roth* agreement limits the release to claims that existed on or prior to the date of the release. But unlike in *Martech*, the *Roth* agreement does not include a disjunctive "or" permitting claims "pursuant to the contract for past or future losses."[35] This difference supports the Court's view that the *Roth* agreement, by its explicit terms, included an unambiguous temporal limit – the date of the settlement – as to the causes of action covered. More significantly, the facts in *Martech* differ from those at issue here. In particular, the conduct that triggered the dispute in *Martech* involved the two parties named in the earlier settlement, occurred both before and after the date of settlement, *and* had surfaced as a point of disagreement between the parties before the settlement. By contrast, the conduct at issue here occurred months after the settlement and release took effect and thus was not a point of contention before the settlement.

The Alaska Supreme Court's decision in an earlier case, *Petroleum Sales, Ltd. v. Mapco Alaska, Inc.*,[36] also lends support to the Court's decision in the case at bar. In *Mapco*, the issue before the Alaska court was whether two local fuel distributors had "asserted a claim sufficiently distinct from those which they voluntarily relinquished" in an earlier settlement and mutual release.[37] The *Mapco* release extended to "any and all claims, equitable and legal, known or unknown, which [the parties] presently have . . ."[38] The parties also covenanted "not to sue [the other] based on any such claims existing as of this date."[39] The Alaska court found that the distributors' second claim, which centered on alleged antitrust violations based on price increases, was precluded because the new conduct that triggered the second lawsuit required that Mapco be found to hold a monopolistic position – a finding already covered by the earlier settlement.[40] The court also held that the conduct at issue in the earlier settlement, unlawful monopolistic pricing, covered both the underpricing alleged in the first suit and the overpricing alleged in the second complaint.[41] However, the court acknowledged that the fuel distributors could, in the future, bring an antitrust claim if the new claim was actionable apart from the monopolistic position approved in the settlement. The court stated: "There is no dispute that a new cause of action

---

[35] *Id.* at 1148.
[36] 687 P.2d 923 (Alaska 1984).
[37] *Id*. at 927.
[38] *Id.* at 926. n.7.
[39] *Id*.
[40] *Id*. at 928.
[41] *Id*.

accrues for damages caused by post-settlement antitrust conduct each time such new or renewed conduct is engaged in." [2][4]

In contrast to *Mapco*, the claim ACE seeks to maintain here is independent of the earlier litigation. While both the *Roth* litigation and ACE's current suit involve allegations of copyright infringement, none of the *Roth* pleadings, as noted above, mention Coates' or AJMC's ownership or use of the IAAC photo album design. Thus, the settlement did not forever release Coates' use of the IAAC design, and ACE's claim against AJMC does not depend on conduct approved of under the *Roth* agreement. Because of this, ACE's current claim against AJMC does not "substantially echo" its earlier infringement claim and the *Roth* release does not preclude the present suit.

### D. Res Judicata

As a separate basis for summary judgment, AJMC argues that the doctrine of res judicata or claim preclusion bars ACE's copyright infringement claim because ACE could have previously challenged Coates' claim to ownership of the IAAC Alaska map photo album design. Res judicata applies when three elements are satisfied: the earlier suit "(1) involved the same claim or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies."[43] To determine whether the two suits involve the same claim or cause of action requires the court to look at four criteria: (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions.[44] In turn, the issue of whether the first element is satisfied – whether two suits are part of the same transaction or series --

---

[42]   *Id.* at 929.

[43]   *Mpoyo v. Litton Electro-Optical Systems*, 430 F.3d 985, 987 (9th Cir. 2005) (internal quotations omitted).

[44]   *Id.*

10

"depends on whether they are related to the same set of facts and whether they could conveniently be tried together."[45]

As ACE points out, the United States Supreme Court in *Lawlor v. National Screen Service Corp.*, held that a prior settlement does not bar a second suit where the conduct complained of in the second suit occurred after the earlier settlement.[46] The Court declared that an earlier judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."[47] While the facts at issue here are not identical to those in *Lawlor*, the same principle applies. ACE's current claim stems from Coates' use of the IAAC photo album and procurement from Hayes Specialties of the AJMC photo album in late 2005 and 2006. While the transactional nucleus of facts giving rise to the current claim overlaps somewhat with that of ACE's earlier claims against Roth, there are significant differences as well. Apart from the post-settlement timing of the conduct at issue here, the current litigation centers on Coates' contact with Hayes Specialties, Hayes' changes to the IAAC design, and AJMC's sale of the album. Reflecting these differences, the evidence in the two suits both overlaps and differs as well. The differences stem from the involvement of different parties and the creation of a new product, the AJMC photo album. Because of the differences in facts and evidence, the two suits do not involve the same claim or cause of action and res judicata does not apply.

    **E.    AJMC's Motion to Strike**

AJMC has moved to strike documents and testimony submitted by ACE in opposition to AJMC's summary judgment motion, arguing that the evidence violates the parol evidence rule and Fed. R. Civ. P. 56(e). Because the Court has decided AJMC's summary judgment motion and ACE's partial

---

[45] *Western Systems, Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir. 1992) (citing Restatement (Second) Judgments s 24(2).
[46] *Lawlor v. Nat'l. Screen Service Corp.,* 349 U.S. 322 (1955).
[47] *Id.* at 328; *see also Hiser v. Franklin*, 94 F.3d 1287, 1292 (9th Cir. 1996) (claim preclusion does not apply where the new claim is "based on a different set of operative facts and is not merely an alternative remedy or theory of recovery.").

summary judgment motion based on the plain language of the Roth agreement, the motion to strike is denied as moot.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiff's Cross-Motion for Partial Summary Judgment at Docket 48, **DENIES** the Defendant's Motion for Summary Judgment at Docket 37, and **DENIES** the Defendant's Motion to Strike at Docket 62.

Dated at Anchorage, Alaska, this 28th day of March, 2008.

/s/ Timothy Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE